# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED] and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MICHIGAN, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, and the DISTRICT OF COLUMBIA,  Plaintiff-Relator,  v.  [SEALED]  Collectively, "Defendant." | Case Number: 19-cv-04557  **QUI TAM FALSE CLAIMS ACT COMPLAINT**  **FILED UNDER SEAL DO NOT PLACE ON PACER**  **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS**  **(Jury Trial Demanded)** |

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ANDREW WHITE, MARK ROSENBERG, and ANN WEGELIN and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, ILLINOIS, INDIANA, LOUISIANA, MARYLAND, MICHIGAN, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTH OF MASSACHUSETTS, the COMMONWEALTH OF VIRGINIA, and the DISTRICT OF COLUMBIA, | Case Number: 19-cv-04557 **Jury Trial Demanded** **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE LAW COUNTERPARTS** |
|     Plaintiff-Relators, v. | |
| RITE AID CORPORATION,  RITE AID HEADQUARTERS CORPORATION, RITE AID OF ALABAMA, INC., RITE AID OF CONNECTICUT, INC., RITE AID OF DELAWARE, INC., RITE AID OF FLORIDA, INC., RITE AID OF GEORGIA, INC., RITE AID OF ILLINOIS, INC., RITE AID OF INDIANA, INC., RITE AID OF KENTUCKY, INC., RITE AID OF MAINE, INC., RITE AID OF MARYLAND, INC., RITE AID OF MASSACHUSETTS, INC., RITE AID OF MICHIGAN, INC., RITE AID OF NEW HAMPSHIRE, INC., RITE AID OF NEW JERSEY, INC., RITE AID OF NEW YORK, INC., RITE AID OF OHIO, INC., RITE AID OF PENNSYLVANIA, INC., RITE AID OF SOUTH CAROLINA, INC., RITE AID OF TENNESSEE, INC., RITE AID OF VERMONT, INC., RITE AID OF VIRGINIA, INC., RITE AID OF WASHINGTON, D.C., INC., RITE AID OF WEST VIRGINIA, INC., THRIFTY | |

PAYLESS, INC., THRIFTY
CORPORATION, ECKERD
CORPORATION, MAXI DRUG NORTH,
INC. MAXI DRUG SOUTH, L.P. MAXI
DRUG, INC., GENOVESE DRUG STORES,
INC, APEX DRUG STORES, INC., PERRY
DRUG STORES INC., and BROOKS
PHARMACY, INC.,

    Collectively, "Defendant."

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................ 2

II.    JURISDICTION AND VENUE ................................................................. 7

III.    THE PARTIES............................................................................................ 9

    A.    Plaintiffs/Relators ............................................................................ 9

    B.    Defendant Rite Aid Corporation .................................................... 10

IV.    THE OPIOID CRISIS IN THE U.S......................................................... 12

V.    THE APPLICABLE STATUTES............................................................. 17

    A.    The Controlled Substances Act...................................................... 17

        1.    Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved.............................................................. 22

        2.    The Corporate Parent of Chain Pharmacies Is Responsible for the Dispensing Practices in Its Stores ........................................... 25

        3.    The CSA Applies to All Persons Who Dispense Controlled Substances . 26

        4.    Rite Aid Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists ........................................................... 28

        5.    The Purpose and Intent of the CSA Bolsters Finding Liability of Rite Aid Corporate Parent ................................................................... 31

    B.    The False Claims Act ("FCA")...................................................... 33

    C.    Opioid Coverage and Use by Government Program Beneficiaries ..................... 36

        1.    Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications.................................................................. 36

        2.    Medicaid Beneficiary Opioid Use and Abuse ......................... 38

        3.    Medicare Beneficiary Opioid Use and Abuse ......................... 39

        4.    Opioid Coverage under TRICARE....................................... 41

        5.    Opioid Coverage under FEHB................................................ 42

        6.    Reimbursement under Other Government Programs................ 42

    D.    Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids .. 42

    E.    State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping ...................................................................... 49

i

F.      Unlawfulness of a Prescription Is Material to Government Program Opioid Payments .................................................................................................... 53

VI.     BACKGROUND ON RITE AID FRAUDULENT DISPENSING OF PRESCRIPTION OPIOID DRUGS .................................................................................................... 54

A.      Rite Aid Has Paid Repeated Fines Related to Its Dispensing of Inappropriate Opioid Prescriptions .......................................................................................... 55

B.      Rite Aid Was Well Aware of the Opioid Crisis and Failed to Take Steps to Curtail and Prevent Expansion of the Problem ................................................. 57

C.      Rite Aid Pressured Pharmacists to Fill Even Questionable Opioid Prescriptions in Order to Meet Profitability Goals ......................................... 59

D.      Immense Pressure to Fill Quickly to Drive Sales ................................................ 65

E.      Rite Aid Had No Rigorous Dispensing Protocols or Policies to Assist Its Pharmacists to Identify Inappropriate Prescriptions ........................................... 67

F.      Rite Aid Rarely Blocked What It Knew Were Suspicious Prescribers ............... 71

G.      Rite Aid Turned a Blind Eye to the Opioid Crisis ............................................... 73

H.      Rite Aid's Public Statements Concealed Its Failures to Prevent Filling Medically Unnecessary Prescriptions .................................................................................... 78

VII.    RITE AID'S UNLAWFUL CONDUCT ....................................................................... 82

A.      Specific Examples of Unlawful Dispensing Conduct: Alabama ......................... 92

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Alabama .................................................................................................... 92

2.      Millbrook, Alabama (Pharmacist No. 13) ................................................. 94

3.      Monroeville, Alabama (Pharmacist No. 14) ........................................... 100

B.      Specific Examples of Unlawful Dispensing Conduct: California ..................... 104

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in California .................................................................................................. 104

2.      Sacramento, California (Pharmacist No. 5) ............................................ 108

C.      Specific Examples of Unlawful Dispensing Conduct: Georgia ........................ 111

1.      Rite Aid failed to investigate or halt dispensing of inappropriate or
        medically unnecessary opioid prescriptions in Georgia ........................ 111

2.      Fayetteville, Georgia (Pharmacist No. 15) ............................................. 114

D.      Specific Examples of Unlawful Dispensing Conduct: Idaho ............................ 117

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or
        medically unnecessary prescriptions of controlled substances in Idaho. 117

2.      Boise, Idaho (Pharmacist No. 6) ............................................................. 118

E.      Specific Examples of Unlawful Dispensing Conduct: Massachusetts ............... 120

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or
        medically unnecessary prescriptions of controlled substances in
        Massachusetts ........................................................................................ 120

2.      Taunton, Massachusetts (Pharmacist No. 4) ........................................... 122

F.      Specific Examples of Unlawful Dispensing Conduct: North Carolina ............. 124

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or
        medically unnecessary prescriptions of controlled substances in North
        Carolina .................................................................................................. 124

2.      Fayetteville, North Carolina (Relator White) ......................................... 126

3.      Dunn, North Carolina (Relator White) ................................................... 129

G.      Specific Examples of Unlawful Dispensing Conduct: Ohio............................. 132

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or
        medically unnecessary prescriptions of controlled substances in Ohio.. 132

2.      Specific Example of Rite Aid Ignoring Its Corresponding CSA
        Obligations: Dr. Adolph Harper ............................................................. 137

3.      Ashtabula, Ohio (Pharmacist No. 7) ....................................................... 142

4.      Cleveland, Ohio (Pharmacist No. 8) ....................................................... 147

5.      Canton, Ohio (Pharmacist No. 9)............................................................ 150

H.      Specific Examples of Unlawful Dispensing Conduct: Pennsylvania ................ 157

1.      Rite Aid failed to investigate, report, or halt dispensing of inappropriate or
        medically unnecessary prescriptions of controlled substances in
        Pennsylvania ........................................................................................... 157

2.      Doylestown, Pennsylvania (Pharmacist No. 10)..................................... 162

3.      Pennsburg, Pennsylvania (Pharmacist No. 2) ......................................... 165

4.      Reading, Pennsylvania (Relator Wegelin)............................................... 167

I.      Specific Examples of Unlawful Dispensing Conduct: Tennessee ..................... 179

1. Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Tennessee ........................................................................................................... 179

2. Chattanooga, Tennessee (Pharmacist No. 3). ........................................ 183

3. Franklin, Tennessee (Pharmacist No. 11) .............................................. 187

4. White House, Tennessee (Pharmacist No. 12) ........................................ 190

J. Specific Examples of Unlawful Dispensing Conduct: West Virginia ................ 195

1. Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in West Virginia ............................................................................................. 195

2. Beckley, West Virginia (Relator Rosenberg) ........................................ 198

VIII.   INJURY TO GOVERNMENT PROGRAMS RESULTING FROM RITE AID'S ACTIONS ........................................................................................................... 203

IX.    CAUSES OF ACTION ................................................................................... 205

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))                                                                    205

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))                                                                    205

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))                                                                    206

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))                                                                    207

COUNT V (Violation of California False Claims Act)                                207

COUNT VI (Violation of Colorado Medicaid False Claims Act)                        208

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance Programs)                                                                         209

COUNT VIII (Violation of Delaware False Claims and Reporting Act)                 210

COUNT IX (Violation of District of Columbia False Claims Act)                     212

COUNT X (Violation of Florida False Claims Act)                                   213

COUNT XI (Violation of Georgia False Medicaid Claims Act)                         214

COUNT XII (Violation of Illinois False Claims Act)                               215

COUNT XIII (Violation of Indiana False Claims and Whistleblower Protection Act)  216

COUNT XIV (Violation of Louisiana Medical Assistance Programs Integrity Law)    217

COUNT XV (Violation of Maryland False Health Claims Act)    218

COUNT XVI (Violation of Massachusetts False Claims Act)    219

COUNT XVII (Violation of Michigan Medicaid False Claims Act)    221

COUNT XVIII (Violation of Nevada False Claims Act)    222

COUNT XIX (Violation of New Hampshire False Claims Act)    223

COUNT XX (Violation of New Jersey False Claims Act)    224

COUNT XXI (Violation of New York False Claims Act)    226

COUNT XXII (Violation of North Carolina False Claims Act)    227

COUNT XXIII (Violation of Oklahoma Medicaid False Claims Act)    228

COUNT XXIV (Violation of Rhode Island False Claims Act)    229

COUNT XXV (Violation of Tennessee Medicaid False Claims Act)    230

COUNT XXVI (Violation of Texas Medical Assistance Program, Damages, and
     Penalties Act)    231

COUNT XXVII (Violation of Vermont False Claims Act)    233

COUNT XXVIII (Violation of Virginia Fraud Against Taxpayers Act)    234

COUNT XXIX (Violation of Washington Medicaid False Claims Act)    235

X.     PRAYER FOR RELIEF ................................................................................ 236

## SECOND AMENDED COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729, *ET SEQ.*, AND STATE LAW COUNTERPARTS

1.       On behalf of the United States of America ("United States"), twenty-two States, the District of Columbia, and the Commonwealths of Massachusetts and Virginia (collectively, the "Whistleblower States"), Relators Andrew White, Mark Rosenberg, and Ann Wegelin hereby file this Second Amended Complaint against Defendants Rite Aid Corp., Rite Aid Headquarters Corp., Rite Aid of Alabama, Inc., Rite Aid of Connecticut, Inc., Rite Aid of Delaware, Inc., Rite Aid of Florida, Inc., Rite Aid of Georgia, Inc., Rite Aid of Illinois, Inc., Rite Aid of Indiana, Inc., Rite Aid of Kentucky, Inc., Rite Aid of Maine, Inc., Rite Aid of Maryland, Inc., Rite Aid of Massachusetts, Inc., Rite Aid of Michigan, Inc., Rite Aid of New Hampshire, Inc., Rite Aid of New Jersey, Inc., Rite Aid of New York, Inc., Rite Aid of Ohio, Inc., Rite Aid of Pennsylvania, Inc., Rite Aid of South Carolina, Inc., Rite Aid of Tennessee, Inc., Rite Aid of Vermont, Inc., Rite Aid of Virginia, Inc., Rite Aid of Washington, D.C., Inc., Rite Aid of West Virginia, Inc., Thrifty Payless, Inc., Thrifty Corporation, Eckerd Corporation, Maxi Drug North, Inc. Maxi Drug South, L.P., Maxi Drug, Inc., Genovese Drug Stores, Inc., Apex Drug Stores, Inc, Perry Drug Stores Inc., and Brooks Pharmacy, Inc. (collectively, "Rite Aid" or "Defendant"), pursuant to the *qui tam* provisions of the federal False Claims Act and State Whistleblower Statutes.[1]

---

[1] 31 U.S.C. §§ 3729 *et seq.* ("FCA") and the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; Louisiana Medical Assistance Programs Integrity Law; the Maryland False Health Claims Act, Md. Code Ann., Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Nevada False

2. Plaintiff-Relators Andrew White, Mark Rosenberg, and Ann Wegelin bring this action against Rite Aid, under the False Claims Act and the State Whistleblower Statutes for Defendant's violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA") its implementing regulations, 21 C.F.R. § 1301, *et seq.* and under state pharmacy laws and regulations. Those violations include: (a) knowingly dispensing controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally distributing and dispensing controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C. § 841(a) and state pharmacy laws and regulations. Plaintiffs/Relators also seek to recover monies that Defendant caused Government Programs to pay for controlled substances that were not prescribed for medically accepted indications and/or lacked a legitimate medical purpose in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq* and the State Whistleblower Statutes.

## I.   INTRODUCTION

3. The nation is experiencing a national public health emergency involving opioid abuse. The dispensing of controlled substances, including prescription opioid painkillers, without

---

Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; New Hampshire False Claims Act, N.H. RSA 167:61-bI(a), *et seq.*; the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; the Texas Medical Assistance Program, Damages, and Penalties Act, Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; the Vermont False Claims Act, Vt. Stat. Ann. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*; and the Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.* (the aforementioned statutes referred to collectively as the "State Whistleblower Statutes").

a legitimate medical purpose and outside the usual course of professional practice exacerbate this crisis. This crisis has impacted nearly all Americans in some way or another.

4.      In addition to the opioid epidemic's human cost, the epidemic has had a monetary one as well. Besides the financial impacts of the increased cost of health care, substance abuse treatment, and law enforcement, the cost of the epidemic has also been felt by Government Programs like Medicare, Medicaid, and others (collectively "Government Programs"). The Government Programs have paid for improperly dispensed controlled substances because Rite Aid has intentionally and knowingly disregarded its independent duties under the law to properly examine and ensure that prescriptions it filled were only dispensed pursuant to a proper prescription and for a legitimate medical purpose.

5.      In furtherance of its own bottom line, Rite Aid formally and informally incentivized and pressured its pharmacists to fill all prescriptions presented at its pharmacies— regardless of validity—resulting in prescriptions that were clearly not medically necessary being filled and billed to Government Programs, the public health and public fisc be damned.

6.      Relators had a front-row seat on how Rite Aid both fueled and profited from this epidemic by repeatedly dispensing highly addictive opioids without a legitimate medical purpose and outside the usual course of professional medical practice.

7.      Relators witnessed numerous incidents of drug-seeking behaviors at the stores where they worked, including a store robbery, a customer who passed out at the high blood pressure machine, customers who regularly used their opioids right in the store, and customers who were engaged in transactions selling their opioids right in the Rite Aid parking lots.  Despite their raising concerns about these activities with Rite Aid management, nothing was ever done.

Instead, it was made clear that raising concerns like this would result in having hours reduced to punish them for causing problems.

8.      Even while rampant drug diversion and abuse was occurring at and around the Rite Aid pharmacies themselves, Relators saw how Rite Aid has incentivized and pressured its pharmacists to fill all prescriptions presented at its pharmacies—regardless of validity—resulting in inappropriate prescriptions that were clearly not medically necessary being filled and billed, the public health and public fisc be damned. Rite Aid has repeatedly dispensed controlled substances prone to abuse without a legitimate medical purpose and outside the usual course of professional practice.

9.      At all times material hereto, Rite Aid has had full visibility into vast amounts of data about dispensing at its pharmacies and industry-wide. But instead of leveraging that information and data to limit the filling of medically unnecessary and/or inappropriate prescriptions, Rite Aid joined the race to dispense as many opioids as possible, all while intentionally failing to recognize that things like the amounts, combinations, and durations of opioid prescriptions being filled and billed in its stores far exceeded the legitimate medical need or were otherwise medically inappropriate.

10.     Rite Aid is subject to due diligence duties under the Controlled Substances Act ("CSA") and duties under state pharmacy law to take special care before dispensing these addictive and dangerous drugs. These laws and regulations require Rite Aid to review each controlled substance prescription prior to dispensing in order to make a determination that the prescription is both effective and valid; ensure that each prescription for an opioid is valid and issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice; refuse to dispense medication if there is reason to believe that the

prescription was not issued for a legitimate medical purpose; and provide effective systems, controls, and procedures to prevent theft, abuse, and/or diversion. Rite Aid violated these duties by dispensing extremely large amounts of opioids from its retail pharmacy stores throughout the United States and this District, as alleged in more detail below.

11.     Pharmacies serve as the last line of defense between dangerous opioids and the public. For this reason, under the CSA as well as state pharmacy laws and regulations, a pharmacy's duty to use due care when filling prescriptions goes beyond simply following the prescription's directions. Pharmacies that are on notice of signs of diversion or abuse and any other red flags that the prescriptions are not medically necessary and/or appropriate may not simply robotically fill those prescriptions. This is particularly true when prescriptions are unreasonable on their face because they are written in a quantity, frequency, or other manner that a reasonable pharmacy would do additional investigation and due diligence. Rite Aid did not fulfill these duties.

12.     In Relators' experience, Rite Aid chose to ignore red flags that should have caused its pharmacies to investigate or reject inappropriate prescriptions before filling them. Examples of such red flags include doctors who write unusually large amounts of opioid prescriptions when compared with similar practitioners in the area; early refills for opioid prescriptions; prescriptions with unusual quantities or dosages; patients seeking to fill a prescription written for someone else; multiple consumers appearing at or near the same time with opioid prescriptions from the same physician; patients who drive long distances to have prescriptions filled; consumers who seek large volumes of controlled substances in the highest strength for each prescription type; patients who appear to be creating cocktails combining opioid drugs with muscle relaxants or tranquilizers; and consumers who pay large amounts of cash for opioid prescriptions rather than using some form of insurance.

13. Rite Aid could have—and was required to—leverage its network of (until at least March 27, 2018) nearly 5,000 pharmacies all over the country to combat the scourge of inappropriate and medically unnecessary opioid prescriptions. Instead, it timed how quickly its pharmacists could increase prescription counts year after year with ever leaner staffing, making it impossible for them to have sufficient time to investigate, report, and halt inappropriate or medically unnecessary prescriptions of controlled substances.

14. While individual pharmacists here and there were able to identify bad prescriptions, Rite Aid as a company intentionally ignored the vast amount of data from its pharmacies to identify increasingly rampant prescribing abuse, identify medically inappropriate prescriptions, and provide its individual pharmacy locations the benefit of Rite Aid's significant pharmacy infrastructure and corporate resources.

15. Rite Aid did not because doing so would have meant it would not have been as profitable, which to Rite Aid is more important than any financial impact on Government Programs and on people's lives.

16. Rite Aid filled opioid prescriptions throughout the U.S. (and in Pennsylvania) under circumstances showing red flags for opioid diversion and abuse, in violation of its duties under the CSA and state pharmacy laws and regulations.

17. Rite Aid failed to train or instruct its employees with respect to proper policies and protocols to follow to prevent diversion and abuse of opioids. This has had the direct, readily foreseeable and intended result of employees continuing to fill prescriptions despite clear red flags.

18. Rite Aid's failure to identify, monitor, detect, investigate, report, and refuse to sell, fill, or dispense medically unnecessary and/or inappropriate prescriptions for opioid drugs also violated its duty to act reasonably in light of the serious and foreseeable harms associated with

diversion and abuse. Rite Aid's failure to take reasonable steps to prevent opioid diversion and abuse is a direct and proximate cause of, and/or substantial factor contributing to, the diversion and abuse of prescription opioids around the U.S. (and in Pennsylvania) for consumption for non-medical, non-scientific purposes.

19.     Relators saw daily how Rite Aid knew and willfully ignored the widespread diversion and abuse of opioids occurring in their pharmacies.  Rite Aid's intentional flouting of its CSA obligations occurred throughout the U.S. (and in this District).  The foreseeable result of Rite Aid's decision to continue dispensing vast quantities of opioid drugs having no medical justification has been widespread addiction, overdoses, death, harms to Government Programs, and the societal and economic harms that flow from prescription opioid abuse.

20.     Compliance with the requirements of federal and state law governing the practice of pharmacy is central to the obtainment of Government Program benefits and is a condition of these medications being covered and paid for by these Programs.

21.     Government Programs routinely deny payment for controlled substance medications, or seek to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is medically unnecessary and/or intended for purposes of addiction or recreational abuse.

22.     The conduct alleged herein is ongoing.

## II.     JURISDICTION AND VENUE

23.     According to 28 U.S.C. §§ 1331 & 1345, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United

States—in particular, the FCA.  In addition, the FCA specifically confers jurisdiction upon the United States District Court.  31 U.S.C. § 3732(b).

24.     Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the States because the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

25.     This District Court has personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a) because Defendant transacts business in this District and engaged in wrongdoing in this District.  Likewise, the FCA authorizes nationwide service of process and the Defendant has sufficient minimum contacts with the United States of America.

26.     Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b).  Defendant has transacted business within this District, and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

27.     Relators are unaware of any public disclosure of the information or allegations that are the basis of the Second Amended Complaint.  If there has been a public disclosure, Relators are the original sources of the information and allegations contained in this Second Amended Complaint.  Prior to the filing of this action, Relators voluntarily provided the United States and the States with material evidence supporting the allegations regarding the false claims that are the subject of this Second Amended Complaint.

28.     The causes of action alleged herein are timely brought because of, among other things, efforts by the Defendant to conceal from the United States and the States its wrongdoing in connection with the allegations made herein.

III.    **THE PARTIES**

A.  *Plaintiffs/Relators*

29.    Relator Andrew White is a resident of North Carolina.  He worked as a Staff Pharmacist and a Pharmacy Manager at Rite Aid stores in North Carolina from 2011 to March 2014. Starting in July 2011, he was a pharmacist at a Rite Aid in Fayetteville, North Carolina, located at 108 Rowan Street (store #11502). After about six months, he transferred to another Fayetteville store at 3716 Morganton Road (store #11507). After another eight months, he was promoted and transferred to a Rite Aid in Dunn, North Carolina at 1721 West Cumberland Street (store #11510).

30.    Relator White is a registered pharmacist in North Carolina with license number 22024. His license was issued on July 14, 2011 and expires on December 31, 2020.

31.    Relator Mark Rosenberg is a resident of West Virginia.  He worked as a pharmacy technician at the Rite Aid at 719 Johnstown Road, Beckley, West Virginia (store #2667) from 2009 until the store closed in June 2019 after being bought by Walgreens.

32.    Relator Ann Wegelin is a resident of Pennsylvania. She worked as a Staff Pharmacist and a Pharmacy Manager at Rite Aid from 2007-2017. She was the pharmacy manager at the Rite Aid store located at 2962 St. Lawrence Ave., Reading, Pennsylvania, 19606 (store #11173).

33.    Relator Wegelin is a registered pharmacist in Pennsylvania with license number RP036963L. Her license was issued on August 9, 1989 and expired on September 30, 2020, but remains active per the Pennsylvania Licensing System Verification Service.[2]

---

[2] Pennsylvania Licensing System Verification Service, Bureau of Professional and Occupational Affairs, Pennsylvania Department of State, available at https://www.pals.pa.gov/#/page/search.

**B.  Defendant Rite Aid Corporation**

34.     Defendant RITE AID CORPORATION ("Rite Aid") is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania. During all relevant times, Rite Aid has sold and continues to sell prescription opioids, including the opioid drugs at issue in this lawsuit, in 30 states around the country, through its vast network of (until at least March 27, 2018) nearly 5,000 pharmacies.

35.     Rite Aid has incorporated subsidiaries of its pharmacies throughout the U.S., including through RITE AID HEADQUARTERS CORPORATION, RITE AID OF ALABAMA, INC., RITE AID OF CONNECTICUT, INC., RITE AID OF DELAWARE, INC., RITE AID OF FLORIDA, INC., RITE AID OF GEORGIA, INC., RITE AID OF ILLINOIS, INC., RITE AID OF INDIANA, INC., RITE AID OF KENTUCKY, INC., RITE AID OF MAINE, INC., RITE AID OF MARYLAND, INC., RITE AID OF MASSACHUSETTS, INC., RITE AID OF MICHIGAN, INC., RITE AID OF NEW HAMPSHIRE, INC., RITE AID OF NEW JERSEY, INC., RITE AID OF NEW YORK, INC., RITE AID OF OHIO, INC., RITE AID OF PENNSYLVANIA, INC., RITE AID OF SOUTH CAROLINA, INC., RITE AID OF TENNESSEE, INC., RITE AID OF VERMONT, INC., RITE AID OF VIRGINIA, INC., RITE AID OF WASHINGTON, D.C., INC., RITE AID OF WEST VIRGINIA, INC., THRIFTY PAYLESS, INC., THRIFTY CORPORATION, ECKERD CORPORATION, MAXI DRUG NORTH, INC. MAXI DRUG SOUTH, L.P. MAXI DRUG, INC., GENOVESE DRUG STORES, INC, APEX DRUG STORES, INC., PERRY DRUG STORES INC., and BROOKS PHARMACY, INC., (collectively, the "Pharmacy Subsidiaries").

36.     At all times material hereto Rite Aid and the Pharmacy Subsidiaries have operated as one, integrated entity.  Rite Aid's Pharmacy Subsidiaries have no independent decision-making

capabilities and all facets of their operations are dominated, controlled and directed by Rite Aid Corporation.

37.     As a result of the control exerted by Rite Aid Corporation, all financial gains and losses by the Pharmacy Subsidiaries inure directly to the benefit or detriment of Rite Aid Corporation and its shareholders.

38.     Thus, Rite Aid Corporation and the Pharmacy Subsidiaries are a joint enterprise that acted to sell opioid drugs in this District and throughout the United States.  As such, each act of one entity is attributable to the other.  Moreover, at all times material hereto these entities have enjoyed an agency and fiduciary relationship whereby each has assented to the fraudulent acts of the other with regard to the dispensing of opioids.

39.     Rite Aid Corporation and the Pharmacy Subsidiaries shall be referred to herein collectively as "Rite Aid," "the Company," or "Defendant" in reflection that the entities acted as alter egos in the perpetrating the fraud alleged herein.

40.     Under these circumstances, the failure to impose liability on Rite Aid Corporation for the acts or omissions of the Pharmacy Subsidiaries would work a substantial injustice.

41.     As of 2019, Rite Aid is publicly traded on the New York Stock Exchange under the symbol RAD. Its major competitors are CVS and Walgreens. On September 19, 2017, the Federal Trade Commission (FTC) approved an asset purchase agreement whereby Rite Aid sold 1,932 stores to Walgreens for $4.38 billion. The sale was completed on March 27, 2018. Three distribution centers and related inventory were transferred after September 1, 2018, when the stores were rebranded to Walgreens.

42.     Until at least March 27, 2018, Rite Aid had approximately 5,000 stores in 30 states, employing more than 51,000 associates.  Rite Aid was ranked No. 94 in the 2018 Fortune

11

500 list of the largest United States corporations by total revenue. Rite Aid was the largest drugstore chain on the East Coast and the third largest in the U.S.

43.     As of fiscal year 2018, California, with 570 stores, had the largest number of Rite Aid stores, followed by Pennsylvania and New York with 529 and 321 respectively.

44.     During fiscal 2019, Medicaid and related managed care Medicaid payors sales were approximately 19.1% of Rite Aid's pharmacy sales. During fiscal 2019, approximately 35.8% of its pharmacy sales were to customers covered by Medicare Part D.

45.     At all times material hereto, Rite Aid has submitted knowingly false and or fraudulent opioid drug claims to Government Programs.  This conduct is ongoing.

## IV.     THE OPIOID CRISIS IN THE U.S.

46.     Opioids are a class of drugs that range from pain relievers available legally by prescription—such as oxycodone, hydrocodone, codeine, morphine, and fentanyl—to illegal narcotics such as heroin. According to the Medicaid and CHIP Payment and Access Commission, "the origins of widespread prescription opioid use can be traced back to the 1990s."[3] That is when the medical profession began using pain as a so-called "fifth vital sign," and drug manufacturers heightened their marketing campaigns.

47.     All opioid drugs are chemically related and interact with opioid receptors on nerve cells in the body and brain. Opioid pain relievers are generally safe when taken for a short time and as prescribed by a doctor, but because they produce euphoria in addition to pain relief, they can be misused (taken in a different way or in a larger quantity than prescribed, or taken without a

---

[3] Medicaid & CHIP Payment Access Comm'n, *Report to Congress On Medicaid And CHIP: Chapter 2: Medicaid And The Opioid Epidemic* 79 (2017), https://www.macpac.gov/wp-content/uploads/2017/06/Medicaid-and-the-Opioid-Epidemic.pdf.

doctor's prescription). Regular use—even as prescribed by a doctor—can lead to dependence and, when misused, opioid pain relievers can lead to addiction, overdose incidents, and death.[4]

48.    Deaths from prescription opioid overdoses quadrupled from 1999 to 2011,[5] as did opioid prescriptions, even though pain levels reported by Americans have not changed.[6] By 2013, drug overdoses were the nation's leading cause of deaths from injury, prompting one author to write: "The opioid epidemic . . . that has been ravaging and shortening lives from coast to coast is a new plague for our new century."[7]

49.    Some 70,237 drug overdose deaths occurred in the United States in 2017. The age-adjusted rate of overdose deaths increased significantly by 9.6% from 2016 (19.8 per 100,000) to 2017 (21.7 per 100,000). Opioids—mainly synthetic opioids (other than methadone)—are currently the main driver of drug overdose deaths. Opioids were involved in 47,600 overdose deaths in 2017 (67.8% of all drug overdose deaths).[8]

---

[4]    NIH National Institute on Drug Abuse: Advancing Addiction Science, https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue.

[5] Vikki Wachino, *CMCS Informational Bulletin: Best Practices for Addressing Prescription Opioid Overdoses, Misuse and Addiction* 1 (Jan. 28, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-02-02-16.pdf.

[6] Ctrs. For Medicare & Medicaid Servs., Centers For Medicare & Medicaid Services (CMS), *Opioid Misuse Strategy 2016* 2 (Jan. 5, 2017), https://www.cms.gov/Outreach-and-Education/Outreach/Partnerships/Downloads/CMS-Opioid-Misuse-Strategy-2016.pdf.

[7] Nicholas N. Eberstadt, *Our Miserable 21st Century*, COMMENTARY MAG. (Feb. 2017), https://www.commentarymagazine.com/articles/our-miserable-21st-century/.

[8]    U.S. Centers for Disease Control and Prevention, *Drug Overdose Deaths*, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

50.     In 2017, the states with the highest rates of death due to drug overdose were West Virginia (57.8 per 100,000), Ohio (46.3 per 100,000), Pennsylvania (44.3 per 100,000), the District of Columbia (44.0 per 100,000), and Kentucky (37.2 per 100,000).[9]

51.     States with statistically significant increases in drug overdose death rates from 2016 to 2017 included Alabama, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maine, Maryland, Michigan, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, West Virginia, and Wisconsin.[10]

52.     Every day, more than 130 people in the United States die after overdosing on opioids.[11] The misuse of and addiction to opioids—including prescription pain relievers, heroin, and synthetic opioids such as fentanyl—is a serious national crisis that affects public health as well as social and economic welfare. The Centers for Disease Control and Prevention ("CDC") estimates that the total "economic burden" of prescription opioid misuse alone in the United States is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement.[12]

53.     Between July 2016 and September 2017, the number of emergency room visits for opioid-related overdoses jumped nearly 30%.

---

[9] Scholl L, Seth P, Kariisa M, Wilson N, Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017*. Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[10] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics Multiple Cause of Death 1999–2017, *Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER), (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

[11] U.S. Ctrs. for Disease Control & Prevention, National Center for Health Statistics, *National Vital Statistics System, Mortality*, CDC WONDER (2018), https://wonder.cdc.gov.

[12] Florence C.S., Zhou C., Luo F., Xu L. *The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States*, 54 Med Care. 901-906 (2016), doi:10.1097/MLR.0000000000000625.

54.     Recently, the congressionally-chartered National Safety Council revealed that, for the first time in U.S. history, a person is more likely to die from an accidental opioid overdose than from a motor vehicle crash. The analysis showed that the odds of dying from opioid overdose are also higher than from falls, drowning, gun assault, or choking.[13]

55.     According to the CDC, retail opioid prescriptions were dispensed in 2017 at a national rate of 58.7 prescriptions per 100 persons.[14]

56.     From 1999-2017, almost 400,000 people died from an overdose involving any opioid, including prescription and illicit opioids.[15]  This rise in opioid overdose deaths can be outlined in three distinct waves:

- The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1999.

- The second wave began in 2010, with rapid increases in overdose deaths involving heroin.

- The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids – particularly those involving fentanyl.[16]

---

[13] Nat'l Safety Council, *Injury Facts*, https://injuryfacts.nsc.org/all-injuries/preventable-death-overview/odds-of-dying/; *see also* Press Release, Nat'l Safety Council, *For the First Time, We're More Likely to Die from Accidental Opioid Overdose than Motor Vehicle Crash* (Jan. 14, 2019), https://www.nsc.org/in-the-newsroom/for-the-first-time-were-more-likely-to-die-from-accidental-opioid-overdose-than-motor-vehicle-crash.

[14] U.S. Ctrs. for Disease Control & Prevention, *U.S. Opioid Prescribing Rate Maps,* https://www.cdc.gov/drugoverdose/maps/rxrate-maps.html.

[15] Scholl L., Seth P., Kariisa M., Wilson N., Baldwin G., *Drug and Opioid-Involved Overdose Deaths – United States, 2013-2017.* Morb Mortal Wkly Rep. (Jan. 4, 2019), https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm.

[16] *Id. See also* Rudd R.A., Aleshire N., Zibbell J.E., Gladden R.M. *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014.* 64 Morb. Mortal Wkly. Rep. 1378-82 (2016).

57.     The harm is real. The misuse and abuse of prescription drugs, along with the associated morbidity and mortality, has been identified as one of the most serious and costly issues facing Americans today.

58.     NAS or neonatal opioid withdrawal syndrome ("NOWS") may occur when a pregnant woman uses drugs such as opioids during pregnancy. A recent national study showed a fivefold increase in the incidence of NAS/NOWS between 2004 and 2014, from 1.5 cases per 1,000 hospital births to 8.0 cases per 1,000 hospital births. That is one baby born with NAS/NOWS every 15 minutes in the United States. During the same period, hospital costs for NAS/NOWS births increased from $91 million to $563 million, after adjusting for inflation.[17]

59.     In March 2016, the CDC, in order to reduce opioid addictions, overdoses, and deaths, published specific recommendations for clinicians who prescribe opioids outside of cancer treatment, palliative care, and end-of-life care.[18] The CDC recommendations are based on "[s]cientific research [that] has identified high-risk prescribing practices that have contributed to the overdose epidemic (*e.g.*, high-dose prescribing, overlapping opioid and benzodiazepine prescriptions, and extended-release/long-acting opioids for acute pain)."[19]

---

[17] NIH National Institute on Drug Abuse: Advancing Addiction Science, https://www.drugabuse.gov/drugs-abuse/opioids#summary-of-the-issue; NIH National Institute on Drug Abuse: Advancing Addiction Science, Tennessee Opioid Summary, Opioid-Involved Overdose Deaths, https://www.drugabuse.gov/opioid-summaries-by-state/tennessee-opioid-summary.

[18] *See generally* Deborah Dowell, M.D. et al., *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 MORBIDITY & MORTALITY WKLY. REP. 1 (2016) [hereinafter, *CDC Guideline*].

[19] *Id*. at 3.

60.     Congress has found that pharmacies are partly responsible for the crisis: "The opioid epidemic … has arisen, in part, from the diversion of prescription opioids through illegal dispensing practices at pharmacies."[20]

61.     The grave statistics about the human toll attributable to the opioid crisis are shocking enough. But the crisis goes beyond the human toll. Not only have millions of lives been lost or squandered to opioid addiction, millions of dollars have been spent by Government Programs on fraudulent or otherwise medically unnecessary opioid prescriptions.

62.     Rite Aid put its own profits over patient health care and indiscriminately dispensed opioid prescriptions that were medically unnecessary and/or inappropriate.

63.     Rite Aid has knowingly violated its duties under the CSA and state pharmacy laws and regulations, ignoring obviously medically unnecessary prescriptions, filling them, and fraudulently charging Government Programs.

## V.     THE APPLICABLE STATUTES

### A.     The Controlled Substances Act

64.     The Controlled Substances Act ("CSA") and its implementing regulations govern the manufacture, distribution, and dispensation of controlled substances in the United States. From the outset, Congress recognized the importance of preventing the diversion and abuse of drugs from legitimate to illegitimate uses. The CSA accordingly establishes a closed regulatory system under which it is unlawful to manufacture, distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA.[21]

---

[20] U.S. S. Homeland Sec. & Governmental Aff. Comm., Ranking Member's Off., Fueling an Epidemic: A Flood of 1.6 Billion Doses of Opioids into Missouri and the Need for Stronger DEA Enforcement 4 (July 12, 2017).

[21] *See* 21 U.S.C. § 841(a).

65.     The CSA categorizes controlled substances in five "Schedules."

66.     Schedule II contains drugs with "a high potential for abuse" that "may lead to severe psychological or physical dependence," but nonetheless have "a currently accepted medical use in treatment."[22]

67.     Schedule III contains drugs in which, although the abuse potential is less than a Schedule II drug, such abuse may lead to moderate "physical dependence or high psychological dependence." Schedule III drugs also have "a currently accepted medical use."[23] Schedule IV contains drugs that, although having a lower abuse potential than Schedule III drugs, still may lead to a physical or psychological dependence when abused.[24]

68.     Schedule V contains drugs that, although having a lower abuse potential than Schedule IV drugs, still may lead to a physical or psychological dependence when abused.[25]

69.     The CSA makes it "unlawful for any person knowingly or intentionally to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance" except as specifically authorized.[26]

70.     Accordingly, the CSA requires those who manufacture, distribute, or dispense controlled substances to obtain a registration from the DEA.[27] A registrant is only permitted to

---

[22] 21 U.S.C. § 812(b)(2).

[23] 21 U.S.C. § 812(b)(3).

[24] 21 U.S.C. § 812(b)(4).

[25] 21 U.S.C. § 812(b)(5).

[26] 21 U.S.C. § 841(a)(1).

[27] 21 U.S.C. § 822(a).

dispense or distribute controlled substances "to the extent authorized by their registration and in conformity with the [CSA]."[28]

71.    A pharmacy and its pharmacists also have a corresponding responsibility to ensure the validity and medical necessity before filling a prescription.[29] An order purporting to be a prescription issued not in the usual course of professional treatment or in legitimate and authorized research is an invalid prescription within the meaning and intent of the CSA.[30] The pharmacy knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances.[31]

72.    A pharmacist is required to exercise sound professional judgment when making a determination about the legitimacy of a controlled substance prescription. Such a determination is made before the prescription is dispensed. The law does not require a pharmacist to dispense a prescription of doubtful, questionable, or suspicious origin. To the contrary, the pharmacist who deliberately ignores a questionable prescription when there is reason to believe it was not issued for a legitimate medical purpose may be prosecuted along with the issuing practitioner, for knowingly and intentionally distributing controlled substances. Such action is a felony offense, which may result in the loss of one's business or professional license.[32]

---

[28] 21 U.S.C. § 822(b).

[29] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* 29 (Rev. 2010).

[30] 21 U.S.C. § 829.

[31] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* 29 (Rev. 2010).

[32] *See, e.g., U.S. v. Kershman*, 555 F.2d 198 (8th Cir. 1977).

19

73.     At all times relevant to this Second Amended Complaint, Rite Aid had registered its retail pharmacies with the DEA in Schedule II–V controlled substances.

74.     Those DEA registrations authorize Rite Aid pharmacies to "dispense" controlled substances, which "means to deliver a controlled substance to an ultimate user … by, or pursuant to the lawful order of, a practitioner."[33]

75.     Agents and employees of a registered manufacturer, distributor, or dispenser of controlled substances, such as a pharmacist employed by a registered pharmacy like Rite Aid, are not required to register with the DEA, "if such agent or employee is acting in the usual course of his business or employment."[34]

76.     Under the CSA, the lawful dispensing of controlled substances is governed by 28 U.S.C. § 829 and more specifically in Part 1306 of the CSA's implementing regulations.[35]

77.     Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency.[36] Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner.[37]

78.     Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA.[38]

---

[33] 21 U.S.C. §§ 823(f), 802(10).

[34] 21 U.S.C. § 822(c)(1).

[35] *See generally* 21 C.F.R. § 1306.

[36] 21 U.S.C. § 829(a).

[37] 21 U.S.C. § 829(b).

[38] 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

79.     A prescription, whether written or oral, is legally valid under the CSA **only** if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[39] Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and **the person knowingly filling such a purported prescription**, as well as the person issuing it, **shall be subject to the penalties** provided for violations of the provisions of law relating to controlled substances."[40] (emphasis added)

80.     As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription."[41]  Thus, under the corresponding responsibilities of the CSA, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

81.     Moreover, "[a] prescription for a controlled substance may **only** be filled by a pharmacist, **acting in the usual course of his professional practice** and either registered individually, or employed in a registered pharmacy…."[42] (emphasis added)

82.     Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice – *i.e.,* "the usual course of his [or her] professional practice" of pharmacy.[43]

---

[39] 21 C.F.R. § 1306.04(a).

[40] *Id*. (emphasis added).

[41] *Id*.

[42] 21 C.F.R. § 1306.06 (emphasis added).

[43] *Id*.

83.     Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows (or has reason to know) that the prescription was not written for a legitimate medical purpose.[44]

84.     This requires a pharmacist to use sound professional judgment in determining the legitimacy of a controlled substance prescription, which includes paying attention to the number of prescriptions issued, the number of dosage units prescribed, the doctor writing the prescriptions, and whether the drugs prescribed have a high rate of abuse. The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate. The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.

     **1.**    ***Pharmacies Are Obligated Not to Fill Prescriptions Until Red Flags Are Resolved***

85.     A pharmacy cannot ignore red flags indicative of diversion. On the contrary, "a pharmacist is obligated to refuse to fill a prescription if he knows or has reason to know that the prescription was not written for a legitimate medical purpose."[45] "[W]hen prescriptions are clearly not issued for legitimate medical purposes, a pharmacist may not intentionally close his eyes and thereby avoid actual knowledge of the real purpose of the prescriptions."[46] Thus, § 1306.064 requires "pharmacists [to] use common sense and professional judgment," which includes paying

---

[44] *See* 21 C.F.R. §§ 1306.04, 1306.06.

[45] *Medic-Aid Pharmacy*, 55 Fed. Reg. 30,043, 30,044, 1990 WL 328750 (Dep't of Justice July 24, 1990).

[46] *East Main Street Pharmacy*, Affirmance of Suspension Order, 75 Fed. Reg. 66149-01, 2010 WL 4218766 (Dep't of Justice Oct. 27, 2010).

attention to the "number of prescriptions issued, the number of dosage units prescribed, the duration and pattern of the alleged treatment," the number of doctors writing prescriptions and whether the drugs prescribed have a high rate of abuse or diversion.[47] "When [pharmacists'] suspicions are aroused as reasonable professionals," they must at least verify the prescription's propriety, and if not satisfied by the answer they must "refuse to dispense."[48]

86.     Courts, too, have recognized the obligation *not* to dispense until red flags are resolved.[49] In *Medicine Shoppe-Jonesborough,* the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated § 829 of the CSA and 21 C.F.R. § 1306.04. The Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[50] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[51] "[B]y filling these

---

[47] *Ralph J. Bertolino Pharmacy, Inc.*, 55 Fed. Reg. 4,729, 4,730, 1990 WL 352775 (Dep't of Justice Feb. 9, 1990).

[48] *Id.*; *see also Townwood Pharmacy*; 63 Fed Reg. 8,477, 1998 WL 64863 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*, 77 Fed. Reg. 44070-01, 2012 WL 3027634 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039, 2011 WL 1343276 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364-01, 2008 WL 34619 (Dep't of Justice Jan. 2, 2008) (revocation of registration); *Notice of United Prescriptions Services, Inc.*, 72 Fed. Reg. 50397- 01, 50407-8, 2007 WL 2455578 (Aug. 31, 2007) (revocation of registration).

[49] *See Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008); *United States v. Henry*, 727 F.2d 1373, 1378-79 (5th Cir.1984); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012).

[50] *Id.* at 412 (emphasis added).

[51] *Id.*

prescriptions anyway. . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[52]

87.    The Court presiding over the federal multi-district litigation involving claims against opioid manufactures, distributors, and dispensers (hereinafter "Opioids MDL") recently addressed this very issue. The Court unequivocally stated that "[t]here is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances."[53]

88.    In fact, the Opioids MDL Court found that the corporate parents of chain pharmacies have an affirmative obligation under the CSA to "design and implement systems, policies, or procedures to identify red flag prescriptions."[54]    The Court reasoned that chain pharmacies " cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that '**[a]ll applicants and registrants shall provide effective controls and procedures to guard against theft _and_ diversion of controlled substances**.'" 21 C.F.R. § 1301.71(a) (emphasis added)."[55]

---

[52] *Id.*

[53] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 22.

[54] *Id.* at 25.

[55] *Id.*

## 2. *The Corporate Parent of Chain Pharmacies Is Responsible for the Dispensing Practices in Its Stores*

89.     The responsibility for dispensing is not limited to pharmacists, pharmacies, or holders of DEA dispensing registrations. Rather, the corporate parent of a pharmacy may be responsible for the dispensing practices of its pharmacies and pharmacists.[56] This is so regardless of whether the parent is a registrant under the CSA or whether the parent is the entity or person actually doing the dispensing.

90.     In short, case law discussed below holds that individuals or entities who have the ultimate responsibility for the dispensing of controlled substances can be liable for violations of the CSA, regardless of whether they are DEA registrants.  To the extent that a corporate parent of a chain pharmacy defendant exerts sufficient control over the pharmacy operations at its stores, which the large chains likely do, these corporate parents can be held liable for dispensing violations.  Moreover, to the extent that the chain pharmacy defendants attempt to blame the individual pharmacists themselves, cases hold that parent company liability can be imposed in addition to any individual pharmacist's liability.

91.     Courts routinely find that liability can attach to a broad array of persons or entities under Section 842.  In particular, courts reject two arguments for limiting liability under Section 842 and its regulations.  First, courts find that Section 842 can impose liability on non-registrants. Second, courts find that Section 1306.4 can be the basis for liability of pharmacy owners in addition the pharmacists themselves.  These holdings are based on the purpose and structure of the CSA:  those who have the ultimate responsibility for the controlled substances and ensuring

---

[56] *See United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D.Ala.1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass.1996); *United States v. Robinson,* No. 12-20319-CIV, 2012 WL 3984786, at *6 (S.D. Fla. Sept. 11, 2012).

compliance with the CSA should be held liable for violations, regardless of whether they are registered with the DEA.

92.     The Court in the Opioids MDL firmly rejected many of the arguments against holding corporate parents of chain pharmacies responsible for the dispensing at individual stores.[57]

### 3.     *The CSA Applies to All Persons Who Dispense Controlled Substances*

93.     Courts have found that because the plain language of Section 842 extends its requirements to "all persons," registrants and non-registrants alike are responsible for complying with the law.[58]  Importantly, in those cases, the courts found that because the pharmacy owners, who were not registrants, essentially operated the facilities on a day-to-day basis, they were not exempted from the requirements of Section 842.[59]

94.     At least one court has explicitly held that a non-registrant pharmacy owner can be held liable for dispensing controlled substances without valid prescriptions.  In *USA v. City Pharmacy*, the court found that the owner of the pharmacy could be held liable in his personal capacity for violations of Section 842(a)(1) even though he was not a registrant and the pharmacies

---

[57] *See generally In Re: National Prescription Opiate Litigation*, Opinion and Order (Case No. 17-md-2804) (Dkt. 3403)

[58] *See United States v. Blanton*, 730 F.2d 1425, 1434 (11th Cir. 1984) (Section 842(a)(5) applied to a physician who was not properly registered with the DEA); *United States v. Clinical Leasing Serv., Inc.*, 759 F. Supp. 310, 313–14 (E.D. La. 1990), *aff'd*, 925 F.2d 120 (5th Cir. 1991) ("Had Congress intended to limit the applicability of § 842(a)(5) to registrants only, it would have done so"); *United States v. Stidham*, 938 F. Supp. 808, 814 (S.D. Ala. 1996); *United States v. Poulin*, 926 F. Supp. 246, 250, 253 (D. Mass. 1996).

[59] *Stidman*, 938 F. Supp. at 809, 814 (the owner of a clinic, who was not a registrant, could be liable because he "shouldered [the] responsibility [to provide a system for the control of drug traffic and to prevent the abuse of drugs] and derived the benefits and profits from operating a methadone clinic."); *Poulin*, 926 F. Supp. at 249, 253 ("Although Mattapoisett Pharmacy, Inc. was listed as the registrant, the statute specifically makes the stated obligations to produce required records applicable to all persons, not simply to registrants.").

he owned were separately incorporated.[60] The United States brought an action alleging that City Pharmacy LLC and City Pharmacy of Charles Town, Inc. violated Section 842(a)(1) by filling illegitimate prescriptions for controlled substances that raised one or more red flags, such as customers traveling long distances or customer receiving drug cocktails.[61]

95.     The Court held that Section "842(a)(1) applies to non-registrants."[62] The Court continued, explaining that "because part C of the CSA applies broadly to all persons involved in the manufacture, distribution, and dispensing of controlled substances, including lay-persons, defendant Lewis may potentially be held liable for his conduct."[63]  To support its conclusion, the Court concentrated on Defendant Lewis' involvement with the pharmacies at issue, looking specifically at his investment of the funds to organize and open the pharmacy, the active role he played in the management of the pharmacies, including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

96.     The *City Pharmacy* Court also found that the individual defendant could not use the pharmacies' separate incorporation to shield himself from CSA liability.  Evaluating various legal mechanisms for piercing the corporate form, the court concluded that the pharmacies "were being used to evade the legal requirements within and undermine the public policy foundations of the CSA."[64] Thus, the Court held, "given the nature of these criminally-grounded allegations, it is

---

[60] *United States v. City Pharmacy, LLC*, No. 3:16-CV-24, 2016 WL 9045859, (N.D. W.Va. Dec. 19, 2016).

[61] *Id*. at *2.

[62] *Id*. at *2 (citing *United States v. Moore*, 423 U.S. 122, 134 n.11 (1975) and *United States v. Stidham*, 938 F. Supp. 808, 813-814 (S.D. Ala. 1996)).

[63] *Id*.

[64] *Id*. at *4.

not a defense to liability in this case for defendant Lewis to assert that he is shielded by the corporate form. [The pharmacies] were allegedly the entities used to evade and subvert the requirements of the CSA."[65]

97.     Just like the defendant in *City Pharmacy*, Rite Aid invests the funds to organize and open its numerous pharmacies and plays a very active role in the management of its pharmacies including overseeing the finances of the pharmacies, managing personnel, and delivering prescriptions to customers.

### 4.     *Rite Aid Cannot Escape Liability for Its Corporate Malfeasance by Blaming Its Pharmacists*

98.     In addition to finding that individuals or entities who own and control pharmacies can be liable for CSA violations, irrespective of their DEA registration status, the case law also makes it clear that pharmacies cannot escape liability under the CSA by simply blaming the pharmacists who work for them.  Even though the "corresponding responsibility" of pharmacists is discussed in terms of what a pharmacist – not a pharmacy – must do, courts have found that a narrow reading of the language to insulate pharmacies from liability is not supported by the

---

[65] *Id.*; *see also Poulin*, 926 F. Supp. at 249 *(*"Mattapoisett Pharmacy, Inc. is also the alter ego of its sole owner, David Poulin, and thus David Poulin cannot use the corporate name to shield himself from personal liability."); *S & S Pharmacy*; 46 Fed. Reg. 13051-52 (Dep't of Justice Feb. 19, 1981) ("[T]he Administrator has in the past looked behind the corporate-veil to revoke or deny a registration when a responsible official of a corporate registrant has been convicted of violating the laws relating to controlled substances."); *United States v. Robinson*, No. 12-20319-CIV, 2012 WL 3984786, (S.D. Fla. Sept. 11, 2012), (finding a non-registrant owner of a pharmacy could be held liable for violations of Section 842 because the defendant was "alleged to have had responsibility over the controlled substances" and holding that "[w]here corporate officers have been in a position to prevent or correct the violations at issue, courts have found that there is individual liability under the [Section 842], which plainly applies to all 'persons.'"); *United States v. Ahmad*, No. 4:15CV-181-JM, 2016 WL 11645908, at *3 (E.D. Ark. May 2, 2016), *aff'd sub nom. United States v. United Pain Care, Ltd.*, 747 F. App'x 439 (8th Cir. 2019) (an owner receiving the "benefits and profit" of a pharmacy, but who was not a registrant or a medical professional, can be liable for violations of the CSA because he was still "responsible for making sure that [CSA] requirements were met.").

language or structure of the regulations. In fact, one Court has called such a reading "deeply troubling."[66]

99.     In *United States v. Appalachian Reg'l Healthcare, Inc.,* 246 F. Supp. 3d 1184, 1186 (E.D. Ky. 2017), the Court looked at the regulations regarding dispensing under Section 842 and found that the pharmacy owner could be held personally liable for dispensing violations.

100.    Defendant Appalachian Regional Healthcare ("ARH") unsuccessfully argued that it could not be held liable as a corporate pharmacy under Section 842(a)(1) because its implementing regulations, namely 21 C.F.R. § 1306.04, articulated the duties under that section in terms of the "pharmacist" or "practitioner," not the corporate pharmacy entity.[67] The court rejected ARH's narrow, technical reading, instead holding that "when § 1306.04(a) states that the person knowingly filling the prescription is subject to penalties, it contemplates liability for corporate entities as well."[68]   The court continued, finding that there is "nothing inconsistent about articulating the responsibilities of individual practitioners and pharmacists while simultaneously indicating that other entities may be subject to penalties for their role in issuing and filling invalid prescriptions."[69]

---

[66] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 13.

[67] *See, e.g,* § 1306.4(a) ("The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.").

[68] *United States v. Appalachian Reg'l Healthcare, Inc.*, 246 F. Supp. 3d at 1189.

[69] *Id*. at 1189-1190; *see also Moore v. Covenant Care Ohio, Inc.*, 18 N.E.3d 1260, 1270 (Oh. App. 2014) (a corporate pharmacy whose subsidiary voluntarily undertook to provide pharmaceutical services to a nursing home owed a duty to exercise reasonable care in providing such services and also owed a common law duty to exercise reasonable care in dispensing and labeling of medicines).

101.    Likewise, other federal courts have found pharmacies and other DEA registrants liable for violations of the CSA and CSA Regulations.[70]  For example, in *Medicine Shoppe-Jonesborough v. Drug Enforcement Administration*, 300 F. App'x 409 (6th Cir. 2008), the Sixth Circuit affirmed a pharmacy's liability for filling false or fraudulent prescriptions for controlled substances, concluding that the pharmacy violated Section 829 of the CSA and Section 1306.04 of the CSA Regulations.

102.    Specifically, the Court held that "[t]he CSA forbids a pharmacy to dispense a Schedule II, III, or IV controlled substance without a prescription, 21 U.S.C. § 829(a)-(b), which 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice,' 21 C.F.R. § 1306.04(a)."[71]  "Medicine Shoppe fell asleep at the wheel in honoring prescriptions no reasonable pharmacist would fill without further inquiry."[72] Prescriptions that "involved excessive" quantities of drugs and "remedies outside the prescriber's ordinary area of practice" "should have raised red flags at Medicine Shoppe."[73] "[B]y filling these

---

[70] *See United States v. Green Drugs*, 905 F.2d 694, 694-5 (3rd Cir. 1990) (affirming retail pharmacy liability for violating Section 842(a)); *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122-3 (5th Cir. 1991) (affirming liability under Section 842(a) for corporate operator of clinic that illegally distributed controlled substances); *United States v. Cap Quality Care, Inc.*, 486 F. Supp. 2d 47, 54 (D. Maine 2007) (granting summary judgment to the United States on claims that DEA registrant clinic improperly dispensed controlled substances in violation of Sections 829 and 842); *United States v. Grab Bag Distrib.*, 189 F. Supp. 2d 1072, 1082 (E.D. Cal. 2002) (granting summary judgment to the United States on liability); *United States v. Little*, 59 F. Supp. 2d 177, 186-8 (D. Mass. 1999) (granting summary judgment to Government for pharmacy's violations of § 842(a) and concluding "a pharmacy empowered to dispense controlled substances will now be held liable . . . if it knew or should have known about an illegal diversion, or inaccurate records, and chose to do nothing"); *Poulin*, 926 F. Supp. at 252-3 (holding pharmacy liable for "filling a total of six invalid prescriptions"); *United States v. Queen Village Pharm.*, No. 89-2778, 1990 WL 165907, *2-4 (E.D. Pa. Oct. 25, 1990) (finding retail pharmacy liable for violating Section 842(a)).

[71] *Id*. at 412 (emphasis added).

[72] *Id*. at 413.

[73] *Id*.

prescriptions anyway . . . the pharmacy not only violated its duties under federal (and state) law to ensure that only proper prescriptions were filled but also put public health and safety at risk."[74] The Sixth Circuit made no distinction between the pharmacy and the pharmacists employed there when determining liability.[75]

103.    The Opioids MDL also "firmly rejected" the argument that only individual pharmacists could be held liable for illegal dispensing: "The Court concludes that the Pharmacy Defendants have not shown that the sole responsibility for their dispensing practices rests with their pharmacist-employees. Rather, the CSA makes clear that any *person*, which includes the pharmacy itself, who knowingly fills or allows to be an illegitimate prescription is in violation of the [Controlled Substances] Act."[76]

104.    These decisions make clear that the dispensing obligations under the CSA are not imposed solely on pharmacists, but on pharmacies and their corporate owners. For this reason, the chain pharmacy parent corporations like Rite Aid had a responsibility under the CSA not to dispense opioids in the face of unresolved red flags about the legitimacy of the prescriptions.

### 5.    *The Purpose and Intent of the CSA Bolsters Finding Liability of Rite Aid Corporate Parent*

105.    The logic of the above authority is consistent with the purpose and intent of the CSA. The Supreme Court has explained that with the CSA "Congress was particularly concerned

---

[74] *Id*.

[75] *See also Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration*, 881 F.3d 823, 835 (11th Cir. 2018) (affirming revocation of pharmacy registration for, among other things, pharmacists dispensing prescriptions that prescriptions presented various red flags, *i.e.*, indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

[76] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 21.

with the diversion of drugs from legitimate channels to illegitimate channels."[77] So, to address this concern, courts do not want defendants using the DEA registration process and requirements (*i.e.*, the structure of the legitimate channels) to shield those responsible from liability. As one court put it, "[t]o accept [defendant's] argument that the Act does not apply to her [because she was not a registrant], even though she was responsible for the drugs, would eviscerate the goal of ensuring the movement of drugs is closely controlled."[78] "The legislative history [of the CSA] indicates that Congress was concerned with the nature of the drug transaction, rather than with the status of the defendant."[79]

106.    The DEA made a similar finding in *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195 Decision and Order*.[80] The Administrative Law Judge rejected CVS's argument that the corporate parent of a chain pharmacy was not responsible for the actions of its pharmacies. In its analysis of whether or not CVS took responsibility for its actions, the ALJ held that:

> [T]he Agency's rule is clear and the fact that CVS is a large corporation provides no reason to excuse it from explicitly acknowledging the misconduct of Respondents and their pharmacists. Therefore, I decline to create one rule for chain pharmacies and another rule for closely held or sole proprietor owned pharmacies. Because Respondents have failed to satisfy this requirement, the ALJ properly held that they have not accepted responsibility for their misconduct.[81]

107.    At its most fundamental level, the purpose of the CSA and CSA regulations is to create a closed system for delivery of controlled substances and prevent the distribution of controlled substances outside of that system. To allow the entity that fully controls the operations

---

[77] *United States v. Moore*, 423 U.S. 122, 135 (1975).

[78] *Robinson,* 2012 WL 3984786 at *7.

[79] *United States v. Moore*, 423 U.S. at 134.

[80] 77 Fed. Reg. 62316-01, 62321-2; 2012 WL 4832770 (D.E.A. Oct. 12, 2012).

[81] *Id.*

of the registrants (such as the corporate parent of a chain pharmacy like Rite Aid) to escape responsibility because of corporate structure thus would defeat the purpose and intent of the CSA.

108.    As the Opioids MDL Court held: "[T]he Pharmacy Defendants' ultimate argument – that they cannot be liable to Plaintiffs because only their pharmacist-employees are responsible for preventing diversion of opioids via illegitimate prescriptions – is premised upon a tortured reading of the CSA and its regulations.  Because Defendants' reading of the CSA is antithetical to its very purpose, the Court rejects [Pharmacy] Defendants' positions."[82]

109.    Consequently, the dispensing of controlled substances when faced with warning signals, without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates both 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829) because doing so violated the pharmacist's corresponding responsibility to ensure the legitimacy of the prescription (21 C.F.R. § 1306.04) and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice (21 C.F.R. § 1306.06).

**B.    The False Claims Act ("FCA")**

110.    The FCA prohibits "knowingly" presenting or causing to be presented to the United States any false or fraudulent claim for payment or approval.[83]

---

[82] *In Re: National Prescription Opiate Litigation,* Opinion and Order (Case No. 17-md-2804) (Dkt. 3403) at 25.

[83] 31 U.S.C § 3729(a)(1)(A).

111.     The FCA prohibits "knowingly" making, using, or causing to be used or made, a false record or statement material to a false or fraudulent claim. [84]

112.     The FCA further imposes liability upon any person who conspires to commit a violation of the FCA.[85]

113.     The FCA defines a "claim" to include any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient.  Any claim submitted by a Government Program provider for a payment constitutes a claim under the FCA.  Any claim submitted by a provider for payment by a federal insurance plan, such as Tricare, is also a "claim" for purposes of the FCA.

114.     Under the FCA, a "claim" is defined broadly to include any request or demand for money that is presented to the United States, or is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest.[86]

115.     In the Medicare Part D context, the claim is the Prescription Drug Event (PDE) that is sent by the dispensing pharmacy to a Part D plan sponsor or Pharmacy Benefit Manager ("PBM"), and then forwarded to CMS as part of the payment process.

116.     The Part D statute provides that drugs may only be reimbursed under the program if the drug is a "covered outpatient drug." Consequently, one of the elements of the PDE is to

---

[84] 31 U.S.C § 3729(a)(1)(B).
[85] 31 U.S.C § 3729(a)(1)(C).
[86] 31 U.S.C. § 3729(b)(2).

designate whether a dispensed drug is a covered outpatient drug. Covered outpatient drugs must be dispensed pursuant to a valid prescription. Under the CSA and many parallel state laws, a prescription must satisfy a number of requirements. For example, the prescriber must be authorized to prescribe controlled substances in the jurisdiction in which he or she is licensed to practice, and must be either registered with DEA or exempt from registration.[87] Perhaps most significantly, in order to be valid, a prescription must be issued "for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."[88] This requirement "ensures that patients use controlled substances under the supervision of a doctor so as to prevent addiction and recreational abuse.[89]  It also "bars doctors from peddling to patients who crave the drugs for those prohibited uses."[90] Violation of any one of the above requirements potentially satisfies the FCA falsity requirement.

117.    The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation for violations that occurred before November 2, 2015 and, for violations that occurred after that date, a civil penalty of between $11,181 and $22,363.[91]

118.    Relevant here, Department of Justice counsel have argued that the "combining the CSA and FCA enforcement schemes can be an effective tool to address violations of the CSA that

---

[87] 21 C.F.R. § 1306.03(a).

[88] 21 C.F.R. § 1306.04(a).

[89] *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006).

[90] *Id.*

[91] 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5.

may lead to diversion of narcotics and Part D fraud,"[92] particularly in combatting the "twin evils of opioid addiction" and Government Program fraud.[93]

### C.    Opioid Coverage and Use by Government Program Beneficiaries

119.    There is an array of health care programs operated and funded by the United States and the Qui Tam States (the "Government Programs") whose purpose is to facilitate the delivery of safe and effective health care through payment or reimbursement of eligible prescription drugs for covered beneficiaries.  Several of these Government Programs are described below.

120.    One method for preventing the over-prescribing of potentially harmful opioids is to pursue those who cause the submission of false or fraudulent claims for payment for those drugs under Medicare Part D, Medicaid, and other federal programs. The treble damages and civil penalties awardable under the FCA can provide a powerful incentive for physicians and others to avoid prescribing and dispensing these substances for indications that are not supported by the approved drug compendia.[94]

### 1.    *Medicare and Medicaid Coverage Limits for Medically Unnecessary Opioid Medications*

121.    Medicare coverage for opioid medications is provided in Part D, the prescription drug benefit program available to Medicare recipients who voluntarily enroll. 42 U.S.C. §§ 1395w-102 (2010). To participate in Part D, beneficiaries must enroll in a Part D Plan of their choice. The beneficiary pays premiums to the Plan's sponsor, which is a private entity approved by the Centers

---

[92] Edward A. Baker, Stacy Gerber Ward, *Pursuing False Claims Act Liability for Controlled Substances Act Violations*, 64 United States Attorneys' Bulletin 101, 113  (Nov. 2016).

[93] *Id.* at 102.

[94] Roger Wenthe, *Fighting Opioid Abuse Under Federal Health Programs With the False Claims Act*, 64 United States Attorneys' Bulletin 93, 100 (Nov. 2016).

for Medicare and Medicaid Services (CMS). Coverage in the Plan includes deductibles, copayments, and benefit caps. The beneficiary fills the prescription at a pharmacy, which submits a claim to the Plan sponsor, and the sponsor pays the pharmacy directly or through a subcontractor. CMS reimburses the sponsor for varying portions of the prescription costs.[95]

122.    To be a "covered Part D drug," a drug must be: (1) dispensable only by prescription; (2) one of the three types of "covered outpatient drug" defined in 42 U.S.C. § 1396r-8(k)(2)(A) (2016); and (3) used for a "medically accepted indication."[96]

123.    The most important of these three requirements for present purposes is the third, that the drug be used for a medically accepted indication. The statute and the regulation define this term by incorporating the Medicaid definition in 42 U.S.C. §§ 1396r-8(k)(6) (2016).[97]

124.    The definition is: "The term 'medically accepted indication' means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act [21 U.S.C.A. § 301 *et seq.*] or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i) of this section."[98] The compendia referred to are "(I) American Hospital Formulary Service Drug Information; (II) United States Pharmacopeia-Drug Information (or its successor publications); and (III) the DRUGDEX Information System."[99]

---

[95] *See Omnicare, Inc. v. UnitedHealth Group, Inc*., 594 F.Supp.2d 945, 948-49 (N.D. Ill. 2009).

[96] 42 U.S.C. §§ 1395w-102(e)(1) (2010).

[97] *See* 42 U.S.C. §§ 1395w-102(e)(4)(A)(ii)(2010); 42 CFR § 423.100 (2016).

[98] 42 U.S.C. §§ 1396r-8(k)(6) (2016).

[99] 42 U.S.C. §§ 1396r-8(g)(1)(B)(i).

125.    The Medicare manuals provide additional guidance on Part D drug coverage. The MEDICARE PRESCRIPTION DRUG BENEFIT MANUAL, Ch. 6, § 10.6 (Rev. 18, Jan. 15, 2016), states that a medically accepted indication "refers to the diagnosis or condition for which a drug is being prescribed, not the dose being prescribed for such indication."[100]

126.    Therefore, Part D and Medicaid cover only prescription drugs used for a "medically accepted indication," which means used either for an indication approved on the Food and Drug Administration (FDA) label, or for an "off-label" indication which is "supported" by one of the approved compendia. If a drug is prescribed outside of these limitations, it is not a "covered Part D drug," and a claim for payment based on the prescription is a false claim.

## 2.    *Medicaid Beneficiary Opioid Use and Abuse*

127.    Medicaid is a public assistance program providing for payment of medical expenses for approximately 55 million low-income patients.  Funding for Medicaid is shared between the federal Government and state governments.

128.    While Medicaid undoubtedly helps many deserving recipients, it also creates a series of incentives for potential abuse of opioids, which are rooted in federal law itself. Patients on Medicaid typically "pay no part of costs for covered medical expenses," other than perhaps a small co-payment.[101] Federal law requires that Medicaid co-payments and other "cost-sharing" borne by Medicaid recipients at lower income levels be nominal. CMS has determined that states could charge those on Medicaid no more than $4 for certain classes of drugs.[102] For dangerous

---

[100] *Id*.

[101] U.S. Dep't of Health & Hum. Servs., *Frequently Asked Questions: What is the Difference Between Medicare and Medicaid?*, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html.

[102] *See* Final Rule, Medicaid and Children's Health Insurance Programs: Essential Health Benefits

opioids such as oxycodone, Medicaid co-pays can run as low as $1 for as many as 240 pills—pills that can be sold for up to $4,000 on the street.

129.     As one longtime local prosecutor in opioid-ravaged eastern Kentucky recounted in DREAMLAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC: "We can talk morality all day long, but if you're drawing five hundred dollars a month and you have a Medicaid card that allows you to get a monthly supply of pills worth several thousand dollars, you're going to sell your pills."[103]

130.     Although Medicaid is administered on a state-by-state basis, the state programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs."  Covered outpatient drugs are drugs that are used for "a medically accepted indication."

### 3.     *Medicare Beneficiary Opioid Use and Abuse*

131.     Medicare is a public health care program that provides coverage for Americans over the age of 65, as well as other persons with certain disabilities and diseases.  The program is administered by third-party contractors known as "carriers," which have some discretion to make coverage determinations, but must do so within statutory and regulatory confines.

132.     Starting in January 2006, Part D of the Medicare Program provided subsidized coverage for pharmacy-dispensed outpatient drugs for all beneficiaries, with low-income

---

in Alternative Benefit Plans, Eligibility Notices, Fair Hearing and Appeal Processes, and Premiums and Cost Sharing; Exchanges: Eligibility and Eligibility and Enrollment, 78 Fed. Reg. 42159-42322 (July 15, 2013) (codified in scattered pts. of 42 C.F.R.), https://www.gpo.gov/fdsys/pkg/FR-2013-07-15/html/2013-16271.htm.

[103] Sam Quinones, DREAM LAND: THE TRUE TALE OF AMERICA'S OPIATE EPIDEMIC 211 (2015).

individuals receiving the greatest subsidies.  However, a "covered Part D drug" must be used for a "medically accepted indication."

133.    Medicare's Prescription Drug Program, known as Part D, provides optional drug benefits to Medicare beneficiaries. CMS contracts with private insurance companies, called sponsors, to provide Part D prescription drug coverage to beneficiaries who choose to enroll. Sponsors offer drug coverage to beneficiaries through Part D prescription drug plans.  These Part D programs are subsidized by the federal Government, which covers the cost of drug payments.

134.    In 2016, one out of every three beneficiaries received at least one prescription opioid through Medicare Part D. In total, 14.4 million of the 43.6 million beneficiaries enrolled in Medicare Part D received opioids. Medicare Part D paid almost $4.1 billion for 79.4 million opioid prescriptions for these beneficiaries. The vast majority of these opioids (80 percent) were Schedule II or III controlled substances, meaning they have the highest potential for abuse among legally available drugs.[104]

135.    Several states had higher proportions of beneficiaries receiving opioids than the United States overall, which was 33 percent. Alabama and Mississippi had the highest proportions, with almost half of the State's Part D beneficiaries receiving at least one opioid—46 percent and 45 percent, respectively. Arkansas had 44 percent of beneficiaries receiving opioids, while Oklahoma, Tennessee, and Louisiana each had 42 percent.[105]

---

[104] Dept. of Health & Human Services OIG, *Opioids in Medicare Part D: Concerns about Extreme Use and Questionable Prescribing*, 2 (July 2017), HHS OIG Data Brief OEI-20-17-00250, https://oig.hhs.gov/oei/reports/oei-02-17-00250.pdf.
[105] *Id*.

136.    In addition, 1 in 10 Medicare Part D beneficiaries nationwide received opioids on a regular basis. Specifically, 5 million beneficiaries received opioids for 3 months or more in 2016. Research shows that the risk of opioid dependence increases substantially for patients receiving opioids continuously for 3 months. Of these 5 million beneficiaries, 3.6 million received opioids for 6 or more months and nearly 610,000 received opioids for the entire year.[106]

137.    A total of 501,008 beneficiaries received high amounts of opioids through Medicare Part D in 2016. This does not include beneficiaries who had cancer or were in hospice care. Each of the 501,008 beneficiaries received an average morphine equivalent dose (MED) of greater than 120 mg a day for at least 3 months. MED is a measure that equates all the various opioids and strengths into one standard value. A daily MED of 120 mg is equivalent to taking 12 tablets a day of Vicodin 10 mg or 16 tablets a day of Percocet 5 mg. These dosages far exceed the amounts that the manufacturers recommend for both of these drugs. They also exceed the 90 mg MED level that CDC recommends avoiding for patients with chronic pain.[107]

138.    As the statistics make clear, there is a real problem with inappropriate opioid prescriptions being filled by Medicare patients. Pharmacies should not be dispensing most, if not all, of the prescriptions that are clearly for excessive amounts of opioids or for patients who have been doctor shopping. However, pharmacies like Rite Aid have failed to do this and instead chose to bill Medicare for those medically unnecessary prescriptions.

### 4.    *Opioid Coverage under TRICARE*

139.    Drug coverage under the TRICARE program differs from that under Medicare and Medicaid. TRICARE's regulations provide that TRICARE "will consider coverage of off-

---

[106] *Id.*

[107] *Id.*

label uses of drugs and devices that meet the definition of Off–Label Use of a Drug or Device in 32 C.F.R. § 199.2(b). Approval for reimbursement of off-label uses requires review for medical necessity and also requires demonstrations from medical literature, national organizations, or technology assessment bodies that the off-label use of the drug or device is safe, effective, and in accordance with nationally accepted standards of practice in the medical community."[108] The definition of Off-Label Use in 32 C.F.R. § 199.2(b) (2016), referred to in the quote above, essentially includes any use not approved on a drug's label.

### 5. Opioid Coverage under FEHB

140. The drug coverage provided under the Federal Employee Health Benefit Plan (FEHB) is also different from that provided by Medicare and Medicaid. No law or regulation defines when a drug is "medically necessary" for FEHB purposes. Instead, that coverage is spelled out by the plan document applicable to each private plan that administers FEHB coverage for its members.

### 6. Reimbursement under Other Government Programs

141. In addition to Medicaid, Medicare, TRICARE and FEHB, at all times material hereto, the States have offered their employees, retirees and their beneficiaries and survivors health insurance coverage, including coverage for prescription opioid drugs.

### D. Federal Guidance and State Law Governing Pharmacy Dispensing of Opioids

142. The CDC has published guidelines regarding the proper use of opioids.[109] The guidelines explicitly state that "Opioid pain medication use presents serious risks, including

---

[108] 32 CFR § 199.4(g)(15)(i)(A), Note 3 (2016).

[109] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. & Mort. Wkly. Rep. (March 18, 2016),

overdose and opioid use disorder."[110]   Furthermore, "[s]ales of opioid pain medication have increased in parallel with opioid-related overdose deaths."[111]

143.    The CDC guidelines, and many state laws, rely on Morphine Milligram Equivalents ("MME"). As the name suggests, MME is an opioid's dosage's equivalency to morphine. Using MME is useful because it provides a constant metric to compare opioids of varying types, strengths, and delivery methods. This is particularly useful for patients who may be using a combination of different opioid products or have changed products over time.

144.    The CDC has a conversion chart of the most common opioids in mg to MMEs.[112] So, for example, 10 tablets of hydrocodone/acetaminophen 5mg/300mg would equal 50 MME (10 tablets x 5mg of hydrocodone x 1 hydrocodone oxycodone conversion factor = 50 MME). 2 tablets of oxycodone 30mg would equal 90 MME (2 tablets x 30mg of oxycodone x 1.5 oxycodone conversion factor = 90 MME).[113]

145.    The CDC has determined that in "[h]aving a history of a prescription for an opioid pain medication increases the risk for overdose and opioid use disorder, highlighting the value of guidance on safer prescribing practices for clinicians. For example, a recent study of patients aged 15–64 years receiving opioids for chronic non-cancer pain and followed for up to 13 years revealed that one in 550 patients died from opioid-related overdose at a median of 2.6 years from their first

---

https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[110] *Id.*

[111] *Id.*

[112] Opioid Oral Morphine Milligram Equivalent (MME) Conversion Factors, https://www.cms.gov/Medicare/Prescription-Drug-Coverage/PrescriptionDrugCovContra/Downloads/Opioid-Morphine-EQ-Conversion-Factors-Aug-2017.pdf.

[113] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

opioid prescription, and one in 32 patients who escalated to opioid dosages >200 morphine milligram equivalents (MME) died from opioid-related overdose."[114]

146.    In addition, the CDC found that "opioid-related overdose risk is dose-dependent, with higher opioid dosages associated with increased overdose risk. [Four studies] evaluated similar MME/day dose ranges for association with overdose risk. In these four studies, compared with opioids prescribed at <20 MME/day, the odds of overdose among patients prescribed opioids for chronic non-malignant pain were between 1.3 and 1.9 for dosages of 20 to <50 MME/day, between 1.9 and 4.6 for dosages of 50 to <100 MME/day, and between 2.0 and 8.9 for dosages of ≥100 MME/day. Compared with dosages of 1-<20 MME/day, absolute risk difference approximation for 50-<100 MME/day was 0.15% for fatal overdose and 1.40% for any overdose, and for ≥100 MME/day was 0.25% for fatal overdose and 4.04% for any overdose."[115]

147.    "A recent study of Veterans Health Administration patients with chronic pain found that patients who died of overdoses related to opioids were prescribed higher opioid dosages (mean: 98 MME/day; median: 60 MME/day) than controls (mean: 48 MME/day, median: 25 MME/day). Finally, another recent study of overdose deaths among state residents with and without opioid prescriptions revealed that prescription opioid-related overdose mortality rates rose rapidly up to prescribed doses of 200 MME/day, after which the mortality rates continued to increase but grew more gradually."[116]

---

[114] U.S. Centers for Disease Control, *CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016*, 65 Morb. & Mort. Wkly. Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[115] *Id.*

[116] *Id.*

148.    Furthermore, "epidemiologic studies suggest that concurrent use of benzodiazepines and opioids might put patients at greater risk for potentially fatal overdose. Three studies of fatal overdose deaths found evidence of concurrent benzodiazepine use in 31%–61% of decedents. In one of these studies, among decedents who received an opioid prescription, those whose deaths were related to opioids were more likely to have obtained opioids from multiple physicians and pharmacies than decedents whose deaths were not related to opioids."[117]

149.    "[M]ost fatal overdoses could be identified retrospectively on the basis of two pieces of information, multiple prescribers and high total daily opioid dosage, both important risk factors for overdose that are available to prescribers in the PDMP."[118]

150.    In those guidelines, the CDC recommends numerous strategies to reduce inappropriate opioid prescribing. Of particular relevance here, the CDC recommends that clinicians "should use caution when prescribing opioids at any dosage, should carefully reassess evidence of individual benefits and risks when considering increasing dosage to ≥50 morphine milligram equivalents (MME)/day, and should avoid increasing dosage to ≥90 MME/day or carefully justify a decision to titrate dosage to ≥90 MME/day."[119]

151.    Dosages at or above 50 MME/day increase the risks of overdose by at least 2x over the risk at <20 MME/day. In a national sample of Veterans Health Administration (VHA) patients with chronic pain receiving opioids from 2004–2009, patients who died of opioid overdose

---

[117] *Id.*

[118] *Id.*

[119] U.S. Centers for Disease Control, *Guidelines for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/guidelines_at-a-glance-a.pdf.

were prescribed an average of 98 MME/day, while other patients were prescribed an average of 48 MME/day.[120]

152.     In 2016, Massachusetts became the first state in the nation to pass a law limiting first time opioid prescriptions to seven days.[121]  Since then, over half of all states have enacted laws that restrict the prescribing or dispensing of opioids for acute pain. Fifteen states have passed laws limiting opioid prescribing for acute pain in an opioid naive patient to a seven-day supply. These states include Alaska, Hawaii, Colorado, Utah, Oklahoma, Louisiana, Missouri, Indiana, West Virginia, South Carolina, Pennsylvania, New York, Maine, Connecticut, and Massachusetts. In addition, Arizona, North Carolina, and New Jersey limit initial prescribing to five days.[122]

153.     Following surgical procedures, Arizona allows for a 14-day supply and North Carolina a seven-day supply. Nevada is the only state with an initial 14-day prescription limit.[123] The strictest limits are in Tennessee, Kentucky, and Florida where initial prescribing is limited to three to four days.[124] Minnesota also has a four-day limit, but only for acute dental or ophthalmic pain.[125]

154.     When addressing risks for drug overdose, studies support the need to monitor not only duration of initial therapy, but also total daily dosing for patients. This is particularly

---

[120] U.S. Centers for Disease Control, *Calculating Total Daily Dose of Opioids for Safer Dosage*, https://www.cdc.gov/drugoverdose/pdf/calculating_total_daily_dose-a.pdf.

[121] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

[122] *Id*.

[123] *Id.*

[124] *Id*.

[125] *Id*.

important for those patients who are receiving 50 to 99 daily MME or more per day.[126] Nevada and Arizona have limited prescribing doses of opioids to 90 MMEs per day.[127] Maine's limit is 100 MME per day and Rhode Island limits prescriptions to 50 MME per day.[128] Tennessee allows 60 MME per day if it is for 3 days or less, otherwise the prescriptions are restricted to 50 MME daily.[129]

155.    While the majority of states focuses on general opioid prescribing limits, Alaska, Connecticut, Indiana, Louisiana, Massachusetts, Nebraska, Pennsylvania and West Virginia also set requirements regarding opioid prescribing to minors, such as discussing their risk with the minor and parent or guardian.[130]

156.    Rather than setting opioid limits by statute, a few state laws direct or authorize other entities to do so (*e.g.*, New Hampshire, Ohio, Oregon, Vermont, Virginia, Washington and Wisconsin). These entities may include the Department of Health, a designated state health official, or regulatory boards, such as the Board of Medicine, Nursing and/or Dentistry. Other states, such as Rhode Island and Utah, have prescribing limits by statute, and allow other entities to adopt prescribing policies.[131]

---

[126] Liang, Y., Turner, B.J., *Assessing risk for drug overdose in a national cohort: Role for both daily and total opioid dose?*, 16 J. Pain 318-25 (2014).

[127] National Conference of State Legislators ("NCSL"), *Prescribing Policies: States Confront Opioid Overdose Epidemic* (Published October 31, 2018) http://www.ncsl.org/research/health/prescribing-policies-states-confront-opioid-overdose-epidemic.aspx.

[128] *Id.*

[129] *Id.*

[130] *Id.*

[131] *Id.*

157.     In addition, state laws may provide guidance or direction related to opioid prescribing. Maryland requires providers to prescribe the lowest effective dose of an opioid for a quantity that is not greater than that needed for the expected duration of pain.[132] Utah, in addition to its seven-day prescribing limit, authorizes commercial insurers, the state Medicaid program, workers' compensation insurers and public employee insurers to implement policies for prescribing certain controlled substances.[133] The policies must include evidence-based guidelines for prescribing opioids.

158.     Consequently, the dispensing of controlled substances, when faced with warning signals and without first ensuring that the prescription was issued for a legitimate purpose by a practitioner acting in the usual course of professional practice, violates the pharmacist's corresponding responsibility under the CSA[134] to ensure the legitimacy of the prescription[135] as well as pharmacy laws and regulations in a majority of the states.

159.     Prescribing or dispensing controlled substances in amounts or for durations that are not medically necessary is beyond the scope of professional practice. Prescribing or dispensing controlled substances for pain will be considered to be for a legitimate medical purpose in certain narrow circumstances, including after a documented medical history, pursuant to a written treatment plan with stated objectives, and considering the risk of medication misuse, diversion and abuse.

---

[132] *Id.*

[133] *Id.*

[134] 21 U.S.C. § 842(a) (prohibiting distributing or dispensing in violation of the prescription provisions of 21 U.S.C. § 829).

[135] 21 C.F.R. § 1306.04 and 21 U.S.C. § 841(a) (prohibiting dispensing except as authorized by the CSA) because the prescription was filled outside of the pharmacist's usual course of professional practice. *See also* 21 C.F.R. § 1306.06.

E.      **State Prescription Drug Monitoring Programs to Counter Doctor and Pharmacy Shopping**

160.    It is undeniable that illicit street opiates and prescription opioid medications can often be linked, with legitimate prescriptions initiating the addiction, often followed by the person seeking the chemical from illegal sources once the prescription has ended. Sometimes, however, they will resort to "doctor shopping" – i.e., visiting multiple physicians in various ambulatory settings to obtain more of the same opioid medications if the patient's own health care provider is unwilling or unable to renew or refill the prescription. State prescription drug monitoring programs ("PDMPs") make a significant contribution to fighting the opioid epidemic by preventing and inhibiting doctor shopping.

161.    PDMPs, or PMPs (prescription monitoring programs), as they are alternatively known, are utilized by 49 states, as well as Guam and the District of Columbia.[136] Although requirements vary by state, they generally collect data from dispensers and report to authorized users of a state's database the number of prescriptions that have been filled for scheduled drugs for each recipient. Access to the information contained in such databases is typically limited to prescribers and state officials. State pharmacy boards and health departments operate most PDMPs, but a minority relies on professional licensing agencies, law enforcement, state substance abuse agencies, or in the case of Connecticut, the Department of Consumer Protection.

162.    All PMDPs monitor at least Schedule II through IV Drugs, with some also monitoring Schedule V and "Drugs of Concern" as designated by an authorized state agency. Eighteen states and the District of Columbia maintain a voluntary system, with no mandatory

---

[136] Missouri is the only state not to have a statewide PDMP, though an Executive Order was issued in July 2017 directing its formulation. PDMP TTAC, *Status of Prescription Drug Monitoring Programs (PDMP)*, www.pdmpassist.org/pdf/PDMP_Program_Status_20170824.pdf.

enrollment required of either prescribers or dispensers.[137] Still, the majority of state legislatures understand that the sum total is only as good as its parts. For example, recent Georgia and Mississippi legislation tied mandatory PMDP registration to the licensed practitioner's ability to secure or renew a DEA number.[138] Maine adopted mandatory registration of both prescribers and dispensers in light of "an unprecedented 272 overdose related fatalities."[139] In an effort to combat the opioid epidemic through ensuring reliable information is accessible to prescribers, Kentucky and North Carolina have each added penalties for failure of pharmacies to comply with reporting requirements, including sanctions and a monetary penalty per offense.[140]

163.    Statutory requirements for submitting and gathering prescription data are of little value if the statutes fail to specify how the data will be used. At least fifteen states enhanced their "query" requirements or how a prescriber or dispenser must check the state's PDMP system for patient information before prescribing a controlled substance. Checking the PDMP for opioid prescriptions from other sources is a recommended step in the CDC's "Checklist for prescribing opioids for chronic pain."[141] The Arkansas legislature directed licensing boards to adopt regulations requiring prescribers to query the PDMP when prescribing an opioid from Schedules II or III for each time a medication was prescribed to a patient.[142] Texas followed suit by naming

---

[137]    PDMP  TTAC,  *PDMP  Mandatory  Query  by  Prescribers  and  Dispensers*, www.pdmpassist.org/pdf/Mandatory_Query_20170824.pdf.

[138]  H.B. 249 (Ga. 2017), www.legis.ga.gov/Legislation/20172018/170657.pdf [hereinafter H.B. 249]; H.B. 1032 (Miss. 2017), http://billstatus.ls.state.ms.us/2017/pdf/history/HB/HB1032.xml.

[139]  Weekly Notices of State Rule-Making: Public Input for Proposed and Adopted Rules, https://www.maine.gov/sos/cec/rules/notices/2017/010417.html.

[140]   H.B. 314 (Ky. 2017); H.B. 243 (N.C. 2017).

[141]  U.S. Centers for Disease Control, *Checklist for Prescribing Opioids for Chronic Pain*, https://www.cdc.gov/drugoverdose/pdf/pdo_checklist-a.pdf.

[142]    S.B.    339,    91st    Gen.    Assembly,    Reg.    Sess.    (Ark.    2017),

specific categories of drugs that require a query prior to being prescribed ("opioids, benzodiazepines, barbiturates, or carisoprodol").[143] Some states (*e.g.*, Georgia, Louisiana, Pennsylvania, and North Carolina) do not require query of all controlled substance prescriptions in certain situations. For example, the query requirement may not be applicable to providers of certain specialties if the prescription is for less than a three-day supply and contains less than 26 pills, the patient is terminally ill, or when the controlled substance is administered in a hospital. Georgia and South Carolina's legislatures added consequences for those practitioners who fail to query the PDMP, requiring them to be reported to their licensure boards for disciplinary action.[144]

164.    Dispensers in Pennsylvania are required to query the state's prescription drug monitoring system when the patient is new to the pharmacy (*i.e.*, the dispenser has no previous or updated medical record of the patient); when the patient pays cash for his/her prescription when he/she has insurance; if the patient requests refills early (an "early refill" is defined as when the patient requests a refill before the date upon which they are eligible for insurance coverage for the prescription or when more than 15 percent of an earlier-dispensed medication would remain when taken in compliance with the directions and quantity prescribed); or when the patient is obtaining opioid or benzodiazepine prescriptions from more than one prescriber.[145]

---

http://www.arkleg.state.ar.us/assembly/2017/2017R/Bills/SB339.pdf.

[143] H.B. 2561 (Tex. 2017), https://legiscan.com/TX/text/HB2561/id/1625193/Texas2017-HB2561-Enrolled.html.

[144] See H.B. 3824 (S.C. 2017), https://www.scstatehouse.gov/sess122_2017-2018/bills/3824.htm; H.B. 249 (Georgia 2017). http://www.legis.ga.gov/Legislation/20172018/170657.pdf.

[145] Commonwealth of Pennsylvania Surrounding Controlled Substances: *What laws of the Commonwealth of Pennsylvania affect opioid prescribing? ACT 122 of 2016: Safe Emergency Prescribing Act*, https://www.health.pa.gov/topics/Documents/Programs/PDMP/4-PDMP_PA_Laws_FactSheet_F.pdf.

165.    Mandatory use of PDMP programs has proven successful. In 2011 and 2012 respectively, Ohio and Kentucky mandated clinicians to review PDMP data and implemented pain clinic regulation. In these states, MME per capita decreased in 85 percent and 62 percent of counties, respectively, from 2010 to 2015.[146] New York, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, New York saw a 75 percent drop in patients' seeing multiple prescribers for the same drugs. Likewise, Tennessee, starting in 2012, required prescribers to check the state's PDMP before prescribing opioids. In 2013, Tennessee saw a 36 percent drop in patients' seeing multiple prescribers for the same drugs.

166.    Research has shed light on how a PDMP affects these Medicare patient behaviors.[147] A study compared Medicare opioid prescription data in 10 states that enacted use mandates from 2007-2013 with 17 other states implementing PDMPs without use mandates. In states with mandates, the percentage of Medicare enrollees who obtained prescriptions from five or more doctors was eight percent lower, compared with other states. The percentage of people getting opioids from five or more pharmacies was 15 percent lower.[148]

167.    States with use mandates also saw a decline in the number of Medicare enrollees filling opioid prescriptions before the previous one had run out or obtaining more than a seven-month supply of opioids in a half-year period. These states also saw a 15 percent reduction in the number of Medicare enrollees with four or more new patient visits in six months. The authors

---

[146]    U.S. Centers for Disease Control, *State Successes*, https://www.cdc.gov/drugoverdose/policy/successes.html.

[147]    Nat'l Bureau Econ. Res. Working Paper Series, *The Effect of Prescription Drug Monitoring Programs on Opioid Utilization in Medicare* 23148 (2017), https://www.nber.org/papers/w23148.pdf.

[148]    *Id.*

estimate that Medicare would save $348 million annually in unnecessary new patient visits if every state mandated use of its PDMP.[149]

    **F.**    **Unlawfulness of a Prescription Is Material to Government Program Opioid Payments**

    168.    Compliance with federal and state requirements relating to pharmacies' dispensing of controlled substances was and remains material to a Government Program's decision to pay Rite Aid's claims for reimbursement of controlled substances. Compliance with these requirements is central to Government Program benefits and is a condition of these medications being covered and reimbursed.

    169.    Government Programs routinely deny payment for controlled substance medications, or seek to recoup payments already made, when such prescriptions are not issued or dispensed for a legitimate medical purpose in the usual course of professional practice or when the controlled substance medication is intended for purposes of addiction or recreational abuse.

    170.    The United States Department of Justice ("DOJ") has litigated or settled numerous actions where it was alleged that medical providers and/or pharmacies submitted claims for controlled substance medications to Government Programs that lacked a valid prescription, were not for a legitimate medical purpose and lacked a medically accepted indication, or that did not comply with state law.[150]

---

[149] *Id.*

[150] *See, e.g.*, Press Release, U.S. Attorney, Middle District of Tennessee, *Tennessee Chiropractor Pays More Than $1.45 Million to Resolve False Claims Act Allegations* (Jan. 24, 2018), https://www.justice.gov/opa/pr/tennessee-chiropractor-pays-more-145-million-resolve-false-claims-act-allegations (detailing $1.4 million settlement resolving allegations of improper billing for painkillers, including opioids, and including a nurse practitioner's surrender of her DEA registration); *United States ex rel. Norris v. Florence*, Civ. Action No. 2:13-cv-00035 (M.D. Tenn.) (ongoing FCA litigation against a physician for causing the submission of false claims by pharmacies for controlled substances that were not for a legitimate  medical  purpose);  Press

171.    The HHS Secretary's declaration that the opioid epidemic is a national public health emergency under federal law reflects the government's stance to deny payment for improperly dispensed controlled substances.

172.    Accordingly, at all times material hereto, Rite Aid knew that Government Programs would not pay for opioid prescriptions if they had known that the controlled substance prescriptions at issue were invalid, did not comply with the CSA or with state pharmacy laws and regulations, or lacked a legitimate medical purpose or were medically unnecessary. Alternatively, Rite Aid knew (or had reason to know) that Government Programs would not pay claims submitted if these Programs knew that the controlled substance prescriptions were invalid as prescribed.

## VI.    BACKGROUND ON RITE AID FRAUDULENT DISPENSING OF PRESCRIPTION OPIOID DRUGS

173.    Rite Aid dispensed unreasonable dosage strengths, quantities and combinations of opioids throughout the U.S. (and in this District) from its retail pharmacies despite being on notice of signs of diversion and abuse and in violation of its duties under the CSA and under state pharmacy laws and regulations.

174.    At all times material hereto, Rite Aid has operated a vast network of (until at least March 27, 2018) nearly 5,000 pharmacies, which have dispensed massive quantities of opioids, fueling the opioid epidemic throughout the U.S.  In doing so, Rite Aid violated its obligations under the CSA and state pharmacy laws and regulations.

---

Release, U.S. Dept. of Justice, *Long-Term Care Pharmacy to Pay $31.5 Million to Settle Lawsuit Alleging Violations of Controlled Substances Act and False Claims Act* (May 14, 2015), https://www.justice.gov/opa/pr/long-term-care-pharmacy-pay-315-million-settle-lawsuit-alleging-violations-controlled (Pharmerica CSA and FCA settlement for improper dispensing of and billing Medicare for unlawfully dispensed prescriptions).

### A. Rite Aid Has Paid Repeated Fines Related to Its Dispensing of Inappropriate Opioid Prescriptions

175.    Rite Aid has been investigated and fined for some of its many failures to secure its supply chain and its own pharmacy stores, but continues to allow inappropriate and harmful distribution of opioids.

176.    In 2009, as a result of a multi-jurisdictional investigation by the DEA and DOJ, Rite Aid and nine of its subsidiaries in eight states were fined $5 million in civil penalties for its violations of the CSA.[151] The investigation revealed that from 2004 onwards, Rite Aid pharmacies across the country had a pattern of non-compliance with the requirements of the CSA and federal regulations that led to the diversion and abuse of prescription opioids in and around the communities of the Rite Aid pharmacies investigated.[152] The investigation revealed a pattern of violations of the CSA, including:

- At pharmacies in Kentucky and New York, Rite Aid knowingly filled prescriptions for controlled substances that were not issued for a legitimate medical purpose pursuant to a valid physician-patient relationship;

- At five pharmacies in Maryland, four pharmacies in New York and 13 pharmacies in California, Rite Aid failed to notify the DEA in a timely manner of significant thefts and losses of controlled substances, thus permitting the diversion and abuse of controlled substances to continue and undermining DEA's ability to investigate such thefts and/or losses;

---

[151] Press Release, U.S. Dep't of Justice, *Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act* (Jan. 12, 2009), https://www.justice.gov/opa/pr/rite-aid-corporation-and-subsidiaries-agree-pay-5-million-civil-penalties-resolve-violations.

[152] *Id.*

- At pharmacies in California, Pennsylvania and Maryland, Rite Aid either failed to maintain or failed to furnish to the DEA upon request records that are required to be kept under the CSA for a period of two years;

- At all 53 pharmacies in all eight states, Rite Aid failed to properly execute DEA forms used to ensure that the amount of Schedule II drugs ordered by Rite Aid were actually received.[153]

177.    Additionally, the DEA conducted accountability audits of controlled substances at 25 of the 53 stores investigated to determine whether Rite Aid could properly account for Schedule II and III controlled substances purchased and dispensed. The results of the accountability audits revealed significant shortages or surpluses of the most highly abused drugs, including oxycodone and hydrocodone products, reflecting a pattern of non-compliance with the requirements of the CSA and federal regulations that lead to the diversion and abuse of controlled substances in and around the communities of the Rite Aid pharmacies investigated.[154]

178.    In 2017, Rite Aid agreed to pay $834,200 in civil penalties to the United States to settle claims stemming from alleged violations of the Controlled Substances Act.[155] The government also alleged that the incorrect or invalid registration numbers were used at least 1,298 times as a result of Rite Aid's failure to adequately maintain its internal database.[156]

---

[153] *Id.*

[154] *Id.*

[155] Press Release, U.S. Attorney, C.D. Cal., *Rite Aid Corporation Pays $834,200 to Settle Allegations of Violating the Controlled Substances Act* (March 9, 2017), https://www.justice.gov/usao-cdca/pr/rite-aid-corporation-pays-834200-settle-allegations-violating-controlled-substances-act.

[156] *Id.*

179.     On January 24, 2018, the U.S. Attorney's Office for the Southern District of West Virginia entered into settlement with Rite Aid for improper sales of the meth precursor pseudoephedrine.[157]

180.     On December 31, 2018, the DEA and the Rhode Island Attorney General announced $300,000 settlement with Rite Aid for filling prescriptions of Schedule III controlled substances in excess of statutory maximums.[158]

181.     On June 4, 2019, Federal and state investigators executed search warrants at five Rite Aid pharmacies in northeast Ohio. The DEA indicated that the investigation was related to suspected "irregularities in dispensing practices." In its public statement about the raids, DEA pointed to the laws imposing an independent duty of a pharmacist to verify and ensure that prescriptions are issued for a legitimate medical purpose.[159]

### B.     Rite Aid Was Well Aware of the Opioid Crisis and Failed to Take Steps to Curtail and Prevent Expansion of the Problem

182.     Rite Aid has had knowledge and/or notice of the opioid problem since at least 2002. At any time since Rite Aid had knowledge and/or notice of the opioid problem it could have unilaterally taken steps to curtail and prevent expansion of the problem, but it failed to do so.

---

[157] Press Release, U.S. Attorney, S.D.W.V., *U.S. Attorney's Office enters settlement with Rite Aid based on improper sales of meth precursor pseudoephedrine* (January 24, 2018), https://www.justice.gov/usao-sdwv/pr/us-attorneys-office-enters-settlement-rite-aid-based-improper-sales-meth-precursor.

[158] Press Release, Drug Enf't Admin.*, DEA and Attorney General Kilmartin announces $300,000 settlement with Rite Aid for filling prescriptions of Schedule III controlled substances in excess of statutory maximums* (December 31, 2018), https://www.dea.gov/press-releases/2018/12/31/dea-and-attorney-general-kilmartin-announces-300000-settlement-rite-aid.

[159] Dave Nethers, Federal agents execute search warrants at several Rite Aid pharmacies, FOX 8 CLEVELAND (June 4, 2019, 4:22 PM), https://fox8.com/2019/06/04/federal-agents-execute-search-warrants-at-several-rite-aid-pharmacies.

183.    Rite Aid was well aware of the problem. For example, throughout the growing opioid epidemic, there have been widespread reports of pharmacy robberies and burglaries,[160] including numerous reports at Rite Aid stores throughout the U.S. tied to narcotics.

184.    Pain clinics and pill mills drive the narcotic burglary problem at pharmacies and the robberies mirror a national rise in the abuse of narcotic painkillers.[161]  The robberies, many of which happened at Rite Aid stores and many of which started many years ago, put Rite Aid on notice of the growing opioid epidemic all over the country. Yet, even with the knowledge of the robberies of opioids, Rite Aid did not critically examine its own role in the opioid epidemic (including its dispensing practices fueling the oversaturation of opioids into communities) and ways to combat the root causes of the epidemic and corresponding robberies.

185.    Rather than act to curb the causes of pill mills and opioid abuse that Rite Aid knew was occurring at a breathtaking pace, Rite Aid chose not to undertake and/or failed to undertake the measures it was capable of taking.

186.    Rite Aid was aware of its obligations under the CSA and state pharmacy law and regulations to serve as a safeguard against opioid abuse.

187.    Rite Aid could and should have many years ago unilaterally taken action, and/or offered a program to assist Government Programs, which had the effect of: (a) limiting to 7 days the supply of opioids dispensed for certain acute prescriptions; (b) reducing the dispensing of stronger and extended release opioids; (c) implementing a program that consists of providing

---

[160]  Pharmacy Robberies Sweeping US, KOLO8 NewsNow (June 27, 2011), https://www.kolotv.com/home/headlines/Pharmacy_Robberies_Sweeping_US_124541499.html.

[161]  *Top 10 states for pharmacy robberies*, Drug Topics (Oct. 7, 2014), https://www.drugtopics.com/drug-topics/news/top-10-states-pharmacy-robberies.

counseling to patients who are receiving an opioid prescription for the first time, such as by discussing the risks of dependence and addiction associated with opioid use and discussing and answering any questions or concerns such patients may have; (d) limiting the daily dosage of opioids dispensed based on the strength of the opioid; (e) requiring the use of immediate-release formulations of opioids before extended-release opioids are dispensed; and (f) checking prescription drug monitoring programs. Rite Aid could have and should have implemented these measures at any point in the last 15 years.

188.     One former senior Rite Aid executive stated that during his time there he did not recall any specific recognition or corporate program focused on monitoring and controlling opioid prescriptions. He contrasted this inattention to what he called "a big focus' on pseudoephedrines such as Sudafed, which can be used to make methamphetamine. "Quite honestly, [the opioid epidemic] jumped on everybody's radar too late," he said. "There were probably procedures that could have been put in place that would have created a safer environment for the patient." (Pharmacist No. 1).  Relator Wegelin stated that while there was training approximately once a year for pseudoephedrine issues, there was never something similar for opioids.

### C.  Rite Aid Pressured Pharmacists to Fill Even Questionable Opioid Prescriptions in Order to Meet Profitability Goals

189.      Rite Aid's singular, overarching goal has been its profitability. In light of its goal, Rite Aid pharmacies have been obligated to fill prescriptions quickly to ensure large volumes of prescriptions were being filled. This focus on driving prescription volume above all else has driven Rite Aid's pharmacy strategy.

190.     As it explains every year in its annual reports, Rite Aid's number one goal is to grow sales. In 2013 Rite Aid stated: "Our primary goal for fiscal 2013, consistent with fiscal 2012, is to grow same stores sales, which is critical for our future financial success." This explicit focus

on sales growth has been consistent, even while the opioid scourge was plaguing America. In 2017, Rite Aid stated that "[f]inancially, our primary goal for fiscal 2017, consistent with fiscal 2016, is to continue growing same stores sales."[162]

191.    The Affordable Care Act greatly reduced the reimbursements pharmacies would receive from Government Programs. By 2013, the reimbursements were down over 20%.[163]

192.    The lowering of pharmacy reimbursements could only be offset by filling a greater number of prescriptions. Unfortunately for the public and Government Programs, the timing was perfect for Rite Aid to capitalize on the opioid epidemic's explosion of pills in order to recoup the lost reimbursements by filling a greater volume of prescriptions much more quickly.

193.    In its financial reports to shareholders, Rite Aid has explicitly and consistently made the connection between the falling reimbursement rates and its need to fill more prescriptions, stating repeatedly that declining reimbursements need to be offset by dispensing more prescriptions overall. The 2013 Annual Report is representative: "When third party payors, including the Medicare Part D program and state sponsored Medicaid agencies . . . reduce their reimbursement rates, sales and margins in the industry could be reduced, and profitability of the industry adversely affected. These possible adverse effects can be partially or entirely offset by lowering our product cost, controlling expenses, *dispensing more higher margin generics and dispensing more prescriptions overall."* (emphasis added)[164]

---

[162] Rite Aid Corp., Annual Report (Form 10-K) 7 (Apr. 25, 2016).

[163] Adam J. Fein, *Obamacare Will Squeeze Pharmacy Profits,* Drugchannels.net (Oct. 8, 2013). https://www.drugchannels.net/2013/10/obamacare-will-squeeze-pharmacy-profits.html.

[164] Rite Aid Corp., Annual Report (Form 10-K) 4 (Apr. 23, 2013).

194.     Rite Aid, however, has not always been successful in growing prescription count every year. The following chart[165] demonstrates sales were flagging:

| Year ending March 1 | Same Store Prescription Count increase (decrease) |
|---|---|
| 2013 | 3.4% |
| 2014 | (.3)% |
| 2015 | 3.5% |
| 2016 | .5% |
| 2017 | .1% |
| 2018 | (1.8)% |
| 2019 | .6% |

195.     Prescriptions made up a significant portion of Rite Aid's overall revenue, ranging from about 65% to nearly 70% of overall revenue for the Company.[166]

196.     Of its prescription revenue, a large percentage has been paid for by Government Programs. In fact, since 2014 the percentage of Rite Aid's pharmacy revenue being driven by Medicare and Medicaid has grown and hit a high of nearly 55% in 2019.

197.     The following chart summarizes the relationship between Rite Aid's prescription revenue and its reliance on the reimbursement from Government Programs:[167]

| Year | Total Revenue* | % Revenue Attributable to pharmacy | Pharmacy Revenue from Prescription Drug Sales* | % Sales to Medicaid Payors | Medicaid Revenue* | % of Sales to Medicare Part D | Medicare Revenue* |
|---|---|---|---|---|---|---|---|
| 2013 | $25,392,263.00 | 67.6 | $17,165,169.79 | 17.4 | $2,986,739.54 | 30 | $5,149,550.94 |
| 2014 | $25,526,413.00 | 67.9 | $17,332,434.43 | 13.7 | $2,374,543.52 | 30.6 | $5,303,724.93 |
| 2015 | $26,528,377.00 | 68.8 | $18,251,523.38 | 18.6 | $3,394,783.35 | 32.1 | $5,858,739.00 |
| 2016 | $26,865,931.00 | 69.1 | $18,564,358.32 | 19.9 | $3,694,307.31 | 31.9 | $5,922,030.30 |
| 2017 | $26,816,669.00 | 68.3 | $18,315,784.93 | 19.8 | $3,626,525.42 | 33 | $6,044,209.03 |
| 2018 | $15,832,625.00 | 65.9 | $10,433,699.88 | 20.4 | $2,128,474.77 | 34.1 | $3,557,891.66 |
| 2019 | $15,757,152.00 | 66.6 | $10,494,263.23 | 19.1 | $2,004,404.28 | 35.8 | $3,756,946.24 |

*all dollar amounts in thousands

---

[165] *Id.*

[166] *See* Rite Aid Corp., Annual Report (Form 10-K) 2012-2019.

[167] *Id.*

198.     The combination of Rite Aid's dependence on its pharmacy revenue for its viability as a business and its inability to offset declining prescription drug reimbursement with higher numbers of prescriptions, created an environment in its stores where many of its pharmacists were under immense pressure to fill all prescriptions without question. The very existence of Rite Aid as a company depended on it.

199.     The key performance indicators ("KPIs") for Rite Aid stores and pharmacists were based on factors including dollars per hour and prescriptions per hour, but the most important measure was Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA). EBITDA essentially was the measure of the revenue of the store or pharmacist and comprised around 75% of the total evaluation.  Revenues from prescription opioids were included in the EBITDA calculation.

200.     The EBITDA profitability metric was heavily dependent on the number of controlled substance prescriptions that were filled at each Rite Aid pharmacy. Another 10% of the evaluation was the number of prescriptions filled versus the goal. The remaining 15% was based on subjective measures like customer satisfaction. None of these measures evaluated adherence to safe and legal dispensing practices. (Pharmacist No. 1).

201.     Only if those sales goals and metrics were met were Rite Aid pharmacists eligible for bonuses.

202.     Likewise, if the pharmacists did not meet the metrics, they would receive negative performance reviews and could be (and were) fired.

203.     Rite Aid had no incentives in its compensation structure for store pharmacists and technicians to investigate and/or report suspicious prescribers, patients, or prescriptions.

204. The only things Rite Aid measured (and thus rewarded) were the sales metrics. This has created a culture where the number of prescriptions filled, their speed in filling scripts, and the corresponding reimbursement for these scripts were the measures of success at Rite Aid. The role of the pharmacist as a healthcare professional serving and counseling patients has been completely lost. Pharmacists have been pressured to be cogs in a prescription filling machine, rather than the last line of defense against inappropriate and/or medically unnecessary prescriptions (and the corresponding fraudulent billing). The result is both deeply troubling and entirely predictable: inappropriate and medically unnecessary prescriptions for opioids flowed out of Rite Aid stores and into communities throughout the country. The policies have remained in place even as the epidemic ravaged the nation.

205. In 2016, The Chicago Tribune investigated how pharmacies, including chain pharmacies, fostered environments where "safety laws are not being followed, computer alert systems designed to flag drug interactions either don't work or are ignored, and some pharmacies emphasize fast service over patient safety."[168] The Tribune tested 255 pharmacies to see how often pharmacies would dispense dangerous drug pairs without warning patients. As part of the investigation, the Tribune selected pairs of drugs that had serious interactions, including life-threating risks.

206. The results were stark: "Fifty-two percent of the pharmacies sold the medications without mentioning the potential interaction, striking evidence of an industrywide failure that places millions of consumers at risk." As the Tribune detailed, "in test after test, other pharmacists

---

[168] Sam Roe, Ray Long, and Karisa King, *Pharmacies miss half of dangerous drug combinations*, CHICAGO TRIBUNE, Dec. 15, 2016, https://www.chicagotribune.com/investigations/ct-drug-interactions-pharmacy-met-20161214-story.html.

dispensed dangerous drug pairs at a fast-food pace, with little attention paid to customers." Chain pharmacies "overall failed 49 percent of their tests."

207.    While acknowledging the difficulty in pinning the failure of the pharmacies to catch the dangerous interaction on a single cause, the Tribune concluded its interviews and studies pointed to the pharmacies' emphasis on speed as a possible explanation. Several pharmacies dispensed risky drug pairs with no warning in less than 15 minutes, and the Tribune found that "pharmacists frequently race through legally required drug safety reviews — or skip them altogether."  The Tribune also noted that The New Hampshire Board of Pharmacy sampled data from two retail chains in the state and found that "pharmacists spent an average of 80 seconds on safety checks for each prescription filled." Also, "of the pharmacists at stores that advertised quick service, 4 in 10 said they had made a medication error as a result of hurrying to fill a prescription within a set time." And even though most pharmacies use computer software designed to flag drug interactions, experts say computer alerts are so common that pharmacists can get "alert fatigue" and ignore many of the warnings.

208.    The National Association of Boards of Pharmacy (NABP) also recognized that performance metrics pose a dangerous problem in pharmacies. In 2013, it adopted Resolution 109-7-13 entitled "Metrics and Quotas in the Practice of Pharmacy."[169] The Resolution tasked NABP to "assist the state boards of pharmacy to regulate, restrict, or prohibit the use in pharmacies of performance metrics or quotas that are proven to cause distractions and unsafe environments for pharmacists and technicians." The resolution specifically cited to a survey conducted by the

---

[169] *Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13)*, National Association of Boards of Pharmacy, June 5, 2013, https://nabp.pharmacy/newsroom/news/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/.

Institute for Safe Medication Practices (ISMP) of 673 pharmacists that revealed that 83% believed that distractions due to performance metrics or measured wait times contributed to dispensing errors and that 49% felt specific time measurements were a significant contributing factor.

209.    In September 2014, the NABP announced that it had amended the *Model State Pharmacy Act and Model Rules of the National Association of Boards of Pharmacy* (*Model Act*). Reflecting Resolution 109-7-13, the Model Act now states that requiring pharmacy personnel to meet production and/or performance metrics and/or quotas that negatively impact patient safety may be grounds for discipline.[170]

### D.    Immense Pressure to Fill Quickly to Drive Sales

210.    Rite Aid has also put immense pressure on its pharmacists to not only fill all prescriptions but to fill them quickly. Often, this pressure has been directly applied by pharmacy managers and store managers.

211.    In 2011, Rite Aid adopted a policy whereby it promised to fill prescriptions in 15 minutes or less.[171] If a fill took more than 15 minutes, the patient would get a $5 gift card. Rite Aid touted the program as something consumers wanted, but many others recognized the danger such a program was to patients and the practice of pharmacy. Numerous State Boards of Pharmacy objected to the program. As the chair of the Illinois State Board of Pharmacy said: "This is 180 degrees away from everything we are trying to do in moving the pharmacy profession toward being patient information-focused rather than product-focused. And it's counter to our many efforts to

---

[170] *Newsletter*, National Association of Boards of Pharmacy, September 2014, Vol. 48, No. 8, https://nabp.pharmacy/wp-content/uploads/2016/07/Final-September-2014-NABP-Newsletter.pdf;  *Model Act/Rules*, National Association of Boards of Pharmacy, https://nabp.pharmacy/publications-reports/resource-documents/model-pharmacy-act-rules/.

[171] Drug Topics, *Rite Aid offers 15-minute Rx guarantee*, May 15, 2011, https://www.drugtopics.com/chains-business/rite-aid-offers-15-minute-rx-guarantee.

improve patient safety." According to Relator Wegelin, the 15-minute guarantee was eventually stopped by the Pennsylvania Board of Pharmacy.

212.    Contrary to its duties under the CSA, Rite Aid adopted a performance metrics system under which pharmacists are directed to meet unobtainable prescription filling goals. If met, those goals would violate the law regarding professional responsibilities and governing the practice of pharmacy.

213.    Rite Aid pressured pharmacists into filling medically inappropriate combinations of opioids and other drugs (Pharmacist No. 2), telling them they had to fill opioid prescriptions (particularly if a patient complained) (Pharmacist No. 3), facing threats of employment termination when they did not fill all prescriptions with less and less staffing support.

214.    Even senior Rite Aid managers felt that its focus on its metrics forced its pharmacists to "rush past" any red flags and fill prescriptions anyway.

215.    The culture of filling prescriptions quickly to drive volume was built into the electronic software used by Rite Aid. The order-filling software would start a countdown to pressure pharmacists to fill the prescriptions more quickly. The system used a stoplight system to ensure that the pharmacist was always on the clock. The system pressured the pharmacist to get back in the green and with yellow flashing to warn off being close to off schedule and red indicating that the pharmacist was not working quickly enough. This system did not take into account the complexities of each prescription, so the system would allot the same amount of time to fill for a customer presenting with numerous red flags as one without.

216.    Rite Aid did not collect information on the pharmacists who were counseling patients, fully evaluating prescriptions, and otherwise acting properly as pharmacists.

217. Although pharmacists were supposed to be customer service people, at Rite Aid they could not do customer service because it took too much time. Many pharmacists go into health care because they want to help people, but Rite Aid did not allow them to do that.

218. The pressure to fill every prescription was also compounded through the lack of adequate staffing. Rite Aid was always "looking for more and more efficiencies" especially with regard to staffing. Often, pharmacists were left as the only pharmacist at a location for entire shifts. One rule of thumb for staff levels was 10 pharmacy technician hours per 100 prescriptions, but that ratio has been reduced over time with increased automation in the pharmacies and other efficiencies that were put in place. (Pharmacist No. 1).

219. The level of staffing at Rite Aid pharmacies often made it impossible to meet performance goals. The average prescription volume in the stores one former Rite Aid manager (Pharmacist No. 1) oversaw was about 1200 a week, and that ranged from a low of 300 to 400 to 3,000 a week. The difficulty in meeting performance goals with ever-leaner staffing greatly cut into the ability of its pharmacists to evaluate each prescription carefully and in accordance with the law.

220. Inadequate staffing made it difficult to conduct due diligence on prescriptions for opioids. "Did they truly have the time to dive into and use all the resources available to make sure the prescriptions are legitimate? I don't think they had the time," one former senior Rite Aid executive said. "I don't think anybody in any chain had the time to do that." (Pharmacist No. 1).

### E. Rite Aid Had No Rigorous Dispensing Protocols or Policies to Assist Its Pharmacists to Identify Inappropriate Prescriptions

221. Rite Aid's singular focus on filling all prescriptions as quickly as possible meant that it had no have rigorous dispensing protocols or policies. Such policies would not have only resulted in denying more inappropriate prescriptions, but would also slow down the speed at which

prescriptions were filled. Instead, Rite Aid has insisted its dispensing practices operate as a production line.

222.     The only training Rite Aid provided was computer-based trainings. According to one former senior Rite Aid executive, however, this type of training had the potential to be ineffective. "Some [pharmacists] would just go through the modules to get them done." Even so, this annual training did not include computer modules on how to identify fraudulent prescriptions or on procedures to follow when staff encountered a prescription believed to be fraudulent. (Pharmacist No. 1)

223.     Rite Aid's procedure for filling prescriptions, including opioids, was limited to a minimal check of the basics of the prescription – patient name, date of birth, check the physician's name, check the medication, verify the signature, verify the dosage, confirm the patient instructions, check the photo of the drug to see if it is the right one, approve it, then make it ready to dispense. But Rite Aid pharmacists were trained to ignore even these basic checks and to just fill the prescriptions quickly. (Pharmacist No. 5)

224.     Critically, Rite Aid pharmacies did not have any policies or protocols about how to address inappropriate prescriptions. There were no Rite Aid guidelines for a pharmacist or technicians to consult to determine whether a particular prescription was suspicious or medically inappropriate. Rite Aid had no checklist, guidance, training, or resources for pharmacists or technicians to consult about whether a prescription was medically appropriate and should or should not be filled.

225.     Even if a pharmacist or technician did identify a prescription that was not medically appropriate, there was a total lack of policies and procedures for the pharmacist to follow after identification. Rite Aid has had no protocol about how to flag prescribers who consistently

were writing suspicious or medically inappropriate prescriptions, no protocol about how to flag prescription shopping by customers, and no protocol how they were to communicate information about trends they were seeing. As one pharmacist put it, Rite Aid did "absolutely nothing" in terms of training on these issues. (Pharmacist No. 3)

226.    As one of the largest corporations in the United States, Rite Aid could have easily invested some of its vast resources into developing uniform protocols that would have given concrete guidance to its pharmacy staff. But Rite Aid did not even use any of the available public guidance to incorporate into its own practices. Instead, it emphasized its profitability metrics, leaving it up to the pharmacy staff to refuse prescriptions at their own risk.

227.    For example, until very recently there has been no guidance from Rite Aid about when pharmacists needed to question certain medically inappropriate combinations (such as the "Holy Trinity" combination of opioids and muscle relaxers), no guidance about when pharmacists needed to refuse opioids being prescribed for inappropriately long periods of time, and no guidance about the number of pharmacies and/or doctors a patient was seeing.

228.    Rite Aid pharmacies essentially left the pharmacists and technicians on their own to evaluate prescriptions. "Ultimately, the Company left it up to the pharmacists' discretion whether to dispense a controlled substance prescription or not." The pharmacists' individual vigilance varied widely, depending on their own training and education, whether they had enough time, and the "overall thought process of the pharmacist." (Pharmacist No. 1) This led to endemic inconsistency, with many simply choosing to fill as many prescriptions as possible. This was especially true given the pressures and incentives built into the structure of Rite Aid pharmacies' operations not to question prescriptions and to fill as many as possible, as quickly as possible.

229. This problem was particularly acute for hydrocodone prescriptions before 2014. Before that time, hydrocodone was a C-III, not a C-II as it is now. That meant that Rite Aid pharmacies paid even less attention to what any reasonable pharmacist knew was a potent and powerful opioid.

230. This complete lack of a compliance function to check the tide of inappropriate and/or medically unnecessary opioid prescriptions has meant that Rite Aid pharmacy staff varied in the kind of diligence they practiced when it came to assessing suspicious customers and inappropriate prescriptions.

231. The lack of any written policies and procedures about how to check for inappropriate prescriptions and deal with them once found also meant that Rite Aid audits of its stores was perfunctory at best, including only cursory checks of the inventory. Often the pharmacy's dispensing practices were not part of the internal audit process. (Pharmacist No. 1)

232. With some pharmacists being particularly lax in their dispensing habits, there were routinely inappropriate and/or medically unnecessary prescriptions that were filled at Rite Aid pharmacies, including hundreds of thousands of opioid prescriptions paid for by Government Programs.

233. Despite reasonably diligent pharmacists who, had they been given the tools and time, who might have able to recognize the steadily growing influx of inappropriate opioid prescriptions, Rite Aid continued to have no pharmacy policies to keep the opioid problem from going off the rails.

234. Of note, at no time has Rite Aid required its pharmacists to check state PDMP databases despite the evidence that using this data reduces overdose deaths, doctor shopping, and

inappropriate or medically unnecessary reimbursements. This has led in many of its stores to pharmacists simply never checking state PDMP databases.

235. In fact, Rite Aid did as little as possible to encourage PDMP use. The PDMP system at Rite Aid pharmacies ran on a separate computer system than pharmacists used to fill the prescription. The two systems did not interface at all.

236. Likewise, Rite Aid made no effort to track or otherwise encourage (let alone require) the use of the PDMP. On the contrary, the fact that PDMP checking was so onerous discouraged pharmacists from checking it at the expense of filling prescriptions quickly. (Pharmacist No. 4)

237. Having such a requirement would have greatly increased the time it took to fill prescription and would have identified many more prescriptions that were medically inappropriate. Sadly, Rite Aid chose its bottom line over public health.

### F. Rite Aid Rarely Blocked What It Knew Were Suspicious Prescribers

238. Despite filling large quantities of controlled substances, including opioids, and even though Rite Aid on a regular basis publicly acknowledged the opioid crisis raging nationally, Rite Aid very rarely blocked suspicious prescribers.

239. Despite the fact that few of its pharmacists were aware such a list existed, Rite Aid's corporate designee testified that since the early 2000s it has maintained a list of what it called "suspicious prescribers."[172] Even then, and despite the fact that thousands of health care providers have lost their licenses, been indicted and/or been convicted of writing inappropriate prescriptions, since it began tracking suspicious prescribers in the early 2000s, on only 150 occasions has Rite

---

[172] *In Re: National Prescription Opiate Litigation*, Hart Dep. (Jan. 31, 2019), 186:24-187:19 (Case No. 17-md-2804) (Dkt. 1978-2).

Aid ever determined that it would stop filling prescriptions for health care professionals because they were writing inappropriate and/or medically unnecessary prescriptions.[173]

240.    Rite Aid's purported suspicious prescribers list is thus clearly deficient in numerous respects.  For example, Rite Aid did not track on its suspicious prescriber list, or elsewhere, whether particular prescribers had been indicted (or convicted) for their prescribing habits:

> Q. Does Rite Aid track whether any prescribers and -- who have customers that come to Rite Aid stores are indicted?
> …
> THE WITNESS: We do not.[174]

241.    Even Rite Aid would have to admit its suspicious prescriber list regularly failed to block numerous bad physicians.  For example, in Rite Aid's 2009 settlement with the DEA, it had admitted that at pharmacies in Kentucky and New York it had knowingly filled prescriptions for controlled substances that were not issued for a legitimate medical purpose pursuant to a valid physician-patient relationship.[175] What it failed to admit, however, was that these problems were endemic at Rite Aid, nor were they resolved following the DEA settlement.

242.    Clearly, in the intervening decade, Rite Aid's suspicious prescribers list has done little to prevent filling prescriptions for unlicensed prescribers. In 2017, the DEA again found that at Rite Aid pharmacies' "incorrect or invalid registration numbers were used at least 1,298 times as a result of Rite Aid's failure to adequately maintain its internal database. Additionally, the

---

[173] *Id.* 168:20-170:15.

[174] *Id.* 186:17-23.

[175] Press Release, U.S. Dep't of Justice, *Rite Aid Corporation and Subsidiaries Agree to Pay $5 Million in Civil Penalties to Resolve Violations in Eight States of the Controlled Substances Act* (Jan. 12, 2009), https://www.justice.gov/opa/pr/rite-aid-corporation-and-subsidiaries-agree-pay-5-million-civil-penalties-resolve-violations.

settlement resolved allegations that Rite Aid pharmacies dispensed, on at least 63 occasions, prescriptions for controlled substances written by a practitioner whose DEA registration number had been revoked by the DEA for cause."[176]

243.    Thus, Rite Aid's list of only 150 instances in the last 19 years when it has blocked prescriptions from suspicious prescribers has only been the tip of the iceberg it knew was widespread.  Its half-hearted efforts ignored what it knew (or could have known) were pervasive, well-documented instances of health care professionals who would be disciplined, indicted or convicted.  Just to illustrate the scale of the problem Rite Aid was ignoring as to the growing list of healthcare professionals who would lose their licenses, the Pittsburgh Post-Gazette reported that between 2011 and 2015 for Pennsylvania, Ohio, West Virginia, Maryland, Virginia, Kentucky, and Tennessee (the bulk of Appalachia), there were 608 doctors disciplined for overprescribing narcotics.[177]  Thirty-six percent of Rite Aid's stores are in these seven states (3150 total stores, PA–540 stores, OH – 212 stores, WV – 70 stores, MD – 95 stores, VA – 127 stores, KY – 71 stores, TN – 13 stores).

## G.  Rite Aid Turned a Blind Eye to the Opioid Crisis

244.    Rite Aid has failed to respond effectively to concerns raised by its own employees regarding inadequate policies and procedures in the filling of opioid prescriptions.

245.    Rite Aid has failed to use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts of opioids, or to

---

[176] Press Release, U.S. Attorney, C.D. Cal., *Rite Aid Corporation Pays $834,200 to Settle Allegations of Violating the Controlled Substances Act* (March 9, 2017), https://www.justice.gov/usao-cdca/pr/rite-aid-corporation-pays-834200-settle-allegations-violating-controlled-substances-act.

[177] *See* Rich Lord, J. Bardy McCollough, Adam Smeltz, *Special Report: Overdosed – How doctors wrote the script for an epidemic,* Pittsburgh Post-Gazette (May 22, 2016), https://newsinteractive.post-gazette.com/overdosed/.

use data available to it to do statistical analysis to prevent the filling of prescriptions that were illegally diverted, dispensed, or otherwise contributed to the opioid crisis.

246.     Rite Aid further refused to take reasonable measures to stop its retail stores from dispensing unreasonable amounts of opioids and filling inappropriate prescriptions, even while telling the public it was complying with its duties as dispensing pharmacies to prevent diversion and abuse. Rite Aid did so in order to further its goal of selling as many opioids as possible and ensuring that the growing demand for opioids would be met by skyrocketing supply and an unimpeded flow of drugs into even the most suspicious pharmacies.

247.     Rite Aid knew or should have known that its pharmacies were (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling prescriptions of unusual size and frequency paid for in cash; (f) filling prescriptions of unusual size and frequency from the same prescribing physician; (g) filling prescriptions of unusual size and frequency from out-of-state physicians; and (h) filing prescriptions for patients and doctors in combinations that were indicative of diversion and abuse. The volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to non-controlled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly sized pharmacy markets.

248.     Rite Aid had complete access into, and full visibility of, all prescription opioid distribution data and dispensing data related to its pharmacies nationally.

249.     Rite Aid had complete access into information revealing the doctors who prescribed the prescription opioids dispensed in its pharmacies nationally.

250.     Rite Aid had complete access into information revealing the customers who filled (or sought to fill) prescriptions for opioids in its stores nationally.

251.     Despite this access, Rite Aid failed to analyze: (a) the number of opioid prescriptions filled by individual pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; (c) the number of opioid prescriptions filled relative to other drugs; and (d) the increase in annual opioid sales relative to the increase in annual sales of other drugs.

252.     Indeed, DOJ has recently started to mine the prescribing data from doctors to identify overprescribing doctors and pill mill operations. To identify pill mill doctors, DOJ looks at data about patient deaths associated with each doctor; distances patients are traveling to get their prescriptions written and filled; prescribing habits of doctors around the country as compared to their peers; and the opioid dosages doctors prescribed, measured by MME.[178] These data points DOJ uses to identify potential criminal prescribing were also easily accessible to Rite Aid.

253.     The only area where Rite Aid attempted, albeit half-heartedly, to use its vast knowledge of its stores' dispensing information was to prevent theft. With theft, Rite Aid was losing money. With other types of diversion like medically inappropriate amounts of prescriptions, Rite Aid made less money if it strictly enforced the law. Thus, Rite Aid turned a blind eye to keeping track of medically inappropriate prescriptions and only focused on making sure it knew if it was losing inventory without getting paid for it.

254.     In a 2013 article in the New England Journal of Medicine, two CVS pharmacy executives recognized that chain pharmacies are in a unique position to stop the dispensing for

---

[178] Jessica Schneider, *Justice Department Reveals Its Number-Crunching Methods to Catch Opioid Over-Prescribers*, CNN, September 24, 2019, https://www.cnn.com/2019/09/24/politics/opioid-doctors-arrests/index.html.

suspicious prescribers and outlined how data could be used. They explained that chain pharmacies "have the advantage of aggregated information on all prescriptions filled at the chain" and that "[a]nalyses of aggregated data … can also target patterns of abuse by both prescribers and patients."[179] They thus concluded that "[g]iven the growing use of controlled substances and the resulting illness and deaths, *more innovative use of transparent data is only prudent*."[180]

255. Even though Rite Aid could have used its own data to identify outlier prescribers and inappropriate prescriptions, there is no evidence Rite aid used its own easily accessible data to identify suspect doctors and medically unnecessary prescriptions.

256. Rite Aid made sure to keep track of any inventory loss and had systems in place to do so. For example, Rite Aid only used "Key Performance Indicators" ("KPIs") to monitor its dispensing and investigate product loss.[181]

257. But, as explained by Andrew Palmer, a Rite Aid employee in the Loss Prevention Department, Rite Aid did not use the KPIs to identify inappropriate prescribing:

> Q. Were there any KPIs that the Company used to identify inappropriate prescribing?
> A. I can't see -- again, I wasn't in this department the entire time, but I cannot see how any NaviStor or NaviScript KPI would be able to do that.[182]

258. Rite Aid also failed to conduct adequate internal or external audits of its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create

---

[179] Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H, *Abusive Prescribing of Controlled Substances—A Pharmacy View*, 369 NEJM 989-991 (Sept. 12, 2013), https://www.nejm.org/doi/10.1056/NEJMp1308222.

[180] *Id*.

[181] *In Re: National Prescription Opiate Litigation*, Palmer Dep. (Jan. 22, 2019) 158:11-164:17 (Case No. 17-md-2804) (Dkt. 2173-51).

[182] Palmer Dep. (Jan. 22 2019) 164:11-17.

policies accordingly, or if it conducted such audits, it failed to take any meaningful action as a result.

259.     Rite Aid was, or should have been, fully aware that the quantity of opioids being distributed and dispensed nationwide by its pharmacies was untenable, and in many areas patently absurd; yet, it did not take meaningful action to investigate or to ensure that it was complying with its duties and obligations under the law with regard to controlled substances.

260.     Rite Aid's duties were assumed voluntarily, as a condition for the privilege of selling and dispensing controlled substances throughout the U.S. (and in this District).

261.     Further, Rite Aid had been warned repeatedly by governmental agencies and publicly available sources that diversion and abuse was occurring and that the opioids supply chain fell beneath the applicable duty of reasonable care.

262.     The sheer volume of opioids sold, distributed, and dispensed throughout the U.S. (and in this District) has been, by itself, sufficient to alert Rite Aid that opioids were necessarily being diverted into unlawful channels.

263.     Rite Aid breached its duties to maintain effective controls, and the foreseeable result is that widespread diversion and abuse of opioids has occurred.

264.     Rite Aid's breach of its duties is the proximate cause and a substantial factor contributing to the damages suffered by Government Programs alleged in this Second Amended Complaint.

265.     The harms to Government Programs were thus totally foreseeable in light of Rite Aid's breach of its duties.

**H.**   **Rite Aid's Public Statements Concealed Its Failures to Prevent Filling Medically Unnecessary Prescriptions**

266.    Rite Aid's public statements have misled the public and officials of the United States and States to believe that Rite Aid was taking proactive steps to fight the opioid epidemic and prevent fraudulent dispensing and billing.

267.    In 2018, in the midst of widespread attention into the opioid crisis, Rite Aid stated that it "remains steadfast in its commitment to address opioid abuse in the communities we serve and we will continue to explore additional ways to further enhance our efforts to address this serious public health issue."[183]

268.    Also in 2018, Rite Aid stated that "[t]he opioid epidemic has reached epic proportions and it is an issue that demands not only our attention but also our continued action to help reduce the rise in opioid deaths," said Jocelyn Konrad, Rite Aid executive vice president of pharmacy. "For the past two years, we've worked with state and federal lawmakers to increase access to this life-saving medication [naloxone]. We support the Surgeon General's recent Advisory on the importance of naloxone and are committed to offering it to our customers in all of the communities we serve."[184]  What Konrad was not acknowledging, however, was that Rite Aid had for years done little to prevent the opioid crisis that was ravaging communities across America.

---

[183] Press Release, Rite Aid Corp., *Rite Aid Makes Free Opioid Disposal Solution Available At More Than 2,500 Pharmacies Nationwide* (May 21, 2018), https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/rite-aid-makes-free-opioid-disposal-solution-available-at-more-than-2-500-pharmacies-nationwide.

[184] Press Release, Rite Aid Corp., *Naloxone Available At Rite Aid Pharmacies in 19 States* (Apr. 19, 2018), https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/naloxone-available-at-rite-aid-pharmacies-in-19-states.

269.     In 2019, Rite Aid again acknowledged that "[t]his vicious cycle of opioid abuse is one that young people are falling victim to far too often," Konrad said. "Our country is faced with an unparalleled crisis that is critically impacting the lives of our children."[185]  While she admits the crisis is "unparalleled," what Konrad did not acknowledge was Rite Aid's central role in stoking the epidemic with massive quantities of opioid prescriptions filled at its pharmacies across America.

270.     In 2019, Rite Aid released its most detailed attempt to mask what have been its wholesale failures to prevent inappropriate dispensing in its pharmacies, issuing its ironically named Fiscal 2019 Corporate Social Responsibility Report ("Responsibility Report"). While attempting to deflect laying blame for the opioid plague at its own doorstep, in it Rite Aid's ex-CEO John Standley touts that Rite Aid was engaged in initiatives which would "mak[e] a meaningful difference in the lives of our customers, associates and neighbors."[186]

271.     However, the Responsibility Report is a thinly veiled public relations effort by Rite Aid aimed at deflecting what it knew to be its woefully deficient conduct.  Indeed, as alleged herein, Rite Aid's newfound resolve came more than a decade after it had already been on notice that the epidemic was decimating the communities where its pharmacies had been for years pouring virtually unlimited opioid drugs without regard to whether the prescriptions were appropriate or medically necessary.

---

[185] Editorial, *Rite Aid and Harrisburg schools team to save young lives in opioid epidemic*, PENNLIVE, Mar. 20, 2019, https://www.pennlive.com/opinion/2019/03/rite-aid-and-harrisburg-schools-team-to-save-young-lives-in-opioid-epidemic.html.

[186] Rite Aid Fiscal 2019 Corporate Social Responsibility Report, *We Are Building a Healthier Next Generation*, at 3, https://www.riteaid.com/corporate/sustainability.

272.     The Responsibility Report disingenuously claims that Rite Aid takes its role in the opioid epidemic "seriously," suggesting it does more than simply comply with pharmacy laws and regulations:

> As one of the nation's leading drugstore chains, Rite Aid takes its role as a community healthcare provider very seriously. **This means going beyond simply complying with state laws and regulations to also raise awareness about important issues like prescription drug safety and drug abuse prevention.** We also are committed to raising awareness about important issues like drug abuse prevention and prescription drug safety while advocating for increased access to education, treatment and proper medication disposal. As one of health care's most accessible practitioners, pharmacists are uniquely positioned to help educate their patients and communities about prescription safety.[187]

As alleged herein, in reality, throughout the opioid crisis Rite Aid has fallen well short of complying with the CSA and state laws and regulations, and in fact has done very little to provide its pharmacists with the tools or training to enable them to identify and prevent inappropriate prescribing of opioids.

273.     The Responsibility Report misleadingly outlines the belated (and inadequate) steps Rite Aid had taken to manage controlled substances, including "ongoing training" of its pharmacists on opioid management, counseling and responses.  In reality, throughout the time the opioid epidemic has been ravaging communities across America, this training at many of its pharmacies has been largely non-existent.  Worse yet, at certain of its pharmacies, Rite Aid's trainers told pharmacists they should falsify compliance documents, filling in bogus answers to its computer-generated C-II due diligence questions (*i.e.*, do you know patient?, verify doctor/patient relationship, run PDMP, etc.).  (Pharmacist No. 5)

---

[187] *Id.* at 36-37 (emphasis added).

274.     In addition, the Responsibility Report provides lip service to its "mandatory" requirement that pharmacists conduct counseling of patients receiving opioid prescriptions.[188]  Not only is this inherently deceptive and simply window dressing (because Rite Aid has nothing in place to ensure that its pharmacists have actually ever undertaken this counseling role), in fact the intense pressure the Company has placed on many of its pharmacists to fill high volumes of prescriptions has not allowed them adequate time to counsel patients.

275.     The Responsibility Report also states that Rite Aid in 2013 had required its pharmacists to be enrolled in state Prescription Drug Monitoring Programs ("PDMPs"), apparently suggesting that its pharmacists were indeed regularly checking these state databases.[189]  What the Responsibility Report fails to make clear is that Rite Aid (a) has never required its pharmacists check the PDMP database before filling all opioid prescriptions; (b) does nothing to ensure its pharmacists' actual compliance with state PDMP rules; (c) does not allow its pharmacists at high volume stores adequate time to take the 15 minutes it can take to check the PMDP databases; and (d) does not provide its pharmacists computer terminals with internet access, allowing easy access to the PDMP databases, instead requiring them to use a separate terminal with internet access being used by pharmacy technicians.

276.     Finally, the Responsibility Report claims it has in place a system that provides "[n]otice of fraudulent prescriber activities when Rite Aid receives notification from the Board of Pharmacy or the PMP program."[190]  As alleged herein, this system rarely flagged what it knew (or reasonably should have known) were well-known pill mill doctors (including failing to identify

---

[188] *Id.* at 37.

[189] *Id.* at 38.

[190] *Id.* at 39.

doctors whose conduct rose to criminal levels). Furthermore, the Rite Aid system has never used its own data preemptively to identify red flags related to inappropriate prescriptions and/or suspicious prescribers.  Indeed, the evidence herein will show that Rite Aid's own system failed to identify numerous suspicious prescribers or inappropriate prescriptions even in the face of blatant red flags of fraud or diversion.

277.    Despite these public pronouncements, Rite Aid has done little to prevent its pharmacies from filling all the opioid prescriptions presented at its stores.

## VII.    RITE AID'S UNLAWFUL CONDUCT

278.    All DEA registrants like Rite Aid have a duty to "provide effective controls and procedures to guard against theft and diversion of controlled substances."[191]  Diversion includes the use medication outside the usual course of professional practice.

279.    The DEA has repeatedly emphasized that, as DEA registrants, retail pharmacies like Rite Aid are required to implement systems that detect and prevent diversion and abuse and must monitor for red flags of diversion and abuse. The DEA has also repeatedly affirmed the obligations of pharmacies to maintain effective controls against diversion and abuse in regulatory action after regulatory action.[192]  According to DEA, pharmacists are the "[l]ast line of defense."[193]

---

[191] 21 C.F.R. § 1301.71(a).

[192] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; 77 Fed. Reg. 62,315 (Dep't of Justice Oct. 12, 2012) (decision and order); *East Main Street Pharmacy*, 75 Fed. Reg. 66,149 (Dep't of Justice Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145 (D.D.C. 2012); *Townwood Pharmacy*; 63 Fed. Reg. 8,477 (Dep't of Justice Feb. 19, 1998) (revocation of registration); *Grider Drug 1 & Grider Drug 2*; 77 Fed. Reg. 44,069 (Dep't of Justice July 26, 2012) (decision and order); *The Medicine Dropper*; 76 Fed. Reg. 20,039 (Dep't of Justice April 11, 2011) (revocation of registration); *Medicine Shoppe-Jonesborough*; 73 Fed. Reg. 363 (Dep't of Justice Jan. 2, 2008) (revocation of registration).

[193]              *See*              https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 132.

280.    The framework of state and federal statutes and regulations, along with industry guidelines, makes clear that all pharmacies like Rite Aid possess and are expected to possess specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription narcotics and of the risks and dangers of the diversion and abuse of prescription narcotics when dispensing of medications outside the usual course of professional practice.

281.    The CSA and state pharmacy laws and regulations require that licensed pharmacists recognize "red flags" that indicate addiction, diversion and abuse, including: (1) customers receiving the same combination of prescriptions or drug cocktails (i.e., oxycodone and alprazolam); (2) customers receiving the same strength of controlled substances, no individualized dosing, and/or multiple prescriptions for the strongest dose of an opioid drug available (i.e., 30 milligrams of oxycodone with 15 milligrams of oxycodone and 2 milligrams of alprazolam); (3) customers paying cash for their prescriptions; (4) customers requesting early refills; (5) customers with the same diagnosis codes written on their prescriptions (i.e., back pain, lower lumbar, neck pain, or knee pain); (6) customers driving long distances to visit physicians and/or fill prescriptions; (7) customers arriving in groups, with each customer presenting a prescription issued by the same physician; and (8) customers with prescriptions for opioids written by physicians not associated with pain management (i.e. a gynecologist). Additionally, a pharmacy may be tipped off to addiction, abuse, and diversion where the overwhelming majority of prescriptions filled by

the pharmacy is for opioids.[194] The DEA has frequently met with industry representatives to discuss these "red flags" of diversion and abuse. [195]

282.    Case law and administrative proceedings interpreting the CSA require that licensed pharmacists recognize "red flags" that indicate addiction, diversion and abuse, including:

- Criminal, civil, or administrative actions against the prescriber[196];

- Patient's use of street slang for certain opioids (e.g., "the M's" or "the Blues")[197];

- Cash payments:

  o   cash payments exceed national average;

  o   "unusually large" cash transactions: cash transactions average 8% or less of all transactions according to DEA)[198];

- Multiple patients with same address/last name/prescription/diagnoses/prescriber/day: (e.g., all prescriptions from doctor have diagnoses of lower lumbar pain; code L-4, L-5, lower back pain; or severe lower back pain)[199];

---

[194]*See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.

[195] Rannazzisi Decl. in *Holiday CVS, L.L.C. v. Holder*, 839 F.Supp.2d 145 (D.D.C. 2012), Case No. 1:12-cv-00191-RBW, Dkt. 19, Ex. 6.

[196] *Holiday CVS, LLC v. Holder*, 839 F. Supp.2d 145, 160 (D.D.C. 2012).

[197] *Id.* at 161; *Holiday CVS, LLC*, 77 Fed. Reg. at 62321, 62344 (2012).

[198] *Oak Hill Hometown Pharmacy v. Dhillon*, 2019 WL 5606926, at *6; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Pharmacy Doctors Enterprises, Inc. v. DEA*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62332; *East Main Street Pharmacy*, DEA Affirmance of Suspension Order, 75 Fed. Reg. 66150, 66158 (2010).

[199] *Holiday CVS*, 839 F. Supp. 2d at 161; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62318, 62326, 62331, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66159.

- Long distance between pharmacy and prescriber (*e.g.*, Western Pennsylvania Pharmacy filling out-of-state prescriptions; 200 miles; Prescribers "not from local area")[200];

- Long distance between patient and prescriber (e.g., "out of state")[201];

- Long distance between pharmacy and patient (e.g., southern West Virginia residence to Western Pennsylvania Pharmacy; 200 miles; Patients "not from local area")[202];

- Prescriptions filled piecemeal over multiple visits[203];

- "Pattern Prescribing":

  o Prescribers writing in a "factory-like" manner, prescriptions for the same drugs, the same quantities, without any kind of variability or change considering the different patients that come into that pharmacy;

  o The presence of an unwavering combination of the same drugs in the same strengths in the same quantities across numerous patients;

  o Multiple patients on a single day with the same combination from a single prescriber;

  o No "individualized therapy" – same prescriptions for multiple patients; or

  o Maximum doses across multiple patients[204];

---

[200] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Holiday CVS*, 77 Fed. Reg. at 62321, 62332, 62333; *East Main Street Pharmacy*, DEA Affirmance of Suspension Order, 75 Fed. Reg. at 66163.

[201] *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62326, 62335.

[202] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5; *Jones Total Health Care Pharmacy, LLC v. DEA*, 881 F.3d 823, 828 (11th Cir. 2018); *Holiday CVS*, 77 Fed. Reg. at 62318, 62322, 62332, 62333; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150.

[203] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at *5.

[204] *Oak Hill Hometown Pharmacy*, 2019 WL 5606926, at 5; *Pharmacy Doctors Enterpris*es, 2019 WL 4565481, at 5; *Holiday CVS*, 77 Fed. Reg. Vol. at 62318, 62332, 62333, 62335, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157.

- High abuse potential prescriptions / "Drug Cocktails":

  - Oxycodone and Xanax;

  - Oxycodone and Alprazolam;

  - Prescriptions for both 15mg and 30 mg strengths;

  - Oxycodone, Alprazolam, and Carisoprodol;

  - Prescriptions of an opiate and a benzodiazepine;

  - Oxy 30, Oxy 15, and Xanax (Alprazolam);

  - Oxy 30, Oxy 15, Alprazolam 2mg, and a fourth "filler" drug;

  - Oxy 30, Oxy 15, Xanax 2 mg, Soma, and Flexeril;

  - 210 mg dose prescription of Oxy 30;

  - High quantity prescriptions;

  - Prescriptions of large volumes of controlled substances in the highest strengths;

  - Multiple drugs prescribed for the same thing;

  - Drugs in different classes that can cause the same side effects, like respiratory depression;

  - "The Triple": benzodiazepine, narcotic painkiller, and sleeping pill;

  - "The Homerun": benzodiazepine, narcotic painkiller, sleeping pill, and Soma;

  - Multiple narcotic painkillers at the same time;

  - High doses of Oxy: normal dose is 5- 10mg/4 hours;

  - High doses of Xanax (alprazolam): normal dose is 4mg/day;

  - High doses of Valium (diazepam): normal dose is 10mg;

  - Daily dose of 300 mg of oxycodone and 60mg of hydrocodone = overdose;

- o "Duplicate Therapy": multiple drugs in the same class prescribed for the same thing;

- o Multiple prescriptions of same narcotic on same day;

- o Multiple prescriptions of Oxycodone, Xanax, and Soma for single patient; or

- o High doses of opioids in light of overdose statistics.[205]

- Patients who arrive together with identical or nearly identical prescriptions[206];

- Patients seeking refills before prescription runs out and/or patients with frequent loss of controlled substance medication[207];

- Prescription numbers are very close sequentially[208];

- Multiple out-of-area patients from the same town/area ("Sponsor Arrangements" in which people from mostly the mountain states come down in buses and vans and drive to the pharmacy to fill opioid prescriptions[209];

- Patient's appearance/behavior (*e.g.*, do not need the medication, or appear high; slurred speech, stumbling walk, drooling)[210];

---

[205] *Jones Total Health Care Pharmacy*, 881 F.3d at 828; *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5; *Holiday CVS*, 77 Fed. Reg. at 62319, 62322, 62325, 62326, 62331, 62336, 62344; *East Main Street Pharmacy*, 75 Fed. Reg. at 66150, 66157, 66158, 66159, 66165; U.S. Centers for Disease Control, CDC Guideline for Prescribing Opioids for Chronic Pain — United States, 2016, 65 Morb. And Mort. Wkly Rep. (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/pdfs/rr6501e1.pdf.

[206] *Pharmacy Doctors Enterprises*, 2019 WL 4565481, at *5.

[207] *Id.* at 5; *Holiday CVS, LLC*, 77 Fed. Reg. Vol. at 62343; *East Main Street Pharmacy*, 77 Fed. Reg. at 66157.

[208] *Holiday CVS*, 77 Fed. Reg. at 62319.

[209] *Id.* at 62319, 62331.

[210] *Id.* at 62319, 62331; *East Main Street Pharmacy*, 75 Fed. Reg. at 66151.

- Prescribers without a specialty in pain management writing large quantities of prescriptions (*e.g.*, prescription influx from board certified pediatricians or gynecologists; doctors prescribing outside the scope of their usual practice)[211];

- Patients between the ages of 25 and 40 with cash[212];

- Evidence of doctor shopping (*e.g.*, Same/similar prescription prescribed by two or more prescribers at the same time)[213];

- Prescription from physician with an expired/revoked medical license, DEA number[214];

- Patient prescribed only controlled substance medications[215];

- Patient presents controlled substance prescriptions under different patient names[216];

- Patient insists on brand name product[217];

- Other pharmacies refuse to fill prescriptions from certain providers[218];

- Prescriber pattern of larger doses and higher quantities over time[219]; and

- Confluence of out-of-state patients on a single day receiving the same medications in the same quantities from the same in-state prescriber[220].

---

[211] *Holiday CVS*, 77 Fed. Reg. at 62326, 62331; *Jones Total Health Care Pharmacy*, 881 F.3d at 828.

[212] *Holiday CVS*, 77 Fed. Reg. at 62331.

[213] *Id.* at 62331, 62343.

[214] *Id.* at 62342.

[215] *Id.* at 62343.

[216] *Id*. at 62343.

[217] *Id*.

[218] East Main Street Pharmacy, 75 Fed. Reg. at 66151.

[219] *Id.* at 66159.

[220] *Holiday CVS*, 77 Fed. Reg. at 62333.

283.     Additionally, a pharmacy may be tipped off to addiction, abuse, and diversion where the overwhelming majority of prescriptions filled by the pharmacy is for opioids.[221] The DEA has frequently met with industry representatives to discuss these "red flags" of diversion.[222]

284.     Most of the time, these attributes are not difficult to detect and should be easily recognizable by pharmacies. Pharmacies like Rite Aid often have firsthand knowledge of dispensing red flags – such as disparate geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, out-of-state license plates, and cash transactions, and other significant information.

285.     Sophisticated, national chain pharmacies like Rite Aid also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores in diverse geographic locations. Its own data allows Rite Aid to observe patterns or instances of dispensing that are potentially suspicious, of oversupply in particular stores or geographic areas, or of prescribers or facilities that seem to engage in improper prescribing.[223]

286.     In 2006, the National Association of Chain Drug Stores ("NACDS") issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.[224]  The Model Compliance Manual notes that a Retail Pharmacy may:

---

[221] *See* Birmingham Pharmacy Diversion Awareness Conference, *DEA Perspective: Pharmaceutical Use & Abuse* (Mar. 28-29, 2015), https://www.deadiversion.usdoj.gov/mtgs/pharm_awareness/conf_2015/march_2015/prevoznik.pdf at 139-40.

[222] Rannazzisi Decl. in *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp.2d 145 (D.D.C. 2012), Case No. 1:12-cv-00191-RBW, Dkt. 19, Ex. 6.

[223] *See, e.g.*, *Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*, 77 Fed. Reg. 62,315 (Dep't of Justice, Oct. 12, 2012) (decision and order) (DEA expert witness examined dispensing records alone to identify inappropriately dispensed medications).

[224] *In Re: National Prescription Opiate Litigation,* Third Amended Complaint (Case No. 17-md-2804) (Dkt. 2613).

- Generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse, including:

- Drug Utilization Reports, which identify the number of prescriptions filled for a particular customer and, in particular, numbers for suspect classes of drugs such as narcotics to identify possible therapeutic abuse or illegal activity by a customer. A customer with an abnormal number of prescriptions or prescription patterns for certain drugs should be identified in reports, and the customer and his or her prescribing providers can be contacted and explanations for use can be received.

- Prescribing Patterns by Physician Reports, which identify the number of prescriptions written by a particular provider and focus on a class or particular type of drug such as narcotics. These reports can be generated to identify possible prescriber or other fraud.

- Geographic Zip Reports, which identify possible "doctor shopping" schemes or "script mills" by comparing the geographic location (zip code) of the patient to the location of the provider who wrote the prescription and should include the location of the dispensing pharmacy.

287.    Yet, Rite Aid never leveraged its resources and troves of information to stop or further question the overwhelming majority of prescriptions written by the criminal prescribers.

288.    Rite Aid failed to respect its role as the last line of defense as a pharmacy and failed to ensure that the prescriptions it was filling were issued to a legitimate patient for a legitimate medical purpose by a practitioner acting in the usual course of professional practice, as is evident by the copious amounts of opioids being dispensed by Rite Aid stores throughout the U.S.

289.    From about 2006 to the present (and ongoing), Defendant Rite Aid violated the CSA and state pharmacy laws and regulations by dispensing controlled substances in violation of the pharmacist's corresponding responsibility in violation of 21 C.F.R. § 1306.04(a) and outside the usual course of pharmacy practice in violation of 21 C.F.R. § 1306.06.

290.    Rite Aid violated the CSA and state pharmacy laws and regulations each time it filled a controlled substance prescription without identifying and resolving those red flags because:

- They were knowingly filled outside the usual course of professional practice and not for a legitimate medical purpose; therefore, they were not pursuant to a valid prescription under 21 U.S.C. § 829 and thereby violated 21 U.S.C. § 842(a)(1).

- They were knowingly and intentionally dispensed outside the usual course of professional pharmacy practice in violation of 21 C.F.R. 1306.06, and therefore such dispensing and delivering of controlled substances was not authorized by the CSA, and thereby violated 21 U.S.C. § 841(a).

291.    Had they known that Rite Aid dispensed scores of controlled substance prescriptions that were lacking a legitimate medical purpose and/or a medically accepted indication (and therefore did not constitute valid prescriptions under the CSA and state pharmacy law and regulations), Government Programs would have refused to pay for those opioid medications.

292.    Rite Aid failed to maintain effective controls against diversion or conduct due diligence to ensure opioids were not diverted, resulting in the gross over-dispensing of opioids. Rite Aid thus directly contributed today's opioid epidemic and corresponding harm to Government Programs.

293.     The opioid crisis described herein is a direct and foreseeable result of Rite Aid's actions. And it was foreseeable that Government Programs would be damaged by Rite Aid's actions.

294.     Below is just a representative sampling of the rampant fraud that has occurred at Rite Aid pharmacies throughout the United States.

### A. Specific Examples of Unlawful Dispensing Conduct: Alabama

### 1. *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Alabama*

295.     The opioid epidemic has had a particularly devastating impact on Alabama.

296.     Alabama has the highest rate of opioid prescriptions issued in the nation — 1.2 prescriptions per person compared with the national average of 0.71.[225] In 2017, no fewer than 422 deaths were attributable to opioid overdoses in Alabama.[226]

297.     According to the Alabama Medicaid Agency, total federal and state expenditures on opioids increased more than 147% from 2011 ($9.9 million) to 2016 ($14.6 million).[227]

298.     Opioids have had an especially dire impact on rural states like Alabama. According to a recent report by the U.S. Department of Agriculture: "Rising rates of prescription medication abuse, especially of opioids, and the related rise in heroin-overdose deaths are contributing to this unprecedented rise in age-specific mortality rates after a century or more of

---

[225] Ctrs. for Disease Control & Prevention, *U.S. State Prescribing Rates, 2016*, https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.

[226] The Henry J. Kaiser Family Foundation, *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths* (2017), https://www.kff.org/other/state-indicator/opioid-overdose-deaths/.

[227] Robert Moon, MD, Alabama Medicaid Opioid Prescribing Trends and Outcomes: The Opioid Crisis in Alabama: From Silos to Solutions (March 10, 2017).

steady declines. This trend, if it continues, will not only lower rural population but will increase what is known as the dependency ratio: the number of people likely to be not working (children and retirees) relative to the number of people likely to be wage earners (working-age adults)."[228]

299.    Despite having some 176 stores located all over the State of Alabama, Rite Aid's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion activities.

300.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Doctor | City | Sentence |
|------|--------|------|----------|
| 5-Jan-10 | Jason Michael Hunt, MD | Guntersville, AL | License suspended |
| 23-Apr-14 | Joseph Ngui Mwau Ndolo, MD | Fairhope, AL | 2 years |
| 28-Oct-15 | Peter Lodewick, MD | Birmingham, AL | 4 years probation |
| 10-Nov-15 | Ernest Albert Claybon, MD | Midfield, AL | 4 years probation |
| 8-Apr-16 | Muhammad Ali, MD | Jasper, AL | 30 months |
| 29-Apr-16 | Francisco Huidor-Figueroa, MD | Opelika, AL | 5 years probation |
| 17-Feb-17 | Shelinder Aggarwal, MD | Huntsville, AL | 15 years |
| 17-Mar-17 | Bridgette Parker, NP | Mobile, AL | 20 months |
| 24-Apr-17 | Thomas "Justin" Palmer, NP | Mobile, AL | 30 months |
| 10-May-17 | Robert Ritchea, MD | Phenix City, AL | 10 years |
| 25-May-17 | John Patrick Couch, MD | Mobile, AL | 20 years |

---

[228] U.S. Dept. of Ag., *Rural America at a Glance*, Economic Information Bulletin 182 (Nov. 2017).

| 26-May-17 | Xiulu Ruan, MD | Mobile, AL | 21 years |
| 17-May-18 | Shepherd Odom, MD | Montgomery, AL | 5 years probation |
| 8-Jun-18 | Rassan Tarabein, MD | Daphne, AL | 5 years, $15,000,000 restitution |
| 17-Jan-19 | Willie Chester, MD | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Steven Cox, MD | Montgomery, AL | 3 years probation |
| 17-Jan-19 | Elizabeth Cronier, NP | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Julio Delgado, MD | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Stephanie Ott, RN | Montgomery, AL | 2 years probation |
| 17-Jan-19 | Gilberto Sanchez, MD | Montgomery, AL | 12 years |
| 17-Jan-19 | Johnnie Chaisson Sanders | Montgomery, AL | 7 months |
| 17-Apr-19 | Elizabeth Korcz, MD | Hoover, AL | |
| 24-Apr-19 | Marshall Plotka, MD | Huntsville, AL | Indicted |
| 24-Apr-19 | Celia Lloyd-Turney, MD | Huntsville, AL | Indicted |
| 17-May-19 | Steven Bruce Hefter, MD | Birmingham, AL | 87 months |
| 29-May-19 | Lillian Akwuba, NP | Montgomery, AL | 10 years |
| 30-May-19 | Erik Raul Torres | Opelika, AL | 6 months |
| 21-Jun-19 | Rodney Morris, MD | Birmingham, AL | Pled Guilty |
| 11-Jul-19 | James Edwards, MD | Opelika, AL | Indicted |
| 18-Nov-19 | Cindy Louise Hyche Dunn | Birmingham, AL | 10 years |
| 8-Sep-20 | Paul Roberts, MD | Fultondale, AL | 6 years |
| 21-Sep-20 | Di'Livro Beauchamp, MD | Montgomery, AL | Indicted |
| 16-Oct-20 | Richard Stehl | Montgomery, AL | 15 years |

### 2. *Millbrook, Alabama (Pharmacist No. 13)*

301.    Pharmacist No. 13 was a staff pharmacist at the Rite Aid store on 3720 Highway 14 in Millbrook, Ala. from 2016 to 2018. When Walgreens bought her Rite Aid store in March 2018, she transitioned to the new company but soon resigned because, she said, the Walgreens staff did not get along with the new Rite Aid employees.

94

302.    Millbrook is a small town (population 14,000) with a substance abuse problem. "They were good ole boys," she said. "Alcohol and drug use went hand in hand."  Pharmacist No. 13 would joke with the staff about the customers on Saturdays. "In the front they came to get alcohol and, in the back, they went to the pharmacy to get drugs," she said. "They'd go out the door with just cartloads of alcohol on Saturdays."

303.    She heard rumors of an illegal drug trade going on in and around Millbrook. "Whenever you're associated with a town that has a big illegal drug use going on, then you might well have a big prescription drug problem as well," she said.

304.    At least 50 percent of the store's prescription sales were in controlled substances and those were mostly pain medications. Norco, which contains hydrocodone and acetaminophen, was a big seller.

305.    The store stocked a lot of Norco. "We sometimes had to order 10 bottles at a time," she said. Some customers would ask for a specific color of hydrocodone, a request that would set off alarm bells. The street value of certain colors was higher. Different manufacturers had different colors. Many customers asked for the white brand from Watson, a generic. Later, many requested yellow tablets (Norco is yellow). Some would say the white tablets did not sit well in their stomachs. Norco was their top selling narcotic. A big reason for that was the prescriptions of Dr. Gilberto Sanchez and the people who worked for him (*see* discussion below).

306.    Pharmacist No. 13 regularly encountered problems with potential prescription fraud, including forged prescriptions and stolen prescription pads. In such cases, she would contact the doctor and asked them what they wanted the staff to do, press charges or talk to the patient themselves. They usually preferred for the pharmacy to press charges.

307.    When the staff were asked to call the police, she would have to stall the customer until the police showed up. The police would sometimes come inside the store or wait just outside the door to arrest the customer.

308.    One typical forgery was to change the quantity of the drug, adding a zero to make a 10-count turn into 100, for example. "Usually, we knew the docs and how they prescribed things, and you could guess that it was forged," she said.

309.    Pharmacist No. 13 had a store procedure to follow if she thought a prescription was forged. She would call the doctors and verify the prescription in those cases.

310.    She remembered a case where an entire prescription pad was stolen, and the customer wrote the whole prescription out. She recalled that the forged signature did not match the true signature of the doctor. In that case, she notified the police, filled the prescription and the police came and arrested him. However, it could be difficult to determine if a pad had been stolen unless the doctor notified the pharmacy. She recalled one case in which a customer had printed a very good copy of a doctor's pad and she did not catch it. She learned about it because the police caught the person at another store.

311.    Pharmacy staff was also able to report to Rite Aid if they were suspicious about seeing lot of prescriptions for controlled substances from certain doctors. She remembered reporting one to corporate but could not recall the name.

312.    The Rite Aid computer system would also block certain physicians' DEA numbers if a doctor had lost their DEA registration. But she does not recall management warning about avoiding specific doctors. That information could be passed on between pharmacists. "Usually, that was on a more personal level," she said. "Usually, you would hear it by word of mouth from other pharmacists or you would come across it yourself."

313.     Pharmacist No. 13 did recall getting emails from corporate warning of the Sudafed diversion problem and other scams, such as gift card scams. If any pharmacies in the district had been robbed, that could also generate a warning email from the corporate office.

314.     She also occasionally saw prescriptions from Florida, which was about four hours away. Although there was no policy about filling scrips from other states, a prescription from out of state was a red flag in her mind and would usually send her to the state's PMP to check on the customer.  Sometimes in such cases, in order to avoid a confrontation, she would tell the customer the pharmacy was out of the drug in question.

315.     Rite Aid did not require pharmacists to check the database, but they encouraged it.  Pharmacist No. 13 developed her own criteria for checking it: If a new customer dropped off a prescription for a pain medication, or if they acted suspicious or were unsure about certain information.  She would also check it if the pain customer was overly friendly and too talkative or seemed to be too knowledgeable about how controlled substances work. Patients who had insurance but wanted to pay cash for their pain medication also would raise a red flag.

316.     However, the work environment made it difficult to check the database even in those cases. On weekends, she would be the only pharmacy staffer for an entire shift. There was barely time to go to the bathroom or get something to eat. The store's prescription count was not high enough to warrant additional staffing. She only had help from 8 to 5 during the week. But after 5 PM was when many people got off work and came to the store.

317.     Even though the store was not high volume (on a good day, about 100 prescriptions were filled), they still have pressure to fill quickly.  It was expected that prescriptions be filled within 15 minutes. "In order to do that, you're going to have to cut corners," she said. "Cutting corners means I don't have time to look at this database to see if this person is a druggie

and I don't have time to call the doctor and sit on the phone forever to verify a prescription," Pharmacist No. 13 said. "We're trying to do our main, primary job, which is to fill prescriptions. So other things that we have to do sometimes go by the wayside. One of those is policing opioids. If they really wanted us to do the things they wanted us to do, they should give us time for it and they should give us help for it."

318.     She saw a lot of prescriptions from Dr. Gilberto Sanchez. He was good at deception, she said. "He had a way of making it look legitimate," she said.  "Even if you had a suspicion that he wasn't on the up and up, he was very good at covering his tracks. Sanchez was very strict about not letting his patients get early refills. He typed his prescriptions in order to avoid forgeries. He asked patients to verify their identifications and would attach a photo of the patient to the prescription.

319.     On August 23, 2018, Sanchez, 56, of Montgomery, Alabama, was sentenced to serve 12 years and 1 month in prison for prescribing unnecessary controlled substances to his patients, committing health care fraud, and laundering money. Sanchez operated a medical practice located at 4143 Atlanta Highway in Montgomery. Sanchez gave patients prescriptions for controlled substances knowing that the patients did not need the medicine and would abuse the drugs. Among the drugs he unnecessarily prescribed were oxycodone, hydrocodone, and fentanyl. Sanchez also gave out illegitimate prescriptions for amphetamines, including Adderall, and benzodiazepines, including Xanax.[229]

---

[229] Press Release, U.S. Dep't of Justice, *Montgomery "Pill Mill" Doctor Receives a 145- Month Sentence for Drug Distribution, Health Care Fraud, and Money Laundering Offenses; "Pill Mill" Mental Health Counselor Pleads Guilty in Related Case* (Aug 24, 2018), https://www.justice.gov/usao-mdal/pr/montgomery-pill-mill-doctor-receives-145-month-sentence-drug-distribution-health-care.

320.     Pharmacist No. 13 also recalled seeing prescriptions from Dr. Shepherd Odom, who was associated with Sanchez.   On December 8, 2017, Dr. Shepherd A. Odom, 78, of Alexander City, Alabama, pleaded guilty to charges of drug distribution and conspiracy to commit money laundering.  The guilty plea was a part of the prosecution of those involved in operating a "pill mill" through the Family Practice medical office at 4143 Atlanta Highway in Montgomery, Alabama. Odom was a part owner of Family Practice.  In 2013, he sold his interest in the business to his partner, Sanchez, but remained involved in the business.[230]

321.     Pharmacist No. 13 also recalled prescriptions from Nurse Practitioner Lilian Akwuba, who was associated with Sanchez. On May 29, 2019, Lilian Ifeoma Akwuba, 40, received a 10-year sentence for her part in helping run two separate "pill mill" operations in Montgomery over a four-year period. In October of 2018, a federal jury convicted Akwuba on 17 counts of unlawfully distributing controlled substances, four counts of health care fraud, one count of conspiring to distribute controlled substances, and one count of conspiring to commit health care fraud. From 2013 through 2016, Akwuba worked at Family Practice, where her supervisor was Sanchez. There, she issued and caused to be issued unnecessary and illegitimate prescriptions for fentanyl, hydrocodone, oxycodone, alprazolam, and methadone.[231]

322.     Pharmacist No. 13 recalled seeing prescriptions from Dr. Willie Chester, who was also associated with Sanchez: On June 11, 2018, a physician, Dr. Willie J. Chester, 65, of Pike Road, Alabama, pleaded guilty in the ongoing prosecution of Sanchez' Family Practice at 4143

---

[230] Press Release, U.S. Dep't of Justice, *Another Montgomery "Pill Mill" Doctor Pleads Guilty to Drug Distribution and Money Laundering Charges* (Dec. 11, 2017), https://www.justice.gov/usao-mdal/pr/another-montgomery-pill-mill-doctor-pleads-guilty-drug-distribution-and-money.

[231] Press Release, U.S. Dep't of Justice, *Montgomery Nurse Practitioner Receives 10-Year Sentence* (May 30, 2019), https://www.justice.gov/usao-mdal/pr/montgomery-nurse-practitioner-receives-10-year-sentence.

Atlanta Highway in Montgomery. Chester pleaded guilty to one count of aiding and abetting the fraudulent acquisition of controlled substances. He admitted to writing a prescription for clonazepam (commonly known as the brand name drug, Klonopin) despite knowing that the patient receiving the prescription had no legitimate medical need for the drug.

323.     Pharmacist No. 13 recalled seeing prescriptions from Elizabeth Cronier, a nurse practitioner who was associated with Dr. Sanchez. On April 23, 2018, Elizabeth Cronier, 70, of Montgomery, Alabama, pleaded guilty to aiding and abetting the fraudulent acquisition of controlled substances. Cronier was a certified registered nurse practitioner and she worked for Sanchez at Family Practice from 2016 to 2017. Cronier admitted to aiding and abetting a patient in obtaining a fraudulent prescription for buprenorphine.[232]

324.     She also recalled seeing prescriptions from Dr. Julio Delgado, also associated with Sanchez. On May 11, 2018, Dr. Julio Delgado, 56, of Homewood, Alabama, pleaded guilty to aiding and abetting the fraudulent acquisition of controlled substances. Dr. Delgado worked for Sanchez at Family Practice during 2015 and 2016. During that time, Dr. Delgado saw some of Dr. Sanchez's patients when Dr. Sanchez was too busy. Delgado admitted to writing a prescription for someone who was never his patient and without ever examining the person.[233]

### 3.     *Monroeville, Alabama (Pharmacist No. 14)*

325.     Pharmacist No. 14 worked as a staff pharmacist for Rite Aid from May 2016 to August 2018. He worked at the store at 1818 S. Alabama Ave., in Monroeville, Ala. The store is now closed. He was laid off when Rite Aid stores were bought by Walgreens in 2018.

---

[232] Press Release, U.S. Dep't of Justice, *Physician, Nurse Practitioner, and Nurse Plead Guilty in Montgomery "Pill Mill" Case* (May 15, 2018) https://www.justice.gov/usao-mdal/pr/physician-nurse-practitioner-and-nurse-plead-guilty-montgomery-pill-mill-case.
[233] *Id.*

326.     Rite Aid management held an offsite meeting during which they urged pharmacy staff to keep their customers' pain considerations in mind when evaluating narcotic prescriptions. In the summer of 2017, when Rite Aid management rented a conference room at a Budweiser brewery or facility of some sort in Montgomery.   The purpose of the meeting was to share corporate ideals and goals and to urge staff to remain with the Company even as the acquisition by Walgreens (which closed in 2018) was playing out. "They urged them not to go away, because Walgreens will want to keep them," he said. "But that was not the case."

327.     The issue of pain pill prescriptions was addressed at this meeting, with the company urging staff to be open-minded about such prescriptions even though the opioid epidemic was well under way and well publicized at this time. "Don't get in that mindset of all of a sudden having your shields up," if a customer comes in with a prescription for opioids is how Pharmacist No. 14 recalls the message. "They didn't want you to think that pain is a bad idea," he said. "No, this person may need it," was the message from above.

328.     The Monroeville Rite Aid store saw a lot of opioid prescriptions coming from the local hospital's emergency department, possibly from people who were drug seekers. Patients coming from emergency visits from the Monroe County Hospital with prescriptions for small amounts of pain pills were frequent customers at this store. Tramadol was a frequently prescribed drug from the hospital emergency department. These were often people complaining of minor injuries such as sprained ankles who were prescribed narcotics for their complaints.

329.     One staff member, Dr. Anthony House, stood out in Pharmacist No. 14's memory as a hospital physician who frequently wrote such prescriptions for pain killers. A DEA agent visited the store one day, unannounced, and asked if there were any physicians the agency should

be investigating. He mentioned Dr. House.  "He always stuck out in my mind," he said. Pharmacist No. 14 doesn't know if they investigated him or not.

330.    The store's staff also dealt with forged prescriptions for opioids, including at least one case that involved law enforcement authorities. He also filled for a veterinarian who wrote prescriptions for large amounts of narcotics for dogs. Forged prescriptions for Tramadol and for promethazine with codeine were seen in the pharmacy and in some cases filled.

331.     Law enforcement had brought the issue of forged prescriptions to the attention of staff at the store, when prescriptions from a local doctor were being altered. A DEA agent showed him images of a prescription with the doctor's original handwriting and an image of one that a patient had added a prescription for Tramadol to. "Sure enough, you could see a weird mismatch in the way they wrote 'Tramadol,'" he said.

332.     In another case, a doctor called the pharmacy and reported the promethazine codeine forgery after seeing on the state PMP that the pharmacy had filled the prescription. The doctor's prescription pad had been stolen and he asked Rite Aid to call law enforcement. Law enforcement was called and prepared a report on the incident.

333.     Pharmacist No. 14 relatively new at the time, reported this to his pharmacy manager who handled it.  He believes the pharmacy manager was trying to hide the matter from his district manager "because he didn't want him asking a lot of questions."  Pharmacist No. 14 did not recall that doctor's name but thinks he was based out of an office in Brewton, Ala.

334.     Forged prescriptions for Tramadol and promethazine with codeine would get by more easily than ones for high-profile, red-flag narcotics such as Percocet and Norco. "They fly under the radar more in a retail setting," Pharmacist No. 14 said. "We're being pushed to fill a

certain amount of prescriptions every day so it's more likely to get under our radar and to get filled."

335.  Pharmacist No. 14 also recalled a veterinarian, Dr. John Grider, who wrote prescriptions for large amounts of Tramadol – 120 tablets – for dogs. These customers, there were a handful of them, appeared to be well off, and perhaps retired. Pharmacist No. 14 was suspicious of the prescriptions, but usually filled them. "It was kind of weird for a dog to be getting that much," he said.

336.  Cases like these would often not be flagged in the Rite Aid internal computer system. Rite Aid did not have a function that allowed management to block prescriptions from being filled for certain physicians. "For most pharmacists, as long as it's not an issue in the computer, it's up to your judgment," he said. Some were repeat customers and he recalled a pharmacy technician reassuring him that they had filled for the customer and the doctor before. In hindsight, he thinks the drugs may have been diverted but he did not have the time or the resources to verify that while working at the store.

337.  Pharmacist No. 14 recalled filling prescriptions from suspicious providers.  For example, he "definitely" recalled filling prescriptions for Dr. Rassan Tarabein from Fairhope, Alabama. On August 31, 2017, Tarabein pleaded guilty before Chief Judge DuBose in the Southern District of Alabama to one count of health care fraud and one count of unlawful distribution of a schedule II controlled substance.  As part of his guilty plea, Tarabein admitted that from around 2004 to May 2017, he ran an insurance scam in which he induced patients to visit his clinic so that he could bill health care benefit programs for medically unnecessary tests and procedures. Tarabein was sentenced to 60 months in prison and ordered to pay restitution totaling $15,010,682 to six different health care benefit programs, including Medicare and the Alabama

Medicaid Agency. Tarabein had operated the Eastern Shore Neurology and Pain Center, a private clinic in Daphne, Alabama where he offered services relating to neurology and pain management, such as spinal injections.[234]

## B.  Specific Examples of Unlawful Dispensing Conduct: California

### 1.  *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in California*

338.    California has not escaped the opioid epidemic.

339.    In the decade between 2008 and 2017, over 14,500 Californians have died due to prescription opioid drug overdoses.[235] There were over 80,000 emergency room visits and hospitalizations in California from opioid overdoses during that same time period.[236] On average, about six Californians die each day from an opioid-related overdose.[237]

340.    Despite having some 541 stores located all over the State of California, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in California.

341.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid pharmacies), who were apprehended (and many of them later convicted) as a result of a DEA or local law enforcement investigation, were

---

[234] Press Release, U.S. Dep't of Justice, *Former Pain Management Doctor Receives 5 Years in Health Care Fraud Case, Ordered to Pay More Than 15 Million Dollars in Restitution* (June 8, 2018), https://www.justice.gov/usao-sdal/pr/former-pain-management-doctor-receives-5-years-health-care-fraud-case-ordered-pay-more.

[235] California Department of Public Health, California Opioid Overdose Surveillance Dashboard, https://www.cdph.ca.gov/opioiddashboard.

[236] *Id.*

[237] *Id.*

identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|------|------|------|----------|
| 23-Aug-03 | Michael Umansky, MD | Los Angeles, CA | 36 months probation |
| 18-Oct-04 | Nicholas Sasson, MD | Salina, CA | 5 years probation |
| 5-Oct-06 | Peter Ahles, MD | Anaheim, CA | 6 months home detention |
| 2-Feb-07 | Heidi Ann Winkler, MD | Norwalk, CA | 1 day |
| 5-Mar-07 | Robert Z. Braun, MD | West Hills, CA | 70 months |
| 22-Aug-07 | Joan Z Kutschbach, MD | Elk Grove, CA | 30 days |
| 30-Jun-08 | Bassam Yassine, MD | Glendora, CA | 37 months |
| 3-Nov-08 | Monique B.  Williams, MD | Los Angeles, CA | 36 months |
| 6-May-09 | Masoud Bamdad, MD | San Fernando, CA | 25 years |
| 6-Jul-09 | Daniel Healy, MD | Arcadia, CA | 4 years |
| 21-Sep-09 | Joel Dreyer, MD | Murrieta, CA | 10 years |
| 11-Nov-09 | Vu Le, MD | Midway City, Cal | 57 months |
| 19-Nov-09 | Peter Dietrich, MD | Sacramento, CA | 60 days |
| 16-Apr-13 | Christopher Henry Lister, MD | Victorville, CA | 14 years |
| 2-May-13 | Anush Davtyan, MD | Encino, CA | 14 years |
| 12-Aug-13 | James William Eisenberg | Venice, CA | 46 years |
| 17-Oct-13 | Alvin Mingczech Yee, MD | Mission Viejo, CA | 135 months |
| 27-Mar-14 | Dr. Toni Daniels, MD | Berkeley, CA | dismissed (dementia) |
| 4-Sep-14 | Dr. Michael Roger Chiarottino, MD | San Rafael, CA | 3 years |
| 29-Sep-14 | Terrill Eugene Brown, MD | Visalia, CA | 4 years, 9 months |
| 9-Dec-14 | William Joseph Watson, MD | Del Mar, CA | 5 years |
| 5-Jan-15 | Andrew Sun, MD | La Mirada, CA | 63 months |
| 7-Dec-15 | Julio Gabriel Diaz, MD | Goleta, CA | 27 years |
| 4-Feb-16 | Madhu Garg, MD | Glendora, CA | 3 years |
| 5-Feb-16 | Hsiu Ying "Lisa" Tseng, MD | Rowland Heights, CA | 30 years |
| 11-Apr-16 | Daniel Cham, MD | Covina, CA | 13 years |
| 20-Apr-16 | Matthew Cole, MD | San Diego, CA | time served |
| 29-Apr-16 | Edward Ridgill, MD | Ventura, CA | 5 years |
| 13-Jun-16 | Victor Boon Huat Siew, MD | Laguna Beach, CA | 70 months |
| 7-Jul-16 | Paul Woodward, MD | Napa, CA | 5 years probation |

| 18-Nov-16 | Washington Bryan, MD | Westwood, CA | 33 months |
| 30-Nov-16 | Naga Raja Thota, MD | El Cajon, CA | 2 years |
| 19-May-17 | Jasna Mrdjen, MD | Mountain View, CA | 4 years |
| 13-Jul-17 | Jeffrey Olsen, MD | Laguna Beach, CA | indictment dismissed (Covid-19); appeal pending |
| 5-Feb-18 | Thanh Nha Pham, PA | Fountain Valley, CA | 41 months |
| 8-Feb-18 | Kaitlyn Phuong Nguyen, PA | San Jose, CA | 41 months |
| 22-Mar-18 | Gregory John Van Dyke, MD | Dana Point, CA | License Surrendered |
| 26-Apr-18 | Sawtantra Kumar Chopra, MD | Modesto, CA | Incompetent to stand trial |
| 24-Jul-18 | David Lague, PA | San Leandro, CA | 10 years |
| 18-Sep-18 | Christopher Owens, MD | San Francisco, CA | 41 months |
| 2-Oct-18 | Thomas Keller, MD | Santa Rosa, CA | trial pending in state court |
| 18-Dec-18 | Dzung Ahn Pham, MD | Tustin, CA | trial 12/1/2020 |
| 21-Feb-19 | Michael Anthony Simental | Corona, CA | arrested |
| 12-Apr-19 | Frank Gilman, MD | San Diego, CA | License Surrendered |
| 12-Aug-19 | Pauline Tilton, Ph.D. | Hesperia, CA | 63 months |
| 27-Aug-19 | Raif Wadie Iskander, PA | Ladera Ranch, CA | arrested |
| 16-Oct-19 | Roger A. Kasendorf, DO | La Jolla, CA | $125,000 fine |
| 13-Nov-19 | Deane Leo Crow, MD | Monterey County, CA | indicted |
| 15-Dec-19 | Edmund Kemprud, MD | Dublin, CA | indicted |
| 6-Jan-20 | Kain Kumar, MD | Palmdale, CA | 24 months |
| 3-Mar-20 | Timothy Mulligan, MD | Santa Clara, CA | indicted |
| 30-Apr-20 | Prakash Bhatia, MD | San Diego, CA | $145,000 fine |
| 4-Jun-20 | Gabriel Hernandez, PA | Anaheim, CA | 18 months |
| 26-Oct-20 | Egisto Salerno, MD | San Diego, CA | 18 months |

342.     Beyond prosecuting medical professionals for inappropriate prescribing, California licensing boards have aggressively investigated bad conduct. As part of an effort to proactively root out California bad doctors, the Medical Board of California in 2015 initiated what it dubbed as the "Death Certificate Project." The California Project takes death certificates in which prescription opioids are listed as a cause, then matches each with the provider – sometimes more than one – who prescribed any controlled substance to that patient within 3 years of death,

regardless of whether the particular drug caused the death or whether that doctor prescribed the lethal dose. At the Project's launch, Board staff began reviewing 2,694 certificates of death filed in 2012 and 2013 and found 2,256 matches in CURES, showing each provider who wrote an opioid prescription filled by those deceased patients. Those reports went to medical peer reviewers who, after extensive review, selected 522 prescribers as warranting an investigation of the patients' files. They included 469 physicians against whom the Board has opened formal complaints along with 12 osteopathic physicians and 60 nurse practitioners or physician assistants, who were referred to their respective licensing boards. Of the nearly 469 MDs investigated for excessive prescribing because of patients' overdose deaths, as of August 2018 formal accusals of wrongdoing had been filed against 64 physicians related to their drug prescribing, primarily involving opioids. Five of the 64 have surrendered their licenses; six others were put on probation, and eight received public reprimands.[238]

343.   Not only were none of these physicians referred to the Board by Rite Aid, evidence from the Board investigations shows that Rite Aid pharmacies filled numerous prescriptions for these prescribers. For example, Rite Aid pharmacies numbers 6000 (520 W. Lodi Ave, Lodi, California 95240), 6403 (4241 Marconi Ave, Sacramento, California 95821), 6079 (1730 Watt Ave, Sacramento, California 95825), and 6228 (9482 California City Blvd, California City, California 93505) filled numerous opioid prescriptions written by Kimberly T. Le, M.D., Carmichael, California (located in Sacramento County, California), whose license was revoked by the Board in 2017.[239] In surrendering her license, Dr. Le admitted she had written numerous

---

[238] Cheryl Clark, *Death Certificate Project Accuses 64 Calif. Doctors*, MedPage Today (Sept. 3, 2019), https://www.medpagetoday.com/painmanagement/opioids/81954.

[239] *See In the Matter of Accusation Against Kimberly T. Le., M.D.*, California Medical Board, Case

inappropriate opioid prescriptions for drug seekers, many of which had been filled at Rite Aid pharmacies in the Sacramento area.[240]

344.    Had Rite Aid pharmacists been required to check the California CURES database, they would have easily seen the blatant doctor and pharmacy shopping under way.

### 2.    *Sacramento, California (Pharmacist No. 5)*

345.    Pharmacist No. 5 has worked as a pharmacist for nearly twenty years, and as a Rite Aid pharmacist from 2014 to the present. While working for Rite Aid, Pharmacist No. 5 has worked at around 20 stores in Sacramento and Northern California. Many of the Rite Aid stores where he worked have been very busy stores filling a lot of controlled substance prescriptions.

346.    Rite Aid's focus on filling every prescription and filling them quickly no matter what was present from Pharmacist No. 5's very first training with Rite Aid. At that training for pharmacists new to Rite Aid, the trainer explicitly told them to fraudulently complete the company's checklist for filling C-II prescriptions. The trainer said that, while they should fill out the checklist as if they had carefully gone through it, in reality the pharmacists should ignore even the perfunctory checks the checklist contained. They were told that the checklist was merely paperwork and should be filled out with the lie that minimal due diligence actions were taken when they were, in fact, not. Instead, the priority was to just fill the prescriptions.

347.    This meant that the pharmacists were being instructed by Rite Aid trainers not to check things such as patient names, doctor names, validity of prescriptions, but also to lie about it

---

No. 800-2013-000921 (Oct. 20, 2016), https://www.dir.ca.gov/Fraud_Prevention/Documentation/Le,%20Kimberly/GS_Le_Kimberly.pdf.

[240] *See Stipulated Surrender Of License And Order*, *In the Matter of Accusation Against Kimberly T. Le., M.D.*, California Medical Board, Case No. 800-2013-000921 (May 1, 2017), https://www.dir.ca.gov/Fraud_Prevention/Documentation/Le,%20Kimberly/GS_Le_Kimberly.pdf.

and cover their tracks. This conduct is particularly egregious because, at the very beginning of his tenure at Rite Aid, it confirmed the atmosphere of noncompliance and Rite Aid's goal of filling every prescription no matter what.

348.    To this day, at Pharmacist No. 5's current Rite Aid store, the pharmacists do not check the California PDMP system (CURES) before filling C-II prescriptions despite it being on the Rite Aid checklist. Sadly, the Rite Aid "training" has worked as intended.

349.    The first store Rite Aid where Pharmacist No. 5 worked immediately opened his eyes to Rite Aid's problematic dispensing practices in action. At that store in North Highlands, California, the Rite Aid pharmacists would fill every prescription without question, including narcotics. This included prescriptions that presented numerous red flags. The red flags included things such as "Holy Trinity" combinations and prescriptions from pain clinics/prescribers from places far away like Modesto, California (1.5 hours away).

350.    Despite the culture of filling at the store, Pharmacist No. 5 tried to be more diligent in investigating the medical necessity and appropriateness of the prescriptions he personally filled. However, Pharmacist No. 5's diligence elicited numerous complaints from customers used to not having their prescriptions questioned at Rite Aid.

351.    Rite Aid cared more about the customer complaints than its obligations under the law, so as the complaints piled up against Pharmacist No. 5, he was reprimanded by his manager. Eventually, the problem of filling inappropriate prescriptions got so bad at the North Highlands store that Pharmacist No. 5 transferred stores. He felt that he could not work in a store that did not allow him to do his job as a pharmacist by questioning certain prescriptions that presented with red flags.

352.    Despite his transfer to a new store, many of the same problems persisted at the other Rite Aid stores where Pharmacist No. 5 has worked throughout Northern California. He has frequently found himself under considerable pressure from his manager, from customer complaints, and time-related pressure to fill all controlled substance prescriptions.

353.    The stores where Pharmacist No. 5 has worked routinely have filled 400-500 prescriptions per 12-hour shift and some filled even more. Pharmacist No. 5 knew that with that sort of volume, there was simply no way for Rite Aid pharmacists to vet prescriptions properly.

354.    Rite Aid has dispensed massive amounts of controlled substances at its 22 stores in Sacramento County.  According to DEA ARCOS data for 2006 through 2012, the 22 Rite Aid stores in Sacramento County filled 81,062,994 doses of opioids, or 1,128,328,340 MME, making it the largest dispenser of opioids in Sacramento County.

355.    On one occasion, Pharmacist No. 5 turned down a script, only to have his district manager order him to fill the prescription. He had refused to fill the script because the patient was living some distance away and drove to his pharmacy to get narcotics filled. Pharmacist No. 5 viewed this as a potential red flag and encouraged the patient to get his prescription filled closer to home. The patient eventually complained to Rite Aid management about Pharmacist No. 5 not filling the prescription. Pharmacist No. 5 concluded the patient could not get his prescription filled anywhere else, and knew that with a complaint, Rite Aid may change its decision. True to form, his district manager called him a short time later, very upset, and ordered him to fill the prescription.

356.    In another instance, a manager at a Rite Aid store in Sacramento (4241 Marconi Avenue, Sacramento, California 95821) told him that he was not to turn away any Norco prescriptions (Norco is the brand name of hydrocodone/acetaminophen combination medication).

This was a direct instruction and had no exceptions. Even if the prescriptions were clearly fraudulent, not medically appropriate, or were presenting with numerous red flags, the manager instructed him to fill all Norco prescriptions. This directive was echoed by two district managers in addition to the store manager. Their instruction was "[j]ust do it. Don't ask questions."

357.    The situation at Rite Aid was so bad that Pharmacist No. 5 eventually reported what he was seeing to DEA's Sacramento office. He eventually met with a DEA agent and a DOJ investigator for about an hour in 2018 but has never heard anything further about it.

### C.  Specific Examples of Unlawful Dispensing Conduct: Georgia

#### 1.    *Rite Aid failed to investigate or halt dispensing of inappropriate or medically unnecessary opioid prescriptions in Georgia*

358.    Georgia finds itself in the midst of an unprecedented prescription drug crisis, with hundreds of deaths attributable to opioid prescription drug overdoses every year.[241]

359.    The State of Georgia had the eleventh highest number of opioid overdoses in the United States between 1999 and 2014.[242] Opioid-involved overdose deaths have not just increased – *but exploded by an astonishing 1000%* -- since 1999 when these drugs were first meaningfully introduced to the State of Georgia.[243]

360.    Statistics in recent years show the ever-increasing momentum of this crisis: from 2010 to 2017, the total number of documented opioid-involved overdose deaths in Georgia

---

[241] The Henry J. Kaiser Family Foundation, *Opioid Overdose Deaths and Opioid Overdose Deaths as a Percent of All Drug Overdose Deaths* (2015), https://www.kff.org/other/state-indicator/opioid-overdose-deaths/.

[242] Substance Abuse Research Alliance, *Prescription Opioids and Heroin Epidemic in Georgia, 2017*, http://www.senate.ga.gov/sro/Documents/StudyCommRpts/OpioidsAppendix.pdf.

[243] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.

increased by an astounding 104%, from 514 to 1051 deaths.[244] In 2017, opioid-involved overdoses accounted for 5,656 emergency department visits and 2,622 hospitalizations. Tellingly, the annual number of such hospital admissions had tripled since 2000.[245] In 2018, there were 1,396 deaths attributed to all drugs in the State of Georgia, but an overwhelming number of them (1,051) were the result of opioids.[246]

361.    The death, addiction, and increased cost associated with prescription opioids is a direct consequence of Georgia's opioid prescription rate increase over the same time period. By 2013, Georgia's average prescription rate for opioids (90.7 per 100 persons) was well over the national average (79.3).[247] In 2016, there were 0.778 opioid prescriptions per person in Georgia, according to the CDC.[248]

362.    Despite having some 315 stores located all over the State of Georgia, Rite Aid's gross inadequacies in the performance of its CSA due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities.

363.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid pharmacies), who were apprehended (and

[244] Georgia Department of Public Health, *Opioid Overdose Surveillance Georgia, 2017*, https://dph.georgia.gov/sites/dph.georgia.gov/files/2017%20Georgia%20Opioid%20Overdose%20Report%20Final.pdf.

[245] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.

[246] Online Analytical Statistical Information System (OASIS) Trending Tool – Drug Overdoses Statistics, https://oasis.state.ga.us/.

[247] Ctrs. for Disease Control & Prevention, *U.S. State Prescribing Rates, 2016*, https://www.cdc.gov/drugoverdose/maps/rxstate2016.html.

[248] *Id.*

many later convicted) as a result of a DEA or local law enforcement investigation, were identified,

investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 6-Jul-05 | David Mark Battista, MD | Atlanta, GA | 3 years, 10 months |
| 26-May-05 | Lisa Sanders, MD | Fort Gordon, GA | 6 months |
| 22-Jan-06 | George Williams, MD | Duluth, GA | 7 years |
| 27-Mar-06 | Anthony Junco, Jr., MD | Savannah, GA | 3 months |
| 20-Oct-07 | Noel Chua, MD | Kingsland, GA | life (felony murder) |
| 16-Jan-08 | William McArthur, III, MD | Jesup, GA | 30 months |
| 18-Mar-08 | In Whan Yun, MD | Wrens, GA | 5 years probation |
| 12-May-09 | Phil Astin III, MD | Newnan, GA | 10 years |
| 11-Aug-09 | Spurgeon Green, Jr., MD | Perry, GA | 30 years |
| 5-Aug-10 | Brian Weaver, MD | Atlanta, GA | 27 months |
| 5-Jul-12 | Michael Assevero, MD | Northlake, GA | arrested |
| 19-Dec-12 | Hung Thien Ly, MD | Savannah, GA | 97 months |
| 15-Nov-13 | Hugh Maddux, DDS | Newnan, GA | 1 year, 1 month |
| 1-Aug-14 | Kenneth Gossett, DO | Rome, GA | 42 months |
| 6-Aug-14 | Najam Azmat, MD | Waycross, GA | 11 years, 1 month |
| 8-Aug-14 | Cleveland J. Enmon, MD | Decatur, GA | 20 years |
| 9-Oct-15 | Michael Johnston, MD | Tucker, GA | 10 years |
| 27-Oct-15 | Sanjay Sinha, MD | Woodstock, GA | 5 years |
| 12/9/2015 | James Chapman, MD | Macon, GA | 120 months |
| 15-Aug-16 | Bradley Lane Frost, MD | Dublin, GA | 127 months |
| 23-Feb-17 | Romie Earl Roland, MD | Atlanta, GA | 10 years, 10 months |
| 29-Mar-17 | Nisar Piracha, MD | Atlanta, GA | 7 years, 3 months |
| 4-Apr-17 | Paul Spencer Ruble, DO | Brunswick, GA | 5 years |
| 25-Apr-17 | Edd Colbert Jones, III, MD | Fitzgerald, GA | 18 months |
| 26-Jun-17 | Nevorn Askari, MD | Atlanta, GA | 5 1/2 years |
| 26-Jun-17 | William Richardson, MD | Atlanta, GA | 4 1/2 years |
| 11-Mar-18 | Narendra Negareddy, MD | Jonesboro, GA | Indicted twice, murder charges |
| 29-Aug-18 | Joseph Burton, MD | Alpharetta, GA | 8 years |
| 7-Dec-18 | William Bacon, MD | Valdosta, GA | 72 months |
| 7-Dec-18 | Donatus O. Mbanefo, MD | Columbus, GA | 96 months |
| 4-Apr-19 | Vinod Shah, MD | Valdosta, GA | 72 months |
| 13-Jun-19 | Johnny Di Blasi, MD | Braselton, GA | 33 months |
| 31-Jul-19 | TaShawna Stokes, MD | Alpharetta, GA | guilty plea |
| 31-Jul-19 | Oscar Stokes, MD | Alpharetta, GA | guilty plea |
| 11-Sep-19 | Victor Hanson | Atlanta, GA | indicted |
| 9-Oct-19 | Arnita Avery-Kelly, DPM | Sandy Springs, GA | 120 months |

| 14-Feb-20 | Frank H. Bynes, Jr., MD | Savannah, GA | 20 years |
| 27-Feb-20 | John Patrick Schilling | Stockbridge, GA | indicted on 58 counts |

## 2. *Fayetteville, Georgia (Pharmacist No. 15)*

364.     Pharmacist No. 15 worked as a pharmacist for Rite Aid from 1998 to 2018. She worked at Rite Aid stores in Bangor, Maine, Hawley, Pennsylvania and Fayetteville, Georgia, which is 24 miles south of Atlanta. She was not rehired by Walgreens when that company bought Rite Aid pharmacies.

365.     At the Fayetteville store, a patient's wife came in with a prescription for 80 milligram OxyContin, three tablets every eight hours. She told her it was too much of the powerful narcotic. "I don't know how a person like that could function with that much OxyContin," she said. The patient was also taking Percocet. She did not recall exactly what type of pain the patient had, but it was not cancer pain, for which OxyContin was originally formulated to address. Although she was new to that area and the patient had had the prescription filled before, Pharmacist No. 15 didn't want to fill it.

366.     "I think it was wrong," she said. "It was too high of a dose. The doctor shouldn't have allowed it. I don't even know how everybody allowed it. That patient has been getting it every month." The customer, the patient's wife, called the Rite Aid corporate office to complain. Customer service sent Pharmacist No. 15 an email and said they have a complaint from a patient. And they followed up with the patient.

367.     She believes the office wanted her to go ahead and fill the prescription and keep the customer. She believes Rite Aid corporate should have looked into it and supported her by saying she say should not fill the prescription.

368.     When a Rite Aid Human Resources representative from Walgreens interviewed her about transferring to the new company, one of the questions was 'What would you do if a patient comes with prescription for a controlled substance?' "I told her if I feel the prescription is not legitimate, I won't fill it," she said. "I also told her I would call the pharmacies and tell them there is a bad prescription going around."

369.     She explained that she had been a pharmacist for more than 20 years and based on her experience knew which customers were drug seekers. She believed she had a 95 percent chance of being correct in such assessments. The HR rep challenged that, asking her how she could judge the truth or falsehood of a customer. "She said you're denying the patient," she said. "I think that may have cost me the job. She wasn't happy with the response I gave her."

370.     Rite Aid's corporate posture toward the opioid epidemic changed and became stricter in the last several years of her tenure there. For example, the company distributed placards with procedures for filling narcotic prescriptions and how to check for the legitimacy of opioid scrips. They posted these placards at the pharmacy work stations. The company also mandated that pharmacists check the state's prescription monitoring programs.

371.     Overall, she believes Rite Aid was slow to respond to opioid epidemic. "I don't think they realized how bad it was, or maybe they didn't care," she said. "Seven, eight, nine years ago it was a different story. They didn't care that much how many scrips we were filling of opioids."

372.     She saw many patients that she believed were addicted and also saw forged prescriptions. Pharmacist No. 15 saw patients who appeared to be high, as their eyes were closing while they were at the counter. She saw very young customers arrive with prescriptions for Percocet and Ibuprofen 800 mg, hoping such a prescription, combining a Schedule 2 drug an OTC

drug, would make it look legitimate.  Pharmacist No. 15 also saw prescriptions for an antibiotic along with one for a large amount of Percocet, which she believed was an effort to make the opioid prescription appear legitimate. She recalls saying she would fill the antibiotic prescription, but not the Percocet and the patient declined to have that filled.

373.    Customers would also arrive after normal business hours with prescriptions for narcotics that they said were for their grandmothers. Unable to confirm with the doctors, she would often say she did not have the drugs in stock.

374.    Pharmacist No. 15 saw forged prescriptions coming from a hospital in Atlanta, which she thinks was Grady Memorial. She was seeing a lot of prescriptions for Percocet with ibuprofen that were fake and also fake scrips for promethazine with codeine. She would call the hospital to verify and the staff would not follow up with an investigation, but only say it was not their prescription. "They didn't do much research; they didn't call me back or talk to me," she said. These prescriptions would typically arrive at night when doctors weren't available to confirm them.

375.    She also recalled prescriptions from fraudulent doctors. For example, she remembers filling prescriptions for Dr. Romie Roland. In February 2017, Dr. Roland was sentenced to ten years, ten months for conspiring to distribute Schedule II controlled substances by illegally prescribing prescription painkillers for no legitimate medical purpose.[249]

---

[249] Press Release, U.S. Dep't of Justice, *Anesthesiologist Sentenced for Illegally Prescribing Oxycodone and Other Prescription Painkillers* (Feb. 23, 2017), https://www.justice.gov/usao-ndga/pr/anesthesiologist-sentenced-illegally-prescribing-oxycodone-and-other-prescription.

376.     Also indicted and sentenced for their roles in the operation of the pain clinic were seven other co-defendants: Anthony Licata, Charlyn Carter, Adrian Singletary, Dante Cummings, Anthony Ferguson, Danny Thompson and Joshua Gadd. Each co-defendant also pleaded guilty.[250]

### D.  Specific Examples of Unlawful Dispensing Conduct: Idaho

1.     *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Idaho*

377.     Idaho has not escaped the scourge of the opioid epidemic.  In 2015, 223 Idahoans died from drug overdoses, most of which involved opioids, while 244 people in Idaho died from drug overdoses in 2016. From 2012–2016, the annual number of drug-induced deaths statewide increased nearly 30%, and nearly all of that increase can be attributed to opioids. For instance, there was a 24% increase in the proportion of drug-induced deaths involving opioids from 2015 to 2016 alone. Moreover, data on the specific drug types are underreported, indicating that the problem is probably even worse than it is currently understood.[251]

378.     Prescription opioids account for more than triple as many overdose deaths as heroin, and many addicts get their prescription painkillers illegally.

379.     In 2016, Idaho had an age-adjusted drug overdose death rate of 16.2 per 100,000 people, and opioids accounted for nearly half (7.7 per 100,000).

---

[250] *Id.*

[251] IDAHO DEP 'T HEALTH & WELFARE, DIV. OF PUB. HEALTH, *Drug-Induced Deaths: Idaho Residents, 2016 Summary* (August 2017), https://healthandwelfare.idaho.gov/; IDAHO OFFICE OF DRUG POLICY , *Idaho Opioid Misuse and Overdose Strategic Plan 2017–2022*, https://odp.idaho.gov/wp-content/uploads/sites/58/2018/09/ID_Opioid_Strategic_Plan_2018_-Update_Final.pdf.

380.    Despite having some 14 stores located all over the State of Idaho, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in Idaho.

381.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Doctor | City | Sentence |
|------|--------|------|----------|
| 5-May-16 | Michael Minas, MD | Eagle, ID | 8 years |
| 30-Nov-17 | Rafael Beier, MD | Coeur D'Alene, ID | 192 months |
| 26-Jun-18 | Jennifer Fanopoulos, RN | Meridian, ID | 3 years probation |
| 13-Mar-19 | Benjamin Hurley, PharmD | Rigby, ID | 3 years probation |
| 15-Aug-19 | John D. Steiner, PharmD | Lewiston, ID | pled guilty |

### 2.    *Boise, Idaho (Pharmacist No. 6)*

382.    Pharmacist No. 6 worked as a staff pharmacist at various Rite Aid locations in Boise, Idaho from March 2008 to April 2017, and sometimes worked as a pharmacy manager during that time.

383.    She did not recall any training from Rite Aid on warning signs, or "red flags" to look for to identify possible fraudulent physicians or doctor-shopping patients. There was no guidance or protocol from the Company. Instead, she on her own contacted other area pharmacies. "I would have to contact providers and do everything I could to prevent an inappropriate dispense," she said.

384.    For most of her tenure at Rite Aid, she did not have support from her superiors to refuse to fill prescriptions.  Instead, she was pressured by her supervisors to meet performance

goals, goals that emphasized sales above all else. There was a lot of pressure to dispense to demanding customers she felt was unsafe.

385.    She was also pressured by the sheer volume of prescriptions her pharmacy handled. Staffing was inadequate, she said, and there was not enough backup support. Breaks were few and far between. The pressure of the retail store made it less likely that she and other pharmacists would use the state's prescription monitoring program to investigate suspected opioid abusers and doctor shoppers.

386.    Rite Aid supervisors regularly evaluated her and other pharmacists on metrics such as the number of prescriptions being processed and approved; growth in volume and sales; and growth in number of people they signed up for prescription discount cards and auto-refill programs. A "key performance indicator" report containing such updated information was issued every four or five weeks.

387.    Rite Aid did not maintain a list or database of suspect physicians, nor did it support pharmacists reporting concerns about physicians.

388.    She recalled that, in one instance, it took her months to bring a veterinarian to the attention of state authorities because he was prescribing pain pills that were being abused by a pet's owner. In 2014 or 2015 one person was getting controlled substances – Ativan and Tramadol – filled for each of his two dogs using a prescription from a veterinarian. She knew the person was getting the same drugs from two other veterinarians because she communicated with pharmacy staff at a Walgreens behind her store.  She believes the "patient" had turned to veterinarians because his physicians would no longer prescribe for him.

389.    She personally called the Board of Pharmacy and asked staff there to contact the vet, who refused to believe that such prescribing was inappropriate.  She said it took months for

her action to result in the veterinarian ceasing to write the bogus prescriptions. She recalls agency staff coming to her pharmacy. She believes they were from the Board of Pharmacy, reviewing the prescriptions from this vet that were filled. "It was kind of a victorious thing for us because we knew that he was overprescribing," she said.

### E. Specific Examples of Unlawful Dispensing Conduct: Massachusetts

#### 1. *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Massachusetts*

390.    More than 11,000 people died from opioid-related overdoses in the past decade in Massachusetts — more than everyone killed in car accidents and murders combined. The people of Massachusetts also survived more than 100,000 overdoses that were not fatal, but still devastating.

391.    Despite having some 79 stores located all over the Commonwealth of Massachusetts, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in Massachusetts.

392.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 21-Apr-05 | Luis A. Molmenti, MD | Plymouth, MA | 2 years probation |
| 30-Sep-05 | Douglas Howard, MD | Melrose, MA | 3 months, 27 months suspended |
| 20-Jul-07 | Michael R. Brown, MD | Mashpee, MA | 3 years |
| 1-Apr-08 | Julian A. Abbey, MD | Saugus, MA | 5 years probation |
| 19-Jan-11 | Paul Weinstein, MD | Lawrence, MA | 63 months |

| | | | |
|---|---|---|---|
| **1-Jul-15** | Esperanza Mata, Dental Asst. | South Chatham, MA | Indicted for forging fake Rx at CVS; CVS paid $3.5M fine |
| **1-Dec-15** | Dr. Fernando Jayma, MD | Ludlow, MA | 2.5 years |
| **11-Jan-16** | Dr. Shaohua Tang, MD | North Adams, MA | Lost license concerning death of patient and fentanyl |
| **21-Mar-16** | Mohammad Nassery, MD | Hyannis, MA | 2.5 years, suspended |
| **27-Nov-17** | Yoon H. Choi, MD | Brockton, MA | Lost DEA license |
| **22-Mar-18** | Fathalla Mashali, MD | Boston, MA | 8 years |
| **8-Aug-18** | Dr. Hung K. Do, MD | Lowell, MA | $23,000 fine |
| **8-Aug-18** | Dr. Vasumathi Brown, MD | Lowell, MA | $12,500 fine |
| **10-Sep-18** | Bharani Padmanabhan, MD | Boston, MA | DEA License revoked |
| **11-Dec-18** | Richard Miron, MD | Dracut, MA | Charged with manslaughter, Mass. Trial starts 4/17/2020 |
| **30-Jan-19** | Dr. Ashok Patel | Dorchester, MA | 3 years probation, $15,855 restitution, lost medical license, for charging patients cash for Suboxone that was covered under MassHealth |
| **6-Feb-19** | Moustafa M. Aboshady, MD | Boston, MA | 6 years |
| **31-Oct-19** | Pondville Medical Associates LLC | Norfolk, MA | $150,000 settlement for charging patients cash for Suboxone that was covered under MassHealth |
| **8-Jan-20** | Frank Stirlacci, MD | Springfield, MA | Supreme Judicial Court upholds indictment (2017) for instructing his NP to write CS Rx while he was in jail in Kentucky |
| **12-Jun-20** | Geoffrey Hart, MD | Cohasset, MA | $42,425 settlement for charging patients cash for Suboxone that was covered under MassHealth |
| **24-Jun-20** | Arthur Shektman, MD | Wellesley, MA | $25,000 fine |

### 2.     *Taunton, Massachusetts (Pharmacist No. 4)*

393.     The opioid crisis has hit Taunton, Massachusetts particularly hard. As the Washington Post describes it, "[l]ike many other blue-collar towns across New England and Appalachia, the loss of traditional industry in Taunton had hollowed out the community, and pain pills and heroin had filled the vacuum."[252]

394.     Pharmacist No. 4 worked as a pharmacist at the Rite Aid on 237 Broadway in Taunton, Massachusetts (store #10214) from September 2006 to February 2018, when the store was acquired by Walgreens. She continued to work in the same location for Walgreens until the pharmacy was shuttered in October 2018.

395.     Around 2014 the state implemented the Massachusetts Prescription Awareness Tool (MassPAT). The web-based platform provides real-time information to support safe prescribing and dispensing.

396.     "With the state program you could go online and see the patient's history," she said. "You could see when they last filled, who the doctor was, etcetera."

397.     Not only were they not required to check MassPAT before filling opioid prescriptions, Rite Aid never followed up to ensure they were using it. As a result, some pharmacists would use it.  Others would hardly ever use it.

398.     Moreover, she said, there was not always time to check the MassPAT system thoroughly.  The Company put the onus on the pharmacists to decide when and to what extent they used the system. Before Massachusetts put the system in place, she said it was extremely difficult

---

[252] Katie Zezima and Colby Itkowitz, *Flailing on Fentanyl*, WASHINGTON POST, September 20, 2019, *available at* https://www.washingtonpost.com/graphics/2019/investigations/fentanyl-epidemic-congress/.

and time consuming to thoroughly vet each prescription, and Rite Aid did not provide its employees with adequate tools to do so.

399.    "I would say in the beginning, when the opioid crisis started going crazy, we felt pressure to dispense and not ask a lot of questions," she said, referring to her experience at Rite Aid beginning around 2009.  She was told "[y]ou cannot deny a patient pain medication." She believed this was a corporate directive, not from her local managers since she was told this verbally through her District Supervisor.

400.    When the MassPAT program went live around 2014, "[t]here was pressure to not check [prescriptions] out because of time," she said, explaining that at Rite Aid she ended up in a situation where she often did not have adequate time to vet a script.

401.    Nor did Rite Aid want a written record of pharmacists' reasons for refusing to fill prescriptions. "Rite Aid did not want us putting any notes in the system because it wasn't a legal document — it wasn't validated," she said. "It was just your personal opinion and they said they didn't want any opinion in the system." That policy left Rite Aid pharmacists with no way to alert pharmacists at other locations about even the most flagrant pill mills. She said that at the height of the opioid crisis her pharmacy turned away "maybe ten [patients] per week."

402.    Pharmacists at her location were reprimanded "a couple times a month" for refusing to fill an opioid prescriptions. "We were just spoken to about our lack of customer service," she said. "It was always about how you didn't handle it right, not about how the guy was screaming at you and on drugs."

403.    Dr. Michael Brown was a well-known pill mill operator in Cape Cod; Rite Aid pharmacists continued to fill the prescriptions he wrote for patients even though he was a "well

known doctor in Cape Cod, Massachusetts" and "a known drug mill person." She was aware of other pill mills in Boston, Massachusetts she said.

404.     She and her colleagues filled prescriptions penned by Brown, she said. "We definitely filled, yes." She said Brown was prolific and that any area pharmacist who was operating during the last few years he practiced likely dispensed to his patients.

405.     Brown was convicted of 10 counts of Medicaid fraud, 16 counts of writing illegal prescriptions, and felony larceny at a jury trial in July 2007. Brown was found to have prescribed OxyContin, Roxicodone, and other controlled substances for no medical purpose and for more than 30 months he was the second largest prescriber of OxyContin in Massachusetts.[253]

### F.   Specific Examples of Unlawful Dispensing Conduct: North Carolina

#### 1.   *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in North Carolina*

406.     North Carolina has been especially ravaged by the national opioid crisis.

407.     North Carolina has an opioid prescription rate of 96.6 per 100 persons, which ranks thirteenth in the country (U.S. median rate 82.5) and a benzodiazepine prescription rate of 45.3 per 100 persons which ranks 15th nationally (U.S. median rate 37.6).[254]

408.     The numbers in North Carolina are:

- Five North Carolinians on average die from opioid overdoses every day;

- More people die from opioid overdoses than car crashes;

---

[253] Hillary Russ, *Cape physician Michael Brown, accused of writing bogus prescriptions, was convicted yesterday in Barnstable Superior Court on all counts of drug and fraud charges*, Cape Cod Times (July 21, 2007) https://www.capecodtimes.com/article/20070721/NEWS/707210322

[254] See Leonard Paulozzi, M.D., et al., *Vital Signs Variation Among States in Prescribing of Opioid Pain Relievers and Benzodiazepines – United States, 2012*, Morbidity and Mortality Weekly Rep. (July 4, 2014).

- More than 2,000 North Carolinians died of an opioid overdose in 2017 – a 32 percent increase over the previous year;

- Between 1999 and 2017, more than 13,169 North Carolina residents have lost their lives to unintentional opioid overdoses;

- The number of unintentional opioid overdose deaths in 2017 was nearly 17 times higher than in 1999;

- The number of unintentional opioid overdose deaths has more than doubled in the past decade; and

- In 2017, there were nearly 125 unintentional opioid-related overdose emergency department visits per week on average.[255]

409.    Despite having some nine stores located all over the State of North Carolina, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in North Carolina.

410.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
| --- | --- | --- | --- |
| 24-Jun-05 | Benjamin Moore, MD | Winston Salem, NC | Committed suicide |
| 28-Jan-02 | Joseph Talley, MD | Wilmington, NC | Lost DEA License |
| 7-Jun-06 | Warren H Williams, MD | Charlotte, NC | 1 year + 1 day |
| 1-Jun-09 | John Blevins Davis, MD | Winston Salem, NC | 3 years probation |
| 1-Aug-09 | Margaret McIntosh-Fulmore, MD | Charlotte, NC | 1 year home confinement |
| 22-Feb-10 | Perry Reese III, MD | Cary, NC | 20 years |

---

[255] North Carolina Department of Health and Human Resources, *The Impact of Opioids*, https://www.morepowerfulnc.org/get-the-facts/the-impact/.

| 03-Mar-17 | James Randall Long, MD | Lexington, NC | 1 year + 1 day |
| 27-Aug-18 | Donovan Dave Dixon, MD | Fayetteville, NC | 240 months |
| 12-Dec-18 | Jong Whan Kim, MD | Tabor City, NC | trial set for July 2020 |
| 21-Feb-19 | Michael Alson Smith MD | Mount Holly, NC | 3 years |
| 22-Feb-19 | Wayland McKenzie, MD | Greensboro, NC | License Revoked |
| 8-Sep-20 | Sanjay Kumar, MD | New Bern, NC | 240 months |

411.    Relator White worked for Rite Aid first as a floater pharmacist, next as a Staff Pharmacist, and then as a Pharmacy Manager at Rite Aid stores in North Carolina from 2011 to March 2014. Starting in July 2011, he was a pharmacist at a Rite Aid in Fayetteville, North Carolina, located at 108 Rowan Street (store #11502). After about six months, he transferred to another Fayetteville store at 3716 Morganton Road (store #11507). After another eight months, he was promoted and transferred to a Rite Aid in Dunn, North Carolina at 1721 West Cumberland Street (store #11510).

## 2.    *Fayetteville, North Carolina (Relator White)*

412.    The opioid epidemic has particularly devastated Fayetteville, the county seat of Cumberland County, North Carolina.  From 1999 to 2007, Cumberland County experienced 90 opiate-related deaths for an average of 10 deaths per year.  In the following nine-year period, opiate-related deaths nearly tripled to 263 for an average of 29.2 deaths per year.[256]

413.    Although there was an epidemic raging in Fayetteville, Relator White was often alone with no tech to assist him in the Rite Aid pharmacies where he worked. His first day working as a staff pharmacist at Rite Aid was on a Sunday. The pharmacy, which was in Fayetteville on 108 Rowan Street, did not have the hours available to have a pharmacy technician on the clock at the time to assist him that day.

---

[256] Centers for Disease Control and Prevention, *U.S. County Prescribing Rate Maps*, https://www.cdc.gov/drugoverdose/data/statedeaths/drug-overdose-death-2017.html.

414.    Rite Aid never provided him or its other pharmacists with formal, live training on how to spot forged and/or inappropriate prescriptions for controlled substances. That kind of in-person training would have helped stop the dispensing of inappropriate prescriptions, especially for pharmacists who were new or not aware of what might make a prescription problematic. The only training that Relator White and other pharmacists received from Rite Aid about dispensing controlled substances was via computer training modules that they were expected to do on their own.

415.    At the Fayetteville Rowan Street store, the pharmacy manager was a woman he recalled only as "Libby." Libby did not provide him with any on-the-job training or guidance about what to look for when filling controlled substances that might be a red flag or indication the prescription was suspicious or inappropriate.

416.    At the Fayetteville Rite Aid on Rowan, he regularly saw suspicious prescriptions for controlled substances. He said the store was right off of I-95, a major interstate that comes up from Florida and through Georgia along the eastern side of the states. He would see customers come in with prescriptions written in Florida or more often in Georgia for large quantities of controlled substances. Often the customer would not live in North Carolina. Sometimes the customer would have a driver's license for a state that was different than the customer's home residence. He rejected out-of-state prescriptions for controlled substances unless he could ascertain that the person legitimately was traveling, and he could confirm the prescription with the provider.

417.    His pharmacy manager, however, did not reject out-of-state prescriptions that, to him, appeared suspicious.  Libby also did not reject prescriptions written locally that he found problematic.

418.    For example, he recalled a patient on methadone who came to the store with a one-month prescription for 500 tablets. He looked at the patient's history in the North Carolina PDMP database that tracks controlled substance prescriptions and saw that Libby had been dispensing the prescription to the patient. He rejected it.

419.    When he told Libby about prescriptions he was not comfortable filling, including the ones she had previously dispensed, she told him: "Oh, if you're not comfortable, just leave it in the basket and I'll fill it the next day."

420.    He and Libby did not usually work together except when their shifts overlapped for a short time. Although he could not say Libby was intentionally filling prescriptions she knew were inappropriate, he thought the Company's pressure on pharmacy managers to hit volume targets weighed on her mind when she was making a decision about whether to fill, and that she was concerned about improving her volume numbers.

421.    A number of customers at the Fayetteville Rowan Street store with prescriptions for Percocet, which is a combination of Oxycodone and Acetaminophen, would request the generic brand that had pills stamped with "512." These customers would demand the Mallinckrodt brand because it had the impression 512 (on the pill). They would come in and ask: "You have the 512s?"

422.    When he told customers that the store had the drug but from a different generic manufacturer, they would respond: "Those are not the 512s. I need the 512s."  The generic Percocet stamped with 512 had more "street cred," because the 512 stamp attested to its authenticity as a Percocet for buyers.

423.    The customers would ask him to order the generic 512s, but he would not.  It is unusual and odd for patients to request a specific manufacturer for a generic drug, which is what the Mallinckrodt 512s were. He would not order the 512s for customers, saying only that the store

carried whatever generics the distributor had in stock for that drug, which could be from a number of different manufacturers.

424.     Even though he would refuse to order the 512s, Libby, however, would do so and keep them in stock for these customers.  She responded with: "We'll lose customers," to which, Relator White said, "[t]hen we'll lose customers."

425.     After several months of working with Libby and witnessing the problems he described above, he talked to his district manager, Jin Lee. Relator White does not know if Lee spoke to Libby, but he was then transferred to another store shortly thereafter.

426.     Relator White also witnessed a pharmacist named Lili Duthiers dispense a C-II medication to a Medicaid patient without a prescription or even speaking to the provider. Duthiers did this to simply get the patient, who was being belligerent, out of the store. Despite this clearly illegal and fraudulent activity, Rite Aid never reported the incident or disciplined Duthiers. The decision to dispense a C-II medication instead of dealing with the problematic customer in a different way demonstrates Rite Aid's lackadaisical attitude toward the dispensing of powerful and dangerous C-II drugs.

### 3.     *Dunn, North Carolina (Relator White)*

427.     When he was promoted to Pharmacy Manager and transferred to the Rite Aid at 1721 West Cumberland in Dunn, North Carolina, Relator White continued to regularly see suspicious prescriptions.

428.     Relator White recalled a time when his new district manager, Niaz Siddiqui, came to his store in Dunn and cornered him about a prescription he had refused to fill.  He explained his reasons for finding it suspicious, and Siddiqui was not satisfied with the answer. He then pulled

up the patient's history on the prescription tracking data to show the suspicious activity, and Siddiqui told him, "I still don't understand why you're not filling it."

429.    He recalls seeing and filling prescriptions from physicians who would later be indicted and convicted.  One such physician was Dr. Donovan Dave Dixon from Fayetteville, North Carolina.  Dixon was a licensed medical doctor who operated a family medical practice in Pembroke, NC from 2012 until April 6, 2015, when his ability to prescribe controlled substances was limited by the North Carolina Medical Board.  The DEA's Tactical Diversion Squad based in Charlotte began investigating Dixon when they noticed that four (4) of the top ten (10) oxycodone prescribing pharmacies for the State of North Carolina were located in the area near Dixon's practice.  At trial, the evidence showed that Dixon prescribed high strength, high dosage amounts of oxycodone with little or no medical examination.  Multiple witnesses testified that they had never even met Dixon testified that Dixon wrote prescriptions for oxycodone in the name of persons that he provided to Dixon in exchange for cash.  The prescription drugs were then sold on the streets of Robeson County by the drug dealer.[257]  Dixon was later sentenced to twenty (20) years' imprisonment.[258]

430.    He also recalls filling prescriptions for patients of Dr. Sanjay Kumar, New Bern, North Carolina.  Kumar was found guilty on August 12, 2019 of five (5) counts of Unlawful Distribution of Oxycodone outside the scope of professional practice and not for a legitimate medical purpose, five (5) counts of Money Laundering by Concealment, and three (3) counts of

---

[257] Press Release, U.S. Attorney, E.D. North Carolina, *Federal Jury Convicts Pembroke Medical Doctor for Unlawfully Distributing Oxycodone* (April 17, 2018), https://www.justice.gov/usao-ednc/pr/federal-jury-convicts-pembroke-medical-doctor-unlawfully-distributing-oxycodone.

[258] Press Release, U.S. Attorney, E.D. North Carolina, *Pembroke Medical Doctor Sentenced to 20 Years for Unlawfully Distributing Oxycodone* (Aug. 27, 2018), https://www.justice.gov/usao-ednc/pr/pembroke-medical-doctor-sentenced-20-years-unlawfully-distributing-oxycodone.

Attempt to Evade and Defeat Tax. The evidence at trial showed that Kumar was a licensed medical doctor who operated a sports medicine and rehabilitation practice in New Bern from 2004 until June 21, 2016, when his ability to prescribe controlled substances was limited by the North Carolina Medical Board.  The DEA began investigating Kumar when it was notified by local pharmacies about the number and frequency with which Kumar was writing prescriptions for opioid narcotics. At trial, the evidence showed that Kumar prescribed oxycodone and other controlled substances with little or no medical examination. Multiple witnesses testified that Kumar operated a cash-only practice, there was no additional staff in the office, and the patients received a prescription from Kumar at every visit without distinction based on their history of prior medications, prior treatment, and medical diagnoses.  The evidence showed that Kumar wrote approximately 9,500 opioid prescriptions between the years of 2011 to 2016.[259]

431.    Relator White does not recall ever seeing any do-not-fill lists of doctors at Rite Aid or lists of doctors whose prescriptions warranted closer scrutiny. Occasionally, he would receive an email from Rite Aid about a patient with a prescription that was suspicious as a heads up if that patient came into his store. But that was not common.

432.    Rite Aid did not have any systematic programs or policies in place that required pharmacists to share information about suspicious doctors or patients with each other.

433.    In his experience, pharmacists were not allowed to keep track or make comments on either patient or provider profiles about any sort of issue. Relator's manager, Niaz Siddiqui, instructed the district on a conference call that there had been a complaint from a customer about

---

[259] Press Release, U.S. Dep't of Justice, *Federal Jury Convicts New Bern Medical Doctor for Unlawfully Distributing Oxycodone, Money Laundering and Tax Evasion* (Aug. 12, 2019), https://www.justice.gov/usao-ednc/pr/federal-jury-convicts-new-bern-medical-doctor-unlawfully-distributing-oxycodone-money.

a defamatory comment about a patient (e.g., "double count all controls"), so instructed them not to write down comments of this kind in the NexGen notes field.  This made it impossible for Rite Aid pharmacists to alert each other about potentially suspicious prescribers and prescriptions.

### G.  Specific Examples of Unlawful Dispensing Conduct: Ohio

1.  *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Ohio*

434.    The opioid epidemic in Ohio has been similarly disastrous. The CDC reports that, over the past six years, more than 7,272 Ohioans have died from overdoses of prescription opioids.[260] These statistics, however, may dramatically underestimate deaths from opioids because they ignore opioid-related complications to infectious diseases, such as pneumonia.[261]

435.    Ohio's prescription opioid deaths are now the highest in the country. In 2016, Ohio had more prescription opioid deaths than any other state in the nation, with one of every 11 deaths from prescription opioids in the United States occurring in Ohio.[262]

436.    In 2016, prescription opioids caused the deaths of 2,875 Ohio residents, a 60% increase compared to 2015.[263] From 2004-16, 86.3% of all unintentional drug overdose deaths in Ohio involving specific drugs, including deaths from cocaine and many other drugs, involved opioids.[264]

---

[260] Ctrs. for Disease Control & Prevention, National Center for Health Statistics Multiple Cause of Death 1999–2017, *Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER), (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

[261] Susan Scutti, *Opioid Epidemic may be underestimated, CDC report says*, CNN.com (Apr. 25, 2017), http://www.cnn.com/2017/04/24/health/opioid-deaths-cdc-report/index.html.

[262] Ctrs. for Disease Control & Prevention, National Center for Health Statistics Multiple Cause of Death 1999–2017, *Wide-ranging Online Data for Epidemiologic Research* (CDC WONDER), (2019), https://wonder.cdc.gov/wonder/help/mcd.html.

[263] *Id*.

[264] *Id*.

437.    In 2016 alone, 2.3 million Ohio patients – roughly 20% of the State's population – were prescribed an opioid drug.[265] According to public data from the DEA, over 18.8 billion milligrams – over 20 tons – of prescription opioids were distributed in Ohio from 2013-2016.[266] These conclusions about the extent of opioid diversion and abuse are further supported by data from the Ohio Automated RX Reporting System ("OARRS") showing that in 2016, the "average" county in Ohio received saw distributions of approximately 65 pills per person per year (including children) and several Ohio counties have seen annual distributions exceeding 100 opioid pills for every man, woman and child and 1,000 pills per user.

438.    Despite having some 212 stores located all over the State of Ohio, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in Ohio.

439.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 28-Sep-99 | George Smirnoff, MD | Cleveland, OH | 5 years |
| 13-Feb-02 | Lonnie Marsh, MD | | License revoked |
| 17-Mar-03 | Randall L. McCollister, MD | Ironton, OH | 97 months |
| 29-Nov-03 | Ghassan Haj-Hamed | | Pled Guilty, license revoked |
| 14-Jan-04 | Glenda M. Dahlquist, MD | Dayton, OH | License revoked |
| 15-Sep-04 | Rogelio A. Banaga, MD | Willard, OH | 1 year |
| 24-Sep-04 | Thomas M. Santanello, DO | Celina, OH | 90 days |

---

[265]    Ohio Automated RX Reporting System, 2016 Annual Report, https://www.ohiopmp.gov/documents/Annual%20Report%20(2016).pdf.

[266]    DEA, ARCOS Retail Drug Summary Reports, https://www.deadiversion.usdoj.gov/arcos/retail_drug_summary/.

| 1-Nov-04 | Alan Gardner | | Indicted |
| 21-Aug-06 | David Albert Hoxie, MD | Waverly OH | 3 years |
| 23-Oct-06 | Randall D. Leuvoy | | License revoked |
| 2-Feb-08 | Peter Franklin | Middlefield Village, OH | indicted |
| 6-Feb-08 | Donald Raymond Kiser | Marietta, OH | 7 1/4 years |
| 20-Mar-08 | Herbert Medoff, MD | Brecksville, OH | 4 years |
| 9-Apr-08 | Matthew Evenhouse, MD | Westlake, OH | suspended license |
| 14-May-08 | Todd Carran, MD | | Consent Agreement |
| 18-Jun-08 | Leo M. Ognen, MD | Toledo, OH | 50 months |
| 8-Jul-08 | Pedrito A. Galupo | Marietta, OH | License surrendered |
| 29-Jul-08 | Stanley Naramore, MD | Cincinnati, OH | 48 months |
| 13-Aug-08 | William W. Nucklos | | license revoked |
| 14-Aug-08 | Brian Griffin, MD | Columbus, OH | Probation |
| 12-Jun-09 | Walter Broadnax, MD | Cincinnati, OH | 5 years |
| 3-Dec-09 | Narenda Kumar Agrawal | Galion, OH | 33 months |
| 1-Feb-10 | Jorge A Martinez, MD | Boardman, OH | Life |
| 10-Jun-10 | Shelia A. Barnes, MD | Columbus, OH | License suspended |
| 17-Feb-11 | Charles C. Njoku, MD | Powell, OH | 1 year + 1 day |
| 10-Mar-11 | Douglas B. Karel, MD | Dayton, OH | License suspended |
| 1-May-11 | Michael Dawes, MD | Wooster, OH | DEA license revoked |
| 12-Oct-11 | Daniel H. Brumfield, MD | Columbus, OH | License suspended |
| 8-Nov-11 | Denise Huffman, owner | South Point, OH | 12 2/3 years |
| 8-Nov-12 | Victor Georgescu, MD | Wheelersburg, OH | Deceased |
| 23-Dec-11 | Victor A. Georgescu | Wheelersburg, OH | Indicted |
| 1-Jan-12 | Brenda Banks, MD | Columbus, OH | 4 years |
| 1-Jan-12 | Han M Yang, MD | Dayton, OH | 3 years |
| 1-Apr-12 | Marcellus Gilreath, MD | Cleveland, OH | Plea, 3 years probation |
| 1-Apr-12 | Stephen Pierce, MD | Cincinnati, OH | 5 years probation |
| 1-May-12 | John Randy Callihan, owner | Portsmouth, OH | 5 years |
| 22-May-12 | William Cullen, MD | Wadsworth, OH | License suspended |
| 13-Jul-12 | Samuel Christian, MD | Tiffin, OH | Indicted |
| 12-Sep-12 | Jose Villavicencio, MD | Columbus, OH | License revoked |
| 14-Oct-12 | George Marshal Adkins, MD | Wheelersburg, OH | 10 years |
| 13-Feb-13 | Shaban Mahmoud | Dublin, OH | License revoked |
| 26-Mar-13 | Darrell Hall, MD | Toledo, OH | 5 years |
| 29-Apr-13 | Kevin Huff, owner | Portsmouth, OH | 21.83 years |
| 4-Jun-13 | James Lassiter, MD | Findlay, OH | 6 months |
| 16-Jun-13 | Mark Fantauzzi, DO | Cincinnati, OH | 18 months |
| 10-Jul-13 | Michael C. Bengala, MD | Canfield, OH | License suspended |

| 14-Aug-13 | Raymond C. Gruenther | Gahanna, OH | License suspended (consent agreement) |
| 27-Sep-13 | Barry P. Deran, MD | Maumee, OH | 28 months in prison |
| 1-Mar-14 | Shannon L. Swanson, DO | Andover, OH | |
| 12-Mar-14 | Abubakar Durrani, MD | Cincinnati, OH | license revoked |
| 16-Apr-14 | Toni Carman, MD | Willoughby, OH | 2 years |
| 1-May-14 | John Dahlsten, MD | Cincinnati, OH | 4 months |
| 21-May-14 | Tracy Bias | West Portsmouth, OH | 14 years |
| 4-Jun-14 | Osama Salouha, PharmD | Lorain, OH | fugitive |
| 4-Jun-14 | Sbeih Sbeih, PharmD | Lorain, OH | fugitive |
| 4-Jun-14 | Julia I. Lucente, MD | Dayton, OH | surrendered license |
| 6-Jun-14 | Jorge Martinez, MD | Boardman, OH | Life |
| 29-Jul-14 | Lorenzo Lalli, MD | Cleveland, OH | 1 year |
| 28-Aug-14 | Syed Jawad Akhtar-Zaidi, MD | Solon, OH | Fugitive |
| 1-Oct-14 | Terry Dragash, MD | Pataskala, OH | 1 year |
| 16-Dec-14 | Douglas S. Trubiano | Tiltonsville, OH | 2 years |
| 3-Feb-15 | Adolph Harper, MD | Akron, OH | 10 years |
| 2-Mar-15 | Herman Weaver, MD | Cuyahoga County, OH | 12 1/2 years |
| 16-Mar-15 | Brian D. Heim, MD | Akron, OH | 63 months |
| 21-Apr-15 | Jason D. Connors, MD | Dayton, OH | Lost license (subsequently sentenced to 25 years for rape) |
| 1-Jun-15 | Raymond Fankell, PharmD | Wheelersburg, OH | Plea |
| 18-Jun-15 | John Temponeras, MD | Wheelersburg, OH | Pled guilty |
| 17-Aug-15 | Paul Volkman, MD | South Point, OH | 4 life sentences |
| 13-Oct-15 | Juan M. Hernandez | Eastlake, OH | License suspended by Pharmacy Board |
| 10-Nov-15 | Gregory Ingram, MD | Ravenna, OH | 1 year |
| 24-Nov-15 | Christopher Stegawski, MD | Cleveland, OH | 13 1/3 years |
| 1-Dec-15 | Karen Climer, employee | Alexandria, OH | 6 months |
| 3-Dec-15 | David Rath, MD | Alexandria, OH | Deceased |
| 9-Dec-15 | Narinder N. Khosla | Sandusky, OH | License revoked |
| 4-Apr-16 | Ronald Celeste, MD | Westlake, OH | 3 years |
| 5-Apr-16 | Thomas Craig, III, MD | Cleveland Heights, OH | 3 years |
| 26-May-16 | John P. Moore, MD | Dayton, OH | 20 months |
| 30-Jan-17 | Kevin B. Lake, DO | New Albany, OH | 60 months (recommended) |
| 5-Feb-17 | William G. Paloski, MD | Youngstown, OH | indicted |
| 5-Apr-17 | Stephen Bernie, MD | Cleveland, OH | 6 months suspended |

| 15-Dec-17 | Robert S. Reeves, MD | Norwalk, OH | 47 months |
| 1-Jan-18 | Rodney Curtis, MD | Belmont City, OH | 6 months |
| 24-Jan-18 | Jayati Gupta Rakhit, MD | Moreland Hills, OH | trial 3/30/2020 |
| 24-Jan-18 | Ashis K. Rakhit, MD | Moreland Hills, OH | trial 3/30/2020 |
| 14-Feb-18 | James Lundeen, MD | Portsmouth, OH | License revoked |
| 22-Mar-18 | Richard Rydze, MD | Pittsburgh, PA | 10 years |
| 3-May-18 | Jerome Yokiel | Cleveland, OH | License Suspended and Reinstated |
| 29-May-18 | Timothy Manuel, MD | Hillsboro County, OH | 5 years |
| 28-Jun-18 | Mike Jones, PA | Hamilton, OH | |
| 25-Sep-19 | Nilesh B. Jobalia, MD | Cincinnati, OH | pled guilty |
| 11-Apr-19 | Saad Sakkal, MD | Hamilton, OH | convicted |
| 1-Aug-18 | Gregory Gerber, MD | | civil litigation stayed pending grand jury investigation on criminal charges |
| 29-Aug-18 | David Kirkwood, MD | Dayton, OH | 70 months |
| 18-Oct-18 | Shuresh Gupta, MD | Riverside, OH | Dayton Outpatient Center raided by FBI, DEA, OH Medicaid Fraud Control Unit |
| 28-Mar-19 | Bruce J. Feldman | Shaker Heights, OH | Indicted |
| 11-Apr-19 | Saad Sakkal, MD | Hamilton, OH | convicted |
| 15-Oct-19 | Raymond L. Noschang, MD | Cincinnati, OH | pled guilty |
| 18-Apr-19 | Morris Brown, MD | Dayton, OH | Indicted |
| 24-Apr-19 | Khaled Amr, MD | New Albany, OH | Indicted |
| 12-Jul-19 | Frank Lazzerini, MD | Jackson Township, OH | 113 years |
| 15-Aug-19 | Gary Frantz, MD | Mansfield, OH | indicted |
| 21-Aug-19 | William R. Bauer, MD | Port Clinton, OH | Indicted |
| 21-Aug-19 | Thomas A. Ranieri, MD | New Castle, OH | guilty plea, sentencing Apr 2021 |
| 24-Sep-19 | George Griffin, MD | Cincinnati, OH | Indicted. License suspended in 2009. Investigated in 1990, indicted again in 2019 |
| 15-Nov-19 | Margaret Temponeras, MD | Wheelersburg, OH | 7 years |
| 5-Mar-20 | Martin Escobar, MD | Youngstown, OH | indicted |

## 2.  *Specific Example of Rite Aid Ignoring Its Corresponding CSA Obligations: Dr. Adolph Harper*

440.    An example of Rite Aid ignoring signs of abuse, diversion and/or inappropriate prescribing is illustrated in the case of Dr. Adolph Harper, Jr., a physician from Akron, Ohio. Although Dr. Harper's specialty was obstetrics and gynecology, Harper prescribed a substantial volume of opioids.

441.    On October 20, 2014, Harper pled guilty to one count of conspiracy to traffic drugs, four counts of health care fraud and sixteen counts of drug trafficking. He was subsequently sentenced to ten years imprisonment. The Department of Justice's news release regarding Harper's sentencing indicated that he had distributed "hundreds of thousands of doses of prescription medications – including OxyContin, Percocet, Roxicet, Opana and others – from his medical offices in Akron between 2009 and 2012."[267]

442.    The Sentencing Memorandum indicates that at least eight of Adolph Harper's patients died as a result of drug overdoses.[268]

443.    Harper most often prescribed oxycodone: all of the opioids he wrote at greater than 5% of his total prescriptions were oxycodone products, two of which were of higher dosage strength. Oxycodone 80mg pills accounted for more than 6% of all of his prescriptions. Compared to other gynecologists in Ohio, this deviated substantially from the norm. On average, Ohio

---

[267] Press Release, U.S. Attorney, N.D. Ohio, *Akron Doctor Sentenced To 10 Years In Prison For Illegally Prescribing Painkillers, Even After Patients Died* (Feb. 13, 2015), https://www.justice.gov/usao-ndoh/pr/akron-doctor-sentenced-10-years-prison-illegally-prescribing-painkillers-even-after.

[268] Government's Sentencing Memorandum, *United States v. Harper*, 5:14-CR-096 (N.D. Ohio Jan. 23, 2015), at 5.

gynecologists typically wrote a mix of low dose prescriptions for oxycodone, hydrocodone, and codeine.[269]

444.    In the Sentencing Memorandum, prosecutors described an environment that should have alerted anyone who visited Harper's office: "The atmosphere of Harper's office, like his prescribing practices, was also more akin to street-level drug trafficking operation rather than a medical office. Harper's customers often waited for hours to see Harper, and many of these customers exhibited behavior consistent with drug abuse. Witnesses reported seeing customers passed out in the hallway and office while waiting to see Harper, or vomiting or urinating on the floor in the waiting room. Customers were also combative and aggressive with Harper's staff members if there was any delay in receiving their drugs."[270]

445.    Most of Harper's patients appeared to be drug addicts. They often looked disheveled and acted like they were "high" on drugs. Harper's waiting room was usually full, with some people needing to stand because there were not enough seats. Many patients "nodded off" while they were waiting to see the doctors. Others were belligerent to the staff or argued with other patients in the waiting room. Some patients even urinated on themselves and others periodically vomited in the water fountain.[271]

446.    According to the Sentencing Memorandum, several Akron-area pharmacies had begun refusing to fill Adolph Harper's prescriptions.[272] Rite Aid was not one of them.

---

[269] EXHIBITS to Plaintiff's Motion for Partial Summary Adjudication that Defendants Did Not Comply with Their Duties Under the Federal Controlled Substances Act to Report Suspicious Opioid Orders and Not Ship Them, Exhibit 3, Expert Analysis: Lacey R. Keller at 48, *In Re: National Prescription Opiate Litigation* (No. 17-md-2804) (Dkt. 1957-3).

[270] Harper Sentencing Memorandum at 4.

[271] *Id.* at 4.

[272] *Id.*

447.    Instead of refusing to fill for Dr. Harper, Rite Aid requested increased amounts of opioids in order to fill the astronomical number of opioid prescriptions from Dr. Harper. Rite Aid store #3182 (located at 325 East Waterloo Road Akron, Ohio 44319) was seeing so much traffic from Dr. Harper's customers that on September 16, 2011, district manager Mary Menegay requested a 15% increase in the amount of oxycodone it could order from its wholesale distributor (McKesson).[273] Rite Aid requested the increases because of a "local pain management doctor" whose patients were now filling at Rite Aid #3182 in addition to Rite Aid #3151. That "pain management doctor" was Dr. Harper.

448.    Mere weeks later, on October 24, 2011, Menegay again asked its wholesale distributor (McKesson) for another "15% bump in the Oxy limit at store 3182" because of "increased activity from a local pain mgmt doctor."[274]

449.    After the second request in October 2011, McKesson's Michael Oriente warned Rite Aid that Harper "may be an issue that you may want to do additional due diligence on. He is an Ob/Gyn not a Pain Management Specialist."[275] Oriente included complaints about Harper from individuals who had posted to the website Vitals.com:

- September 29, 2011: "No one is filling his prescriptions! … some of us are very sick and not just drug addicts!"

- July 15, 2011: "YOUNG PEOPLE ARE DYING BECAUSE THIS MAN WILL GIVE PAIN PILLS AND XANAX TO ANYONE! PLEASE SOMEONE STEP IN BEFORE ANOTHER LIFE IS LOST."

---

[273] *In Re: National Prescription Opiate Litigation* (Case No. 17-md-2804) (Dkt. 2184-3).

[274] *In Re: National Prescription Opiate Litigation* (Case No. 17-md-2804) (Dkt. 2387-14).

[275] *Id.*

- July 6, 2011: "gives my daughter any pills she wants as long as he can be a pervert once a month and check her, in trouble with drug board, he will get you addicted to any pills, he is not a doctor he is a drug dealer with his own daughters as accessories."[276]

450.    McKesson was able to figure out with a simple internet search what Rite Aid did not want to know and intentionally ignored about Dr. Harper. This was true despite Rite Aid knowing that multiple Rite Aid stores were being inundated with prescriptions from Dr. Harper.

451.    Even though Rite Aid #3182 continued to fill Dr. Harper's prescriptions, belatedly Rite Aid's Director of Loss Prevention for Rite Aid, Sophia Novack, agreed with McKesson's concerns: "I agree, we ran a report and checked his DEA number and saw the same thing. We have the [Pharmacy District Manager Mary Menegay] reviewing a checklist to visit the clinic. No increases at this time."[277]

452.    Rite Aid's response was thus not to stop filling Dr. Harper's prescriptions, but that it would simply not increase shipments to the store a second time.  There is also no evidence to suggest that Menegay actually visited Dr. Harper's clinic, nor that she or anyone at Rite Aid ever reported their concerns about the ongoing rampant inappropriate prescribing to the DEA.

453.    In addition, subsequent to Dr. Harper's conviction, he filed a pro se motion to vacate his 10-year sentence, arguing ineffective assistance of counsel.  In the motion, Harper referenced a conversation he had with Karen Mason, a pharmacist he mistakenly refers to as having worked at the CVS Pharmacy on Kenmore Boulevard in Akron.  Harper appears to have confused CVS with the Rite Aid 3151 store on Kenmore because there is no CVS store on Kenmore. Moreover, Mason appears never to have worked at CVS, but instead at the Rite Aid pharmacy on

---

[276] *Id.*

[277] *Id.*

Kenmore.  In his motion Harper quotes Mason as stating: "Dr. Harper, I don't know why they are doing this to you. You are not prescribing any more of these medicines (controlled drugs) than any of the other doctors."[278]

454.    The increase in dispensing volume associated with Dr. Harper's prescribing should have alerted Rite Aid to Dr. Harper's inappropriate prescribing in the first instance. But it was only after McKesson refused Rite Aid's *second* request in a month to increase that Rite Aid agreed only to limit the amount of oxycodone it would order for its stores – not to alert its pharmacies they should immediately cease dispensing for Dr. Harper's customers.

455.     In addition, Rite Aid did nothing to investigate Dr. Harper.  It was instead content to simply keep dispensing its already high quantities of oxycodone to meet the demand of Dr. Harper's patients. It did not stop dispensing for Dr. Harper's patients and did nothing to alert its pharmacies about Harper's problematic prescribing habits. This indifference continued even after being put on notice of the suspicious prescribing from McKesson, a company which would itself later be fined a record $150 million for its own failures to report suspicious orders.[279]

456.    Despite having transparency into the data which it could have used to identify Harper's inappropriate prescribing, Rite Aid did nothing to determine whether the prescriptions were appropriate or medically necessary other than relying on the judgment of its over-worked

---

[278] Defendant Motion to Vacate, "Proper Vehicle and Jurisdiction for Post-Conviction Relief," at 7, *United States v. Harper,* (5:14-cr-00096-JRA), Nov. 2, 2015 N.D. Ohio, (Dkt. No 106-1).

[279] Press Release, U.S. Dep't of Justice, *McKesson Agrees to pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs* (Jan. 17, 2017), https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

and under-staffed pharmacists in its stores despite not giving them the tools, time, and support needed to properly vet prescriptions.[280]

### 3.  *Ashtabula, Ohio (Pharmacist No. 7)*

457.    Pharmacist No. 7 was a Pharmacy Manager at the Rite Aid store at 1115 West Prospect Avenue in Ashtabula, Ohio, from 2002 to 2017. He initially started as a Staff Pharmacist, then became the Pharmacy Manager after about a year and a half. The last six months of his time with Rite Aid, he worked as the Pharmacy Manager at another Rite Aid in Ashtabula at 2148 Lake Avenue. He reported to at least three different Pharmacy District Managers: Jill Rose, Mary Menegay, and a woman he recalled only by first name, Kirsten.

458.    Ashtabula is a small town (population 19,124) in the northeast corner of Ohio on the edge of Lake Erie about 60 miles east of Cleveland. "Low employment, a lot of poverty," he said. "When I worked at the [Rite Aid] store on West Prospect Avenue, 93 percent of our prescriptions were paid by Medicaid." He said the town and surrounding area were plagued by "extremely" high use of narcotics and opioid addiction and had the accompanying pill pushers.

459.    When he started at Rite Aid in 2002, he recalled the store had about 25 to 30 prescriptions a day for narcotics. That number began to rise starting in about 2005 and dramatically climbed for a number of years. At the peak of opioid use in the area in about 2012, he said his store was filling about 50 to 70 narcotic prescriptions a day.

460.    He said for the first few years as the narcotics prescriptions rose, he saw the number of customers in need of narcotics was growing. "Initially, you assume you're seeing an increase in people who were experiencing severe pain because you were getting prescriptions from

---

[280] *In Re: National Prescription Opiate Litigation*, Hart Dep. (Jan. 31, 2019), 64:21-65:22 (Case No. 17-md-2804) (Dkt. 1978-2).

the doctor," he said. At the time, he explained, he and other pharmacists had been trained to respect doctors and trust the doctor's prescribed treatment for their patients.

461.    But as the number of prescriptions continued to increase, he began to question whether the doctors were aware of what they were doing to patients or if the doctors even cared. "This was crazy," he said of the explosive numbers of narcotic prescriptions. "It went from trusting the doctor to what the hell are you thinking. I was shocked by how many physicians out there who had so little regard for a human being's life and the possibility of creating addiction."

462.    The following are some of the signs he witnessed at his Rite Aid that indicated the growing problem:

- He saw patients getting opioid prescriptions from different doctors.

- He saw combination prescriptions for what he called the "trifecta," which is a combo of an opioid, a muscle relaxer and a benzodiazepine.

- He got to know a lot of his patients, and some would tell him about doctors who asked for cash payments to prescribe whatever the patient wanted.

- He saw people who usually would not associate with each other coming into the store together with prescriptions for oxycodone. When he asked how they knew each other, they told him they met at the doctor's office, and they now ride to the pharmacy together to get their prescriptions.

463.    While one regular patient who had come in to pick up her opioid prescription, another woman pulled into the drive-thru window and asked to pick up the same prescription. When he told the woman at the counter that someone in the drive-thru was asking to pick up the same prescription, she told him to give the pills to the woman at the drive-thru who would give him some money for the pills.  He balked, recognizing his customer was trying to involve him in

a "drug deal" by selling her prescription to someone else. He reported the incident to the authorities, who investigated.  He has no idea what the outcome was.

464.     During the early years of the opioid epidemic, he could not make sense of why doctors were prescribing at such an irresponsible and dangerous levels. Later, he realized the doctors were making large amounts of money to dispense the drugs, often by charging their patients cash for an appointment. "It was not about care and concern for the patient, it was about lining (the doctor's) pockets," he said.

465.     Pharmacist No. 7 said he discussed the dramatic increase in opioid prescriptions with other pharmacists in the area, but there were no discussions internally at Rite Aid or with the corporate office about what was happening.  "We never had anything formal or informal," he said. "The only discussions we had was between us pharmacists."

466.     He said Rite Aid could have done more sooner. "It should have been addressed a lot earlier," he said. In his view, Rite Aid "benefitted tremendously because script counts were going through the roof. I think if Rite Aid or any other company would have intervened to slow this down, they would have lost millions of dollars. If you cut out the oxycodone prescriptions or minimize them, you're talking about billions of dollars lost."

467.     The Ashtabula area had a number of pill mill or pill pusher doctors who provided area residents with opioids. Some didn't take insurance, only cash. The patient paid the doctor directly for an appointment, and the doctor wrote them prescriptions for what they wanted.

468.     He recalled the names of two: Dr. Almon S. Lee in Ashtabula and Dr. Peter Franklin in Middlefield, among others.

469.     Dr. Lee was an older doctor whose office was two doors down from the Rite Aid on West Ave, so his store saw a lot of Lee's prescriptions. "He always had a reputation as being a

pill pusher," he said. Despite his reputation as a pill pusher, for a number of years at Rite Aid, he and other pharmacists in the area filled Dr. Lee's prescriptions. Over time, Dr. Lee's prescribing habits became increasing irresponsible and dangerous, he said. For example, a patient came into his Rite Aid with an oxycodone prescription from Dr. Lee. The patient had recently filled a prescription for oxycodone prescribed by another doctor. The patient was also on a benzodiazepine prescribed by Dr. Lee.

470.    Pharmacist No. 7 eventually stopped filling Dr. Lee's prescriptions. When he called about the above prescription, he told him, "Dr. Lee, you're killing these people. I will not fill these prescriptions for these people." Dr. Lee then hung up on him, and he never talked to the doctor again.

471.    He discussed his decision not to fill Dr. Lee's prescriptions with his pharmacy district manager, Jill Rose, and with the staff pharmacist who worked in his store. When he called pharmacists at the other Rite Aid in Ashtabula to tell them about his decision regarding Dr. Lee, they told him they also had stopped filling Dr. Lee's prescriptions. He does not recall any memos from his pharmacy district manager or from Rite Aid going out to inform other stores about concerns regarding Dr. Lee or about the Ashtabula stores' decision to stop filling his prescriptions.

472.    He said Dr. Lee has been investigated for his prescribing practices, but is still practicing and had not lost his license to prescribe opioids.

473.    Pharmacist No. 7 said his Rite Aid also filled prescriptions from Dr. Peter Franklin who operated a pill mill in Middlefield, Ohio, a town about 30 miles away. According to news reports, Dr. Franklin shifted from operating a family medicine practice to a pain management

145

office and stopped taking medical insurance.[281] He began charging patients out-of-pocket for appointments during which he prescribed powerful opioids. Dr. Franklin's office was raided by state drug investigators in early 2009 under suspicion that he was over-prescribing painkillers. Dr. Franklin's prescribing, however, came to an abrupt end when his wife, who worked at his pain management office, killed him in August 2009.[282]

474.     He saw a high level of opioid use in his customers in Ashtabula. One of his customers, Paul, was a "known druggie in our area," who went to Dr. Lee for his prescriptions, he said. Rite Aid filled a lot of Paul's prescriptions from Dr. Lee, he said. "He knew he was a drug addict; we knew he was a drug addict," he said.

475.     He would talk to Paul about his drug use, saying to him, "Paul, you have to stop this shit." Paul would respond, "I know. I'm trying," he recalled. His Rite Aid would eventually stop filling Paul's prescriptions after he was caught stealing from the store. "He was no longer allowed in our store," he said. Sometime later, in about 2011 or 2012, Paul overdosed from what he thought was a combination of Percocet and Soma (a muscle relaxer).

476.     Despite the overwhelming problems Ashtabula was experiencing with opioid addiction, he does not recall Rite Aid having any centralized bad doctor list or providing any tools which would help pharmacists identify these doctors or inappropriate prescriptions.

---

[281] Ohio Task Force Commanders Association, Lake County Narcotics Agency, *Ohio state, local officials working to prevent 'pill mills'* (Feb. 16, 2015), https://otfca.net/ohio-state-local-officials-working-to-prevent-pill-mills/; Two pharmacists, Robert J. Graves, of Newton Falls, Ohio, and Andrea Luchetts, of Masury, Ohio, pled guilty on March 4, 2011 to felony charges related to drugs they dispensed which had been prescribed by Franklin. *Pharmacists plead guilty to charges,* The Vindicator (March 5, 2011), http://webcache.googleusercontent.com/search?q=cache:qpkzEcEQj7IJ:www.vindy.com/news/2011/mar/05/pharmacists-plead-guilty-to-charges/%3Fprint+&cd=7&hl=en&ct=clnk&gl=us.
[282] *Id.*

### 4.     *Cleveland, Ohio (Pharmacist No. 8)*

477.     From April 2017 to May 2019, Pharmacist No. 8 was a pharmacy manager at a Rite Aid store on Chagrin Boulevard in the Cleveland area (store # 3131). At Rite Aid, she initially reported to Kriston Yoho, Pharmacy Manager, and Mark Overt, District Manager.

478.     In Ohio, the state provides the OARRS database for health care providers that tracks all controlled substance prescriptions dispensed to patients in the state. The system allows doctors and pharmacists to check a patient's medication history and determine if the patient is doctor hopping or pharmacy shopping to obtain inappropriate controlled substances.

479.     While it was good practice for pharmacists to check OARRS whenever a patient submitted a new prescription for a controlled substance, checking OARRS prior to dispensing controlled substances was not a state law, nor a required at Rite Aid.

480.     Nor did Rite Ad have policies that required pharmacists to reject prescriptions from out-of-state doctors or doctors who were located many miles away, she said.

481.     Rite Aid did not keep lists of doctors who had been identified for writing inappropriate prescriptions. While at Rite Aid, she would receive occasional memos from management about specific doctors who had been identified as writing inappropriate prescriptions, were under investigation or who had lost their license to prescribe. Pharmacists were told to stop filling prescriptions for these doctors. But she does not recall the Company keeping a master list of these doctors in its internal systems.

482.     When doctors lost their licenses to prescribe, the pharmacists were informed of it by the State of Ohio Board of Pharmacy, she said. The announcement might also come through Company communications, she said.

147

483.    Rite Aid did not specifically encourage its pharmacists to share the names of doctors they had concerns about.

484.    The Rite Aid store where she worked filled about 150 to 200 prescriptions a day. During her two years there, she said she denied only one prescription for a controlled substance. In that case, she said the prescription was obviously fake.

485.    As for why she would not deny prescriptions she found questionable:  "If I reject a prescription for pain, they [the patient] would complain to my manager. The manager would ask me why." If she didn't have a "good explanation that it's not proper to sell it," her managers would come down hard on her, she said.

486.    She recalled a Cleveland area pain management physician, Dr. Jerome Yokiel, who was a frequent prescriber of opioid who lost his license for what she thought was inappropriately prescribing controlled substances.

487.    Dr. Yokiel had his license to prescribe controlled substances suspended in late 2017 because of his own use and addiction to opioids.[283]  According to ProPublica's Prescriber Checkup database, Dr. Yokiel was the ninth highest prescriber of oxycodone HCL in Ohio with some 1,163 claims submitted to Medicare.[284]

488.    She recalls filling numerous controlled substance prescriptions from Dr. Yokiel at her Rite Aid pharmacies. Dr. Yokiel's prescriptions were usually for an opioid and, typically, his patients came into the pharmacy with a combination of two to three prescriptions for controlled

---

[283] Brie Zeltner, *Chronic pain patients struggle after Beachwood doctor suspended*, cleveland.com (Aug. 26, 2018), https://www.cleveland.com/healthfit/2018/08/chronic_pain_patients_struggle.html.

[284]        Prescribers        of        OXYCODONE        HDL        in        Ohio, https://projects.propublica.org/checkup/drugs/2954/states/ohio.

substances, she said. She recalled seeing five to ten prescriptions and combo prescriptions from this doctor per week. The most common drugs he prescribed were Percocet and hydrocodone, she said. She said it was more common to see the two-combo prescription of an opioid with an anti-anxiety or sleeping medication such as Ambien. But Dr. Yokiel also wrote numerous combinations of three prescriptions. "There were a lot of muscle relaxant and anti-anxiety and opioid at the same time," she said.

489.    She said she never refused to fill any of the prescriptions from Dr. Yokiel. She said Dr. Yokiel typically wrote prescriptions for a two-week supply, but that the dosage strengths tended to be on the higher side. "If Percocet is available in 2.5 (mg), 7.5 and 10, he would do 7.5 or 10," she said.

490.    She said she first heard about Dr. Yokiel losing his license through word-of-mouth among colleagues. She then received notice from the Board of Pharmacy that he no longer had a license to prescribe and that his prescriptions should not be filled. She recalls she had shared her concerns about Dr. Yokiel with colleagues, but she did not reject any of his prescriptions and that she filled them while at Rite Aid.

491.    At Rite Aid, the Company's top priority and focus of job evaluations was on revenue streams. "Prescription volume was number one," she said.

492.    At Rite Aid, she was so understaffed, she believed it created a dangerous situation for patients and could lead to pharmacists missing red flags for inappropriate prescriptions. "I practically had no staffing," she said. . . . Rite Aid does not give you any help. They don't care."

493.    While at Rite Aid, she worked 12-hour shifts from 9am to 9pm. Generally, she worked four to five hours of the shift alone, often opening and closing by herself.  She only had a pharmacy technician scheduled for a portion of her shift. Not infrequently, technicians called in

shortly before the shift to say they were not coming in. That left her working the entire shift by herself. "It happened too much and too often," she said of working a shift alone at Rite Aid.

494.     While alone, she had to do everything expected of the pharmacy – type prescriptions into the system, call doctors, call patients, process insurance, print and attached labels, count the pills, fill the bottles, confirm the accuracy of the medication and pills, work the register, answer phone calls, process refills, deal with customers, provide immunizations, etc.

495.     She was so overworked and understaffed it created a dangerous situation in the pharmacy for the patients. She said it created an environment in which mistakes and oversights were more likely to occur. "I was a pharmacist who worked by myself doing the job of four people," she said. "It's just not safe. You always need a tech… I absolutely feel it jeopardized the patient safety."

496.     She said the understaffing contradicted what Rite Aid claims is its priority on safety. "They want safety, safety all over, safety is the strategy of the pharmacy," she said of Rite Aid's claims. "What kind of safety is it if you work by yourself?"

497.     The understaffing situation at Rite Aid made it difficult to catch red flags for inappropriate prescriptions and possibly allowed inappropriate prescriptions to slip by. "It's possible that they slipped by," she said. "You can't catch everything when you're chasing your tail all day long."

498.     She said she initially reported her concerns about understaffing to her managers at Rite Aid, but "then I just decided to stop because it didn't get me anywhere."

   **5.    *Canton, Ohio (Pharmacist No. 9)***

499.     Pharmacist No. 9 was Pharmacy Manager for Rite Aid from 1994 to 2015 at the store located at 4332 Cleveland Ave., Canton, Ohio (store #3061). Previous to that, she was a staff

pharmacist for about two years at an East Liverpool, Ohio Rite Aid (store #3060).  She reported to John Nicora, District Manager, and Mary Menegay, Pharmacy District Manager.

500.    She recalled the lack of staff and constant pressure to meet corporate metrics left insufficient time for Rite Aid pharmacists to scrutinize controlled substance prescriptions.  In particular, she described a severely understaffed environment at the pharmacy and an intense pressure to meet corporate metrics, which were used to determine promotions and raises.  Rite Aid pharmacists did not always have time to fully investigate controlled substance prescriptions to ensure the drugs were appropriate to dispense.

501.    "It's definitely hard to keep all of the time constraints in your head and think about what you need to get done," she said. "And if you don't have anybody there [to help] or the tech is at lunch, it's like, 'How am I going to do this.' It was difficult. It was stressful." This undermined her ability to catch inappropriate controlled substance prescriptions, she said, "I would say that there were probably times that it did."

502.    Asked what Rite Aid could have done to better support its pharmacists' ability to stop inappropriate prescriptions from going out the door, she said: "The biggest thing they could have done was drop their concern with the metrics and focus on the customer, which would mean better service, which would mean more help [staff] in the pharmacy. A lot of things would become easier. Things [prescriptions] that might slip through the crack would be more likely to be looked at."

503.    If a controlled substance prescription came in that technically met criteria but still seemed off, a pharmacist who was not so overloaded with work would have the time and attention to say, "Hmmm, let's give this one (doctor) a call," or to investigate the situation more, she said. "With the workload they expected of us and the constant cutting of hours, it was kind of like, 'This

one looks OK, let's do it,'" she said, referring to controlled substance prescriptions that were filled as long as they did not have any glaring problems.

504.    Over her time there, Rite Aid gradually cut further and further back on pharmacist and pharmacy technician hours while also increasing the amount of work they were expected to do. When she first started at Rite Aid in about 1992, the staffing in the pharmacies was far more robust than when she left in 2015.  Over the years, Rite Aid continued to cut back on the number of technicians working alongside pharmacists, she said.

505.    Her shift was 13 hours long, from opening the pharmacy to closing it. Usually, she was there alone in the morning for about an hour before the tech would come in. The tech was allotted a one-hour lunch break and other shorter breaks during the shift, during which she was alone. Two hours before closing, the tech would go home, again leaving her alone in the pharmacy.

506.    The staff cutbacks came at the same time that Rite Aid was increasing the amount of work expected of the pharmacists, she said. In the last several years, Rite Aid has pushed pharmacists to do more immunizations, make more calls to customers about refilling prescriptions, conduct more reviews of customers' medication profiles, among other things, she said.

507.    She also noted that her volume of prescriptions did not change much, and that she typically filled between 120 and 150 prescriptions a day.

508.    In years past, when she needed extra staff (for example, a monthly inventory count or an expected surge in flu shot requests), she simply assigned the hours and submitted a form explaining why she needed the extra hours. In more recent years, when she tried to request more staff, her pharmacy manager said she had to make do with the staff she had.

509.     She recalled that her Rite Aid pharmacy filled prescriptions from doctors who were later flagged for writing inappropriate prescriptions.  The doctors eventually lost their licenses due to Ohio State Board of Pharmacy investigations.

510.     She recalls Dr. Frank Lazzerini, who operated in Jackson Township near Canton and had been convicted of illegally prescribing opioids.  Between March 2013 and September 2015, Dr. Lazzerini wrote some 20,745 prescriptions for controlled substances, equal to 1.9 million doses.[285]

511.     In 2019, Lazzerini was convicted of 187 felony charges for prescribing addictive pain medication without a legitimate medical purpose for dozens of patients, irresponsibly prescribing medication that killed a 38-year-old man, and in 2014, fraudulently overbilling Medicaid for services not rendered.  He was sentenced to 113 years in jail.[286]

512.     "Every prescription from [Lazzerini] was a C-II," she said, referring to controlled substance Class II. "There was never anything else but C-IIs. If we had to call him because it was an early fill, like a week early, it was always OK. He'd say, 'It's OK. I told them to take a few extra when they needed it.'"

513.     When Lazzerini's office confirmed a prescription and there was no evident abuse issue in the patient's medication history, she said her Rite Aid pharmacy would usually fill the prescription. "We either lose a customer or we fill it," she said. She recalls Dr. Lazzerini's patients

---

[285] Robert Want, *Investigator: Lazzerini billed Medicaid $260 after 2-minute exam*, CantonRep.com (May 10, 2019), https://www.cantonrep.com/news/20190510/investigator-lazzerini-billed-medicaid-260-after-2-minute-exam.

[286] Robert Wang, *Judge calls Frank Lazzerini 'Dr. Frankenstein'*, CantonRep.com (July 14, 2019), https://www.cantonrep.com/news/20190712/update-judge-calls-frank-lazzerini-dr-frankenstein.

in particular: "I just remember them because there were always that, 'Ugh, not this guy again,'" she said.

514.　　Other pharmacies, however, refused to fill his prescriptions. At Lazzerini's trial, two local Walgreens pharmacists testified that in 2014 and 2015 they had refused to fill his prescriptions because many seeking the medications lived outside the area and otherwise illustrated "red flags" that caused them to refuse to fill. Pharmacist Teresa Russell, who worked at the Walgreens in Massillon, Ohio, "said after Lazzerini's patients presented a series of suspicious prescriptions she felt presented a risk to their health, she refused to fill any more prescriptions by Lazzerini for controlled substances. In one case, Lazzerini prescribed a drug prone to abuse at twice the recommended level to treat impotence. She also talked about a 16-year-old girl with a broken ankle for whom Lazzerini prescribed pain medication repeatedly and a weight loss drug. 'I started questioning why she was on (long-term pain medication) for a broken ankle,' Russell said. 'It's an acute pain situation, not a chronic pain situation, especially for a teenager.'"[287]

515.　　The State Board of Pharmacy came into Pharmacist No. 9's store more than once and pulled all the prescriptions from Lazzerini for the prior "year or so," she said. While at the store, the Board representative told the pharmacy to "keep an eye on" Lazzerini's prescriptions and that "it would be in your best interest not to fill" his prescriptions, she said. She said she notified her pharmacy manager Mary Menegay about the visit by the Board and their recommendation.

---

[287] Robert Wang, *Investigator: Lazzerini billed Medicaid $260 after 2-minute exam*, CantonRep.com (May 10, 2019), https://www.cantonrep.com/news/20190510/investigator-lazzerini-billed-medicaid-260-after-2-minute-exam.

516.    She does not recall a list of problem doctors that was kept in the Rite Aid computer system. Nor does she recall anything in the Rite Aid computer system that provided a red flag or a warning when the doctor's name was typed in as the prescribing doctor for a prescription.

517.    During job performance reviews, she was graded on several different metrics set by Rite Aid corporate. Her job performance was based on her prescription volume, the number of immunizations given, her prescription fill-rate, not exceeding the allotted technician hours, and customer satisfaction. The Company had expectations about how many prescriptions she should fill per day and how fast she filled them. The Company's computer had a timer that started the second a new prescription was entered into the system until it was completed. For waiting patients, the pharmacy was expected to fill it in 15 minutes. Failing to fill prescriptions for waiting customers within 15 minutes would lower her performance score.

518.    Her evaluation was also based on how well she kept to the allotted tech hours or whether she went over budget on staffing. Customer complaints also factored negatively into her job evaluations, even if the complaint was unfounded.

519.    If she denied an opioid prescription and the customer complained, she would get a phone call from her pharmacy manager. The pharmacy manager would question her about why she denied the prescription. Even though her Pharmacy Manager Mary Menegay may understand her reasoning, the complaint from the customer would stay in her file as a negative mark against her, she said.

520.    The pressure to meet the Rite Aid metrics would factor into some pharmacists' decisions about whether to deny a controlled substance prescription. A pharmacist with a number of customer complaints would be more reluctant to deny a prescription out of concern about receiving another negative mark on their job performance, she said.

521.    Rite Aid was more focused on profits than the safety of customers. "It was money. It had nothing to do with safety. They always say it's 'customer first,'" she added. "It was Company first." She said it was clear to her that the Company put profits over customer safety by the amount of work expected from its staff and how little help the employees received to do it.

522.    A few years before she left Rite Aid, the Company issued an alert to its pharmacies about the dangers of a medication combination of an opioid, a benzodiazepine and a muscle relaxant referred to as the "Holy Trinity," she said.  Prior to the alert, she was unaware that the combo was a red flag for inappropriate prescriptions and patients who were likely abusing drugs.

523.    She had been dispensing the "Holy Trinity" combinations prior to that time as long as they met the technical criteria as a legitimate prescription. The alert from Rite Aid came with large red stickers that were affixed to the pharmacy counter warning about the dangers of the "Holy Trinity" combo of drugs. At that point, she stopped dispensing the combinations of drugs.

524.    She would ask patients what their primary medical need was, and if for example, the patient said, "pain," she might dispense just the opioid medication. She would also, however, write on the other two prescriptions that she filled the opioid and mark the date. She did that so if the patient tried to fill at another pharmacy, the pharmacist there would be aware of the opioid prescription.

525.    She said the "Holy Trinity" problem had been going on for a number of years before Rite Aid issued its alert to pharmacists. She felt Rite Aid should have issued the alert sooner if it had been more concerned about the opioid crisis.

H.  **Specific Examples of Unlawful Dispensing Conduct: Pennsylvania**

1.  ***Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Pennsylvania***

526.    The opioid addiction and overdose crisis is the worst public health and public safety emergency in Pennsylvania. Some 5,456 Pennsylvanians died as a result of drug abuse in 2017— more than in any other state.[288] That number was 4,643 the year before, and at least 85% of those drug-related fatalities involved opioids. The rate of drug-related overdose deaths in Pennsylvania increased from 26 per 100,000 in 2015 to 43 per 100,000 in 2017. This far exceeds the national average (22 per 100,000 in 2017).[289]

527.    In addition to overdose deaths, the Pennsylvania Health Care Cost Containment Council reports that the number of opioid-related hospitalizations in Pennsylvania increased 103.6% between 2008 and 2015. Nearly 1 in 37 hospital admissions in the Commonwealth were related to opioids in 2017 alone. This number does not include emergency room visits for opioid intoxications and other opioid encounters that did not result in a hospital admission.[290]

528.    Between 2008 and 2015, the number of inpatient hospital stays involving opioids more than doubled from 14,711 admissions to 29,958. In 2017 alone, there were 36,712 opioid-related hospitalizations, with hospital admissions for opioid use disorder amounting to an

---

[288] PittPharmacy, *The Opioid Threat in Pennsylvania* (Sept. 2018*)*, at 2, DEA-PHL-DIR-036-18, https://www.dea.gov/sites/default/files/2018-10/Opioid%20threat%20in%20Pennsylvania%20FINAL.pdf.

[289] *Id.* at 33.

[290] Pennsylvania Health Care Cost Containment Council, http://www.phc4.org/reports/researchbriefs/overdoses/l01618/docs/researchbrief_overdoses101618.pdf and http://www.phc4.org/reports/researchbriefs/overdoses/17/docs/researchbrief_overdoses2017.pdf

estimated $32 million in hospital payments at an average cost of $10,321 per stay related to prescription opioid overdoses.[291]

529.    The Pennsylvania Medicaid program spent millions on opioid drugs from 2007 to the present. In 2017, Medicaid was the anticipated payer for 44.3% of opioid-related hospitalizations-the largest percentage among insurance payer groups. As a comparison, Medicaid comprised only 16.9% of all hospitalizations that same year.[292]

530.    Despite having some 540 stores located all over the Commonwealth of Pennsylvania, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in Pennsylvania.

531.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
|---|---|---|---|
| 9-Mar-04 | Bernard Rottschaefer, MD | Pittsburgh, PA | 78 months |
| 12-Oct-04 | Barnett, Randy | Philadelphia, PA | 24 months probation |
| 20-Jan-05 | William Delp, DO | Bethlehem, PA | 1-2 years |
| 7-Feb-05 | Nicholas Lisnichy, MD | Dunmore, PA | 6-12 years |
| 24-May-05 | Harry Alexanderian, MD | West Pittston, PA | 6 months home detention |
| 25-Jan-06 | Abdul Hussain, MD | Wilkes-Barre, PA | 3-10 years |
| 24-Apr-06 | Frank Bregar, MD | Pittsburgh, PA | 3 months home detention |
| 5-May-06 | Gurbachan Kathpal, MD | Canonburg, PA | 2-4 years |
| 9-May-06 | Philip G Wagman, MD | New Castle, PA | 7-15 years |
| 5-Sep-06 | Robert Snyder, DO | Pittsburgh, PA | 1 year probation |

---

[291] *Id.*

[292] *Id.*

| | | | |
|---|---|---|---|
| 26-Sep-06 | Jatinder Bajwa, MD | Springdale, PA | 2 year probation |
| 5-Jul-07 | William Mangino, II, MD | Philadelphia, PA | 8 1/2-20 years |
| 14-Nov-07 | Paul H. Caviness, MD | Middleton, PA | 9-23 months |
| 13-Feb-08 | Edward J Alexander, MD | Philadelphia, PA | 3 years probation |
| 20-May-08 | Evelyn Frances Sabugo, MD | Philadelphia, PA | 18 months |
| 24-Jun-08 | Aziz Chaudhry, MD | Philadelphia, PA | 15 months |
| 24-Jun-08 | Manuel Pagalilauan, MD | Philadelphia, PA | 9 months |
| 2-Sep-08 | Joseph Borkson, MD | Philadelphia, PA | 5 years |
| 28-Oct-08 | Thomas Bradley, MD | Dubois, PA | 5 years probation |
| 31-Oct-08 | Lawrence Adams, MD | Phillipsburg, PA | 7-14 years |
| 10-Mar-09 | David Girardi, MD | Curwensville, PA | 2 years probation |
| 19-Mar-09 | Randy Weiss, DO | Philadelphia, PA | 4 years |
| 29-Sep-09 | Jennifer Zampogna, MD | Mechanicsburg, PA | 23 months probation |
| 30-Mar-10 | Laurence T McKinney, MD | Philadelphia, PA | 87 months |
| 24-Sep-12 | Oliver Herndon, MD | Pittsburgh, PA | 135 months |
| 14-Jan-13 | Rajendra D. Yande, DO | DuBois, PA | 4-8 years state |
| 2-Apr-13 | Arlene Gerson, PharmD | Philadelphia, PA | 68 days time served |
| 15-May-13 | Kermit Gosnell, MD | Philadelphia, PA | 3 life sentences |
| 24-Sep-13 | Norman Werther, MD | Ft. Washington, PA | 25 years |
| 29-Oct-13 | Heather Herzstein | Folcroft, PA | 33 months supervised release |
| 4-Dec-13 | Charles Brian Griffin, PharmD | Pittsburgh, PA | 40 months |
| 22-May-14 | Michael B Rosen, MD | Lafayette Hill, PA | community service |
| 5-Jun-14 | Richard R. Ruth, DO | Franconia, PA | 15-30 years |
| 10-Feb-15 | Jay Cho, MD | Mechanicsburg, PA | |
| 10-Mar-15 | Cynthia Masso, MD | Philadelphia, PA | Charged |
| 10-Dec-15 | Lawrence Wean, MD | Delaware City, PA | 10-20 years |
| 12-Dec-15 | Mohammed Abdul Rahman Khan, MD | Reading, PA | 2-4 years |
| 15-Jan-16 | John Terry, MD | Wellsboro, PA | 20 months |
| 19-Jan-16 | David A. Wait, MD | New Cumberland, PA | 1.5-3 years state prison |
| 23-Feb-16 | Davis, Glenn Bryan | Johnstown, PA | 6 years |
| 1-Jun-16 | Thomas Radecki, MD | Clarion, PA | 11-22 years |

| 20-Jun-16 | Amy Schneider | York, PA | 30 months |
|---|---|---|---|
| 28-Jul-16 | Walter Krajewski, DO | York, PA | $300,000 fine |
| 7-Oct-16 | William J. O'Brien, III, DO | Philadelphia, PA | 30 years |
| 8-Dec-16 | Jeffrey Bado, DO | Philadelphia, PA | 25 years |
| 23-Feb-17 | Harold J Pascal, MD | East Stroudsburg, PA | 6-18 months |
| 23-Feb-17 | Keyhosrow Parsia, MD | Philadelphia, PA | 3 years probation |
| 27-Feb-17 | Clarence R Verdell, MD | Philadelphia, PA | 1 day |
| 31-Mar-17 | Chetan Byhadgi, MD | Milford, PA | 9-23 months, home detention |
| 31-Mar-17 | Barbara Schneider, MD | Philadelphia, PA | deceased before sentence |
| 27-Jul-17 | Rosalind Sugarmann, Director | Allison Park, PA | 1 year + 1 d |
| 2-Aug-17 | Dominic W. Dileo, MD | Uniontown, PA | 1 year (Spent 10 years in prison in 90s for Medicare fraud) |
| 11-Aug-17 | Kenneth M. Stanko, MD | Pittsburgh, PA | 1 year 1 d |
| 26-Oct-17 | Kenneth L. Cherry | State College, PA | 18 months probation, license suspended 30 months |
| 2-Nov-17 | Daniel Garner, DDS | Pittsburgh, PA | |
| 20-Dec-17 | Raymond Kraynak, MD | Mount Carmel, PA | |
| 27-Feb-18 | Alan Summers, MD | Ambler, PA | 48 months $4.6MM restitution |
| 8-Mar-18 | Rebecca Delbaggio, MD | Hollidaysburg, PA | |
| 8-Mar-18 | Bruce Lief, MD | Wayne, PA | |
| 13-Mar-18 | Brent E. Clark, MD | Pittsburgh, PA | 5 years |
| 9-Apr-18 | Azad A. Khan, MD | Villanova, PA | 2 years |
| 23-May-18 | Michael Milchin | Philadelphia, PA | 14 years |
| 20-Jul-18 | Alan Barnett, MD | Pittsburgh, PA | 5 years probation |
| 7-Sep-18 | Erica LaBoy | Philadelphia, PA | sealed |
| 7-Sep-18 | William Richardson | Pittsburgh, PA | |

| | | | |
|---|---|---|---|
| 18-Sep-18 | Ralph Capone, MD | Greensburg, PA | pled guilty, probation |
| 24-Sep-18 | Mamdouh El-Attrache, MD | Mt. Pleasant, PA | Indicted |
| 28-Sep-18 | Nabil Jabbour, MD | Greensburg, PA | |
| 14-Nov-18 | Arthur Miriana | Medford, PA | 70 months |
| 6-Feb-19 | Debra Cortez, PA | Bristol, PA | No trial date set (Covid) |
| 6-Feb-19 | Marcus Rae Williams, MD | Coatesville, PA | No trial date set (Covid) |
| 6-Feb-19 | Brown, Avrom, MD | Elkins Park, PA | No trial date set (Covid) |
| 6-Feb-19 | Vincent Thompson, MD | Elkins Park, PA | No trial date set (Covid) |
| 6-Feb-19 | Loretta Brown, DO | Landsowne, PA | No trial date set (Covid) |
| 6-Feb-19 | Mehdi Nikparvar-Fard, MD | Penn Valley, PA | No trial date set (Covid) |
| 6-Feb-19 | Mitchell White, PA | Philadelphia, PA | No trial date set (Covid) |
| 6-Feb-19 | William Demedio, MD | Springfield, PA | No trial date set (Covid) |
| 6-Feb-19 | Neil Cutler, MD | Warminster, PA | No trial date set (Covid) |
| 6-Feb-19 | Frederick Reichle, MD | Warrington, PA | No trial date set (Covid) |
| 6-Feb-19 | Jason Dillinger, PA | West Chester, PA | No trial date set (Covid) |
| 13-Feb-19 | Sabrina Thomas | Greensburg, PA | |
| 4-Apr-19 | Fuhai Li, MD | Milford, PA | 27 years |
| 9-Apr-19 | Allyson Delfino, Med Tech | Greentown, PA | 36-72 months |
| 11-Apr-19 | Martin D. Weaver, MD | Philadelphia, PA | sealed |
| 30-Apr-19 | Tayjha Brown, NP | Coatesville, PA | |
| 17-Jun-19 | Nancy Esslinger, Dental Asst. | Upper Chichester, PA | 19 months |
| 25-Jul-19 | Murray Soss, DO | Philadelphia, PA | Indicted |
| 28-Aug-19 | Stephen Padnes, MD | Philadelphia, PA | Indicted |
| 10-Sep-19 | Neil K. Anand, MD | Philadelphia, PA | Indicted, Trial postponed |
| 10-Sep-19 | Asif Kundi, MD | Philadelphia, PA | Indicted, Trial postponed |
| 10-Sep-19 | Atif Malik, MD | Philadelphia, PA | Indicted, Trial postponed |

| 10-Sep-19 | Viktoriya Makarova, NP | Philadelphia, PA | Indicted, Trial postponed |
| 24-Sep-19 | Emilio Ramon Navarro, MD | Perryopolis, PA | Indicted |
| 25-Oct-19 | Robert Schorschinsky, MD | Exeter Township, PA | charged, 20 counts |
| 29-Oct-19 | Paul Michael Hoover, MD | Coraopolis, PA | 11 years, 4 months |
| 22-Nov-19 | Kenneth Sun, MD | Easton, PA | pled guilty |
| 17-Dec-19 | Thomas J. Whalen, DO | Havertown, PA | 1 day prison + 12 months house arrest |
| 8-Jan-20 | Richard Ira Mintz, DO | Philadelphia, PA | 12 months |
| 7-Feb-20 | Milad Shaker, MD | Greensburg, PA | 3 years |
| 17-Mar-20 | Andrew M. Berkowitz, MD | Huntington Valley, PA | $2.8 civil damages and penalties; lost DEA license; 20-year exclusion from govt healthcare programs |
| 16-Sep-20 | Kurt Moran, MD | Scranton, PA | Indicted |
| 29-Sep-20 | Ajeeb Titus, MD | Bethlehem, PA | Indicted |

## 2. *Doylestown, Pennsylvania (Pharmacist No. 10)*

532.     Doylestown, Pennsylvania is the county seat of Bucks County, which has been designated as a High-Intensity Drug Trafficking Area or "HIDTA."[293]

533.     Pharmacist No. 10 worked as a "floating" pharmacist for Rite Aid from September 2014 to August 2017. She floated to many pharmacies in a 40-mile radius around Doylestown.

534.     When presented with a prescription that she felt was suspicious or out of the ordinary, she would usually look to the pharmacist in charge for guidance because she was a floater and not familiar with store practices.

535.     "It is hard to refuse to fill for a patient who is a regular customer," Pharmacist No. 10 said. That was something she liked about floating – she did not get to know customers personally and could make decisions based on her professional training and ethics.

---

[293] *Officials: Drug trafficking a problem in Bucks County*, 6 Action News (Sept. 30, 2019), https://6abc.com/officials-drug-trafficking-a-problem-in-bucks-county/5579775/.

536.     However, in some cases when customers complained about her refusals, she would tell them, "I don't work here every day. Why don't you speak to the regular pharmacist who will be here tomorrow?"

537.     Pharmacist No. 10 recalled an incident when she refused to fill prescriptions for a family of six people, all of whom had prescriptions from the same doctor for the same opioids. This incident presented many red flags for fraud. These six family members all had the same address; they had the prescriptions for the same opioids from the same doctor.

538.     Based on these signs, she refused to fill the prescription. The customer complained to a call-in customer service number and she got a phone call that same day from a corporate employee asking her to explain why she refused to fill.

539.     Despite the fact that fraudulent doctors operated all around the area, neither Rite Aid nor the stores where she worked kept any database or list of suspicious physicians.

540.     One notorious Bucks County was osteopath William J. O'Brien III, who was sentenced to 30 years in prison for illegal distribution of controlled substances resulting in death and additional charges arising from O'Brien's operation of a pill mill.[294] On July 14, 2015, a grand jury had charged O'Brien and nine codefendants in a 139-count Second Superseding Indictment ('the indictment") with conspiring to distribute controlled substances and other crimes. O'Brien was also charged with 121 separate counts of distribution of controlled substances, and distribution resulting in death. In addition to O'Brien, the defendants charged in the indictment included members and associates of the Pagans Motorcycle Club ("Pagans"), an outlaw gang known for

---

[294] Kara Seymour, *Bucks County Doc Sentenced To 30 Years For Pill Mill Operation, Patient Death*, Bensalem Patch (Oct. 7, 2016), https://patch.com/pennsylvania/bensalem/bucks-county-doc-sentenced-30-years-pill-mill-operation-patient-death.

violence and drug dealing. O'Brien was charged with conspiracy to engage in money laundering, conspiracy to commit bankruptcy fraud, and making false statements under oath in bankruptcy proceedings.[295]

541.    On June 28, 2016, after a six-week trial, a jury found O'Brien guilty of all charges in the indictment except for four distribution counts. The evidence at trial showed that O'Brien worked together with Pagans and their associates to operate a "pill mill" out of O'Brien's medical offices. O'Brien wrote fraudulent prescriptions for oxycodone and other drugs, while the Pagans and their associates recruited "patients" to buy the fraudulent prescriptions. O'Brien charged $250 cash for the first appointment to obtain prescriptions for controlled substances and $200 cash for each subsequent visit. Oxycodone (30 mg) was in high demand by drug dealers who could sell each pill on the street for $25 to $30. O'Brien sold prescriptions for these dangerous and addictive drugs to hundreds of "patients." After filling the prescriptions, the Pagans and their associates resold the pills on the street. The trial evidence showed that from March 2012 to January 2015, more than 700,000 pills containing oxycodone and other Schedule II controlled substances were distributed by O'Brien in furtherance of the conspiracy.  O'Brien generated for himself an estimated $2 million in cash proceeds from the drug trafficking conspiracy.[296]

542.    In connection with his operation of the pill mill, O'Brien intentionally distributed, for no legitimate medical purpose, oxycodone, methadone, and cyclobenzaprine, a muscle relaxer, to Joseph Ennis, 38, of Bucks County. Mr. Ennis had initially sought treatment from O'Brien

---

[295] Press Release, U.S. Attorney, E.D. Pa., *Former Philadelphia Doctor Sentenced To 30 Years For Running Pill Mill And Distributing Oxycodone Resulting In Patient Death* (Oct. 5, 2016), https://www.justice.gov/usao-edpa/pr/former-philadelphia-doctor-sentenced-30-years-running-pill-mill-and-distributing.

[296] *Id.*

following a car accident. On December 17, 2013, O'Brien prescribed oxycodone and methadone without a legitimate medical purpose, which combined with the cyclobenzaprine, led to Mr. Ennis' death. Mr. Ennis died five days later on December 22, 2013 from the combination of these substances. At sentencing, Mrs. Bridget Shaw, Mr. Ennis' sister, asked the Court to consider "the countless victims [O'Brien] fooled who are not here to represent themselves. The patients he turned into addicts for his profit and their families who are now left swimming in hospital bills or worse, wondering how this hell came to be . . . Rather than save lives, according to the oath he took, he chose to ruin them."[297]

543.    Pharmacist No. 10 recalled occasional conference calls or emails from the Company about doctors who were over-prescribing opioids. Despite these occasional communications, neither Rite Aid corporate nor the stores where she worked maintained a list or database of suspicious physicians.

### 3.    *Pennsburg, Pennsylvania (Pharmacist No. 2)*

544.    Pennsburg, Pennsylvania is located in Montgomery County, the location of numerous reported pill mills.  There have been numerous arrests and convictions of Montgomery County pill mill doctors related to the opioid epidemic, including Michael B. Rosen,[298] Richard Ruth, Michael Ruth, [299]Spiro Kassis,[300] Lawrence I. Miller, Joseph F. Cipriano, Brian C.

---

[297] *Id.*

[298] Cael Hessler, *'Dr. Feel Good' gets probation*, Mainline MediaNews (May 22, 2014), http://www.mainlinemedianews.com/news/region/dr-feel-good-gets-probation/article_3c349d4d-b6bb-5b7e-9ac2-f7c77fcd393e.html.

[299] Cael Hessler, *Franconia doctor, son sent to prison for running pill mill*, Souderton Independent (June 5, 2014),  http://www.montgomerynews.com/soudertonindependent/news/franconia-doctor-son-sent-to-prison-for-running-pill-mill/article_7fc380ad-4b86-565d-a89d-1fe23039f50e.html.

[300] Press Release, U.S. Attorney, E.D.Pa., *Montgomery County Doctor Charged with Illegally Prescribing Opioids* (Aug. 2, 2019), https://www.justice.gov/usao-edpa/pr/montgomery-county-

Keeley,[301] Alan Summers,[302] Vincent Thompson, Avrom Brown, Mehdi Nikparvar-Fard, Loretta Brown, Frederick Reichle, Marcus Rey Williams, William Demedio, Neil Cutler, Mitchell White, Jason Dillinger, and Debra Cortez.[303]

545.     Pharmacist No. 2 worked as a pharmacist at a Rite Aid store at 350 Main Street, Pennsburg, Pa. (store #443) from 2015 to 2017.

546.     He became disillusioned with working in a retail pharmacy environment, largely because of pressure from management to fill prescriptions, even when he suspected prescriptions were fraudulent.

547.     At the Pennsburg Rite Aid store, he reported to a district manager who ordered prescriptions that he believed were fraudulent to be filled despite his warnings. He refused to fill a lot of prescriptions there for customers he believed were questionable. However, his decisions were often questioned by his district manager, whose name was Henry Kim. "Many times, I got pushback from my district manager," he said.  Kim would intervene if a customer's complaint made its way to him. "When that was the case, the patient got their way, unfortunately," he said.

548.     He said the store did have customers who he considered drug seekers, with prescriptions for opioids from medical doctors and dentists. He remembered refusing to fill a

---

doctor-charged-illegally-prescribing-opioids.

[301] *Four Montgomery County doctors accused of illegally prescribing opioids*, 6 Action News (Sept. 12, 2018), https://6abc.com/four-montco-doctors-accused-of-illegally-prescribing-opioids/4223129/.

[302] Bobby Allyn, *Ambler doctor gets prison for supplying prescription pills to addicts, dealers in South Philly*, WHYY (Feb. 27, 2018), https://whyy.org/articles/ambler-doctor-gets-prison-supplying-opioids-addicts-dealers-south-philly/.

[303] Dan Sokil, *Doctors among 14 charged for alleged opioid ring*, The Reporter (Feb. 7, 2019), https://www.thereporteronline.com/news/doctors-among-charged-for-alleged-opioid-ring/article_9d371f56-2a4b-11e9-94b8-9b0ea7d0d2b6.html.

prescription for a "huge amount" of oxycodone liquid for a 16-year-old patient. He recalled it being for "a storeroom quantity," perhaps 475 milliliters.

549.    He recalled another case, also involving a 16-year-old patient, who was prescribed "an obscene dose of oxycodone" and who had traveled an hour to the store to have it filled. He refused to fill the prescription.

550.    He also recalled an incident when the district manager stepped in. A customer had prescriptions for the "Holy Trinity" of dangerous medications: a benzodiazepine, a muscle relaxer and an opioid. He refused to fill them and the patient contacted the district manager, who asked him to fill the prescriptions. Pharmacist No. 2 objected, citing his expertise and years of schooling in pharmacology, saying he did not believe it was an appropriate regimen of medications for the patient.

551.    "There was a lot of pushback," from the district manager, he said. "He said, 'It would be in your best interest to fill it.'" Because of that threat to his employment, he did fill the prescription and it was that experience that led him to leave the retail pharmacy profession.

552.    "I didn't really like the shady practices of retail pharmacies with opioids," Pharmacist No. 2 said. "That's why I got out."

553.    He made notations in the Rite Aid computer system of some of these incidents. He made a note in the system about this incident, documenting that the district manager pushed him to fill the prescription. He said he always documented such incidents in the system, making notations under the patient's profile so other pharmacists would be aware

### 4.    *Reading, Pennsylvania (Relator Wegelin)*

554.    Reading, Pennsylvania is the county seat of Berks County.  According to statistics from the CDC, the population in Berks County, Pennsylvania rose 2.9 percent from 2006 to 2012.

167

During this same period, the rate of drug-related deaths went up by nearly two-thirds over that time: from 7.7 deaths per 100,000 people in 2006 to 12.8 in 2012. Meanwhile, the number of opioid pills distributed to pharmacies in the county more than doubled: from 5.9 million in 2006 to nearly 12 million in 2012.[304] From 2006 through 2012, pharmacies in Berks County distributed more than 63 million doses of oxycodone and hydrocodone — enough to give each person in the county about 20 opioid pills per year over that period.[305]

555.    Relator Wegelin worked for Rite Aid from 2007 to 2017 at thirteen different stores in Pennsylvania, including the Rite Aid stores located at 500 East Lancaster Ave, Shillington (Store #290); 525 Penn Ave., West Reading (Store #467); 524 North 6th St., Reading (Store #1581); 4810 Penn Ave., Sinking Spring (Store #1975); 5370 Allentown Pike, Temple (Store #2589); 670 Philadelphia Ave., Reading (Store #2591); 2320 Penn Ave., West Lawn (Store #2781); 3145 Main St., Morgantown (Store #7861); 418 Penn St., Reading (Store #11170); 3215 5th Street Highway, Reading (Store #11171); 4360 Perkiomen Ave., Reading (Store #11172); 2962 St. Lawrence Ave., Reading (Store #11173); 2210 State Hill Road, Wyomissing (Store #11174). At the end of her time working there, she was the pharmacy manager at the Rite Aid store located at 2962 St. Lawrence Ave., Reading, Pennsylvania, 19606.

556.    When Relator Wegelin started, it was typical for the pharmacy to fill around 400 prescriptions per 12-hour shift. Later, after another Rite Aid and a CVS opened nearby, the prescription volume fell to around 300 per shift. Even after the drop in volume, Relator Wegelin

---

[304] Adam Richter, Steve Henshaw, *As drug overdose deaths soared, so did the supply of opioid pills in Pa. and Berks County*, Reading Eagle (Aug. 19, 2019), https://www.readingeagle.com/news/article/as-drug-overdose-deaths-soared-so-did-the-supply-of-opioid-pills-in-pa-and-berks-county.

[305] *Id*.

still found that she needed to come in early and leave after hours to ensure that all the work that needed to be done was completed; there simply was not enough time in each shift to do everything that was required. In addition to never even having the time to sit down during the entire shift, Relator Wegelin felt that her job was like an assembly line. Often, the time pressures meant that Relator Wegelin could not do all the due diligence that she would have liked to have done, such as check the Pennsylvania PDMP. A check of the PDMP system alone took around 5 minutes, which was a lot in an environment where you were still expected to fill 35 prescriptions an hour.

557.    The pharmacists would get a weekly "clinical report" by email. This email laid out in great detail the performance of each store. It included such things as how many immunizations were performed and the number of medication therapy monitoring billed. The clear priority of the reports was to encourage stores to grow profitability. In fact, in the clinical report from December 26, 2016, District Manager Mario Zuccaroli highlights that the stores in his district needed to keep looking to grow profits: "There is still ***sooooo much opportunity***, and much like Shared QA we can only achieve district success if everyone contributes and driving clinical initiatives and must be an *everyday priority*. **Highlighted RED stores cannot continue on this report without improvement**…." [emphasis in original]. Thus, the clear priority of Rite Aid was profit above all else, with weekly reminders to make this clear.

558.    From time to time, due to high demand Relator Wegelin's store had to request increases in its allotment of opioid drugs like oxycodone being shipped. This was because the store would exceed its threshold of drugs set by its wholesale distributor, AmerisourceBergen.[306]

---

[306] The Rite Aid store at 2962 St. Lawrence Ave. appears in the ARCOS data as two different Thrift Drug Stores. Thrift was acquired by Eckerd, then subsequently by Rite Aid. The pharmacy at 2962 St. Lawrence Ave. dispensed a total of 25,090,881 MME from 2006-2012. That means that at the highest bounds of the recommended MME per day (90 MME/day) the stores were supplying enough opioid prescriptions for an average of 109 regimens per day.

559. For much of her time working at Rite Aid, the Company did not have processes or policies that blocked filling suspicious prescriptions. Rather, district managers would become involved and direct them to fill prescriptions even when pharmacists disputed them with good reason.

560. For example, Relator Wegelin objected to their continuing to fill prescriptions for a Reading, Pennsylvania psychiatrist, Dr. Mohammed Abdul R. Khan, who was prescribing what she believed to be wildly inappropriate and medically unnecessary quantities of controlled substances. Khan was charged in 2013 with illegally writing thousands of prescriptions for more than 145,000 pills to patients who went to his Reading or Pottsville offices to feed their addictions or sell the drugs on the street.[307] Khan would later on December 11, 2015 plead guilty to unlawful administration of a controlled substance by a physician, insurance fraud and conspiracy. He was sentenced to two to four years in state prison followed by eight years of probation.[308]

561. Several years before Dr. Khan's arrest, Relator Wegelin had objected to her District Manager Mario Zuccaroli about filling Dr. Khan's prescriptions, but was directed they were to continue to fill his prescriptions anyway. Zuccaroli told her that she should validate the scripts with the doctor's office, and if the doctor's office confirmed the prescription, "don't worry about" whether the doctor is prescribing appropriately. At one point, Dr. Khan's prescribing was

---

[307] Steve Henshaw, *Reading psychiatrist arrested, charged with improperly prescribing medications*, Reading Eagle Press (Oct. 3, 2013), https://www.psychsearch.net/7-3-million-seized-from-pennsylvania-psychiatrist-mohammed-abdul-r-khan-arrested-for-drug-trafficking/. The widely publicized charges had been filed on October 9, 2013 against, nearly a year after Pennsylvania attorney general's office agents and Berks County detectives raided both offices and seized patient records. That same day – Oct. 16, 2012 – authorities also seized nearly $7.3 million from Khan's personal and business bank accounts and $200,000 from his safe deposit. *Id*.

[308] Stephanie Weaver, *Berks woman sentenced to prison for helping run 'pill mill'*, Reading Eagle (March 16, 2017), https://www.readingeagle.com/news/article/berks-woman-sentenced-to-prison-for-helping-run-pill-mill.

so excessive that all of the eleven Rite Aid pharmacies in Berks County had run completely out of their opioid Adderall allotment by November. In spite of Dr. Khan's wildly inappropriate prescribing, Rite Aid did nothing to limit his prescriptions.

562.    In Relator Wegelin's experience, this alibi of using calls to prescriber's offices to provide a pretext for filling inappropriate prescriptions became commonplace. Rite Aid instructed its pharmacists that as long as they called a prescriber's office to confirm the prescription, then the pharmacists had no choice but to fill it. Yet, in her experience this practice was often lead to their filling what she knew were inappropriate and/or medically unnecessary prescriptions. In Relator Wegelin's experience, when calling pill mill prescribers' offices (like she had with Dr. Khan) who were writing copious amounts of suspicious prescriptions, these offices nearly always confirmed the validity of the prescriptions, without regard whether the prescriptions were inappropriate. For example, when Relator Wegelin called the office of Dr. Robert W. Schorschinsky, who was later criminally charged for his prescribing habits (*see* below), the office would even sometimes confirm the prescription was valid before even hearing the patient's name. For Rite Aid, the simple act of calling the prescriber—not truly verifying the prescription—was enough to provide cover for its pharmacist to dispense.

563.    In her experience, should she reject an opioid prescription, not infrequently these customers lodged complaints with management.  When a customer called 1-800-RITE-AID for a customer complaint, Rite Aid marked it as a customer complaint. All complaints were considered valid, even if it was something trivial like the customer not liking the way the pharmacist was dressed.  This was problematic because customer complaints directly affected bonuses and raises. If a customer complained about anything, including about something like the pharmacist taking too long to fill or refusing to fill a prescription, pharmacists could potentially lose a raise or bonus.

In Relator Wegelin's experience, the threat of a customer complaint was another reason pharmacists would often fill any prescription.

564.    Illustrating just how the threat of customer complaints impacted pharmacists filling of opioids, in response to a customer complaint when she had refused to fill an opioid prescription from a pill mill doctor, she received a call from John Boyle, the Regional Vice President for Pharmacy Operations in charge of the District Manager over her pharmacy. Boyle directed Relator Wegelin that she had to fill these prescriptions even though she was not comfortable doing so. Wegelin had been suspicious of the prescription in part because both the patient and doctor were not local; instead, they were both from Philadelphia. Also, Wegelin noticed that there were notes in the NexGen system that said "FAKE RXs" for the both the patient and doctor. These notes were in the system despite management generally discouraging entering such information.

565.    Even so, Boyle threatened Relator Wegelin's continued employment if she did not fill the suspicious prescription, telling her "[i]f you like your job, you better fill it." Two pharmacy technicians witnessed the incident, Josiah Kantner and Pam Brandt. Faced with the possibility of losing her livelihood, Relator Wegelin reluctantly filled the prescription, but wrote on the hard copy prescription "Boyle made me fill this" to document she had filled the prescription in protest.

566.    Boyle's command was not uncommon among Rite Aid.  The reasoning of Rite Aid management was that, even though pill mill physicians like Dr. Khan may have had their offices raided or been charged criminally, they had not yet lost their licenses. Until prescribers lost their license, Boyle and other Rite Aid management instructed pharmacists they were to continue filling all that prescriber's prescriptions, regardless of the pharmacy's corresponding responsibility to independently evaluate the prescription, including such factors as criminal charges against the

prescriber. In her experience, the filling of prescriptions for prescribers who were under investigation, but technically still maintained a license, led to unchecked opioids flooding into Reading.

567.    In another example of rampant prescribing by a physician she had flagged for his unbridled prescribing, on September 12, 2019 charges were filed against Dr. Robert W. Schorschinsky, the culmination of a two-year investigation into his practice, Penn Family Medicine in Exeter Township, Pennsylvania. According to the criminal complaint, Schorschinsky pre-signed prescriptions when he would go on vacation and other physicians would see his patients. On May 23, 2018, investigators had obtained patient records from Penn Family Medicine pertaining to overprescribing opioid pills. The State's expert determined that Schorschinsky's "patients" were being prescribed 288% to 800% higher dosages of controlled substances than the maximum recommended dosage set by the Centers for Disease Control and Prevention and the Pennsylvania Medical Society.[309]  Even though she had complained about Schorschinsky's prescribing, Rite Aid did nothing to stem the tide of his excessive scripts which flooded into the community.

568.    Frustrated that Rite Aid had insisted they continue to fill prescriptions she believed were inappropriate and/or medically unnecessary, at one point she called the Pennsylvania State Board of Pharmacy in 2015 to complain. But her complaint was rebuffed when the Board refused to intervene.  The response from the Board was: "Well, what do you want us to do about it?"

---

[309] Steven Henshaw, *Berks doctor ran opioid 'pill mill,' investigators say*, Reading Eagle (Sept. 13, 2019),         https://www.readingeagle.com/news/article/berks-doctor-inappropriately-prescribed-opioid-pills-investigators-say.

569.    Relator Wegelin was not the only pharmacist whose job was threatened by Rite Aid for a refusal to fill suspicious prescriptions. One of Relator Wegelin's pharmacist coworkers, Abigail Tercha, was given the same ultimatum that she was. When she refused to fill what she felt was an inappropriate script, Tercha's Rite Aid manager told her that she was to "fill or leave." Tercha ended up not filling the prescription and instead of reporting the incident or supporting its pharmacist's decision, Rite Aid management told the patient to go to the Rite Aid store in nearby Shillington, Pennsylvania, which would fill the prescription.

570.    For the times when they strongly disputed continuing to fill suspicious prescriptions, Rite Aid management directed Relator Wegelin and her colleagues to tell the customer go to another Rite Aid location, providing the address where the prescription would be filled.

571.    In some instances, Relator Wegelin would confiscate what she determined to be clearly fraudulent or forged prescriptions. She also would occasionally call the police on the patient who presented the bad prescription, doing so at least five times while she worked at Rite Aid. Relator later was called to testify about these incidents 3-4 occasions.

572.    In one instance, Relator Wegelin received a prescription for Percocet that allegedly was written by an ophthalmologist. Given that ophthalmologists generally do not write prescriptions for powerful opioids, Relator Wegelin was immediately suspicious and called the doctor who confirmed that he never wrote that prescription. Relator Wegelin then called police to have the patient arrested.  Even though she had independently reported these suspicious drug seekers to law enforcement, she did so completely on her own and without the support from her management.

573.    Nor was there a way for Relator to record when she refused to fill a prescription into the Rite Aid computer NexGen system. Although pharmacists could take it upon themselves to enter a note in the free text field in a patient or doctor record in NexGen, the practice was discouraged by Rite Aid management. Unless a pharmacist disregarded this management directive, there was no way to record refusals to fill so that others at Rite Aid could see the refusal.

574.    Yet, in instances when Relator Wegelin took it upon herself to report drug-seekers and inappropriate prescriptions, Rite Aid had no policy or procedure to record such events. In fact, Relator Wegelin's manager, Mario Zuccaroli, explicitly discouraged getting the authorities involved because it would hurt business, telling her: "Don't call the police. We don't want the police in the building; it's not good for business." Relator Wegelin's understood was that Zuccaroli's directive came from his corporate managers, given the company's focus on "customer service" and the bottom-line over all else.

575.    Eventually, in an about face that appears to have been the result of the rising tide of litigation against the Company, in around 2017 Rite Aid finally began to change its practices and began to flag physicians whose opioid prescriptions should not be filled due to inappropriate prescribing.

576.    For example, Relator Wegelin recalls that Rite Aid began to block prescriptions for two doctors who were part of the Advanced Urgent Care group ("AUC"), Dr. Frederick Reichle and Physician's Assistant Jason Dillinger.  On February 6, 2019, Reichle and Dillinger along with twelve other AUC health care providers were indicted for a multitude of crimes, including conspiracy to dispense and distribute controlled substances outside the course of professional

practice and without a legitimate medical purpose; distribution of oxycodone; health care fraud; and maintaining a drug-involved premises.[310]

577.    Even then, this was too little too late.  The changes made by Rite Aid in 2017 were announced to pharmacists with little explanation and no rationale by Regional Manager Boyle on a conference call.   While these changes did allow Rite Aid pharmacists to report problem physicians, nor did it include a number of physicians who were writing what Relator Wegelin believed to be inappropriate opioid prescriptions. Instead, only a limited number of physicians' prescriptions were blocked by the Rite Aid computer system.  As such, the Rite Aid changes only partially addressed the pill mill issues that Relator Wegelin saw in her pharmacy.

578.    Around the same time (2016-2017), Rite Aid provided for the first time a number for pharmacists to call if they had concerns or suspicions about a doctor's prescribing habits. Prior to that point, there was no official way for pharmacists to report bad doctors. Relator Wegelin reported Dr. Schorschinsky this way. But after she filed her complaint, Relator Wegelin never heard anything else about the issue. What happened to the complaints, whether there was an investigation, etc. was never explained or made clear to Rite Aid pharmacists like Relator Wegelin. Nor was Dr. Schorschinsky ever blocked or otherwise flagged in the Rite Aid system during the time she worked for Rite Aid.

---

[310] Press Release, U.S. Attorney, E.D.Pa., *Fourteen Individuals Charged for Operating "Pill Mills" and Illegally Prescribing Drugs to Hundreds of Patients in Multiple Locations in the Philadelphia Area* (Feb. 6, 2019), https://www.justice.gov/usao-edpa/pr/fourteen-individuals-charged-operating-pill-mills-and-illegally-prescribing-drugs.  The AUC defendants included Dr. Mehdi Nikparvar-Fard, 49, of Penn Valley, PA; Dr. Vincent Thompson, 70, of Elkins Park, PA; Dr. Loretta Brown, 65, of Landsowne, PA; Dr. Avrom Brown, 70, of Elkins Park, PA; Dr. Frederick Reichle, 83, of Warrington, PA; Dr. Marcus Rey Williams, 70, of Coatesville, PA; Dr. William Demedio, 58, of Springfield, PA; Dr. Neil Cutler, 77, of Warminster, PA; Physician's Assistant Mitchell White, 33, of Philadelphia, PA; Physician's Assistant Jason Dillinger, 40, of West Chester, PA; Physician's Assistant Debra Cortez, 56, of Bristol, PA; Physician's Assistant Samantha Hollis, 42, of Wilmington, DE, and Office Manager Joanne Rivera, 35, of Pennsauken, NJ.

579.    Despite the eventual blocking of two of the bad doctors from AUC, Rite Aid continued to fill prescriptions from other AUC physicians, despite the complaints of Relator Wegelin.

580.    For example, at least one AUC physician, Dr. Richard W. Spore, wrote numerous questionable prescriptions which Rite Aid failed to block. When Relator Wegelin questioned the fact that Dr. Spore was prescribing the exact same inappropriate combination of drugs that other AUC doctors were (30mg oxycodone, Xanax, Soma, stool softener, and vitamins), Rite Aid only saw an opportunity to increase sales. Relator Wegelin's manager told her that she should fill Dr. Spore's prescription because, if Rite Aid filled the opioid, it would also get the benefit of the other four prescriptions for other drugs from this patient, thereby increasing profit even beyond just the opioid itself. Her manager said: "You should fill because we get 5 prescriptions out of it!" So, despite the questionable opioid prescriptions from Dr. Spore, Rite Aid focused on the profit to be gained.

581.    Rite Aid's focus on profits and lack of concern for the appropriate practice of pharmacy is further illustrated through regular competitions held between districts for the number of flu shots administered. Relator Wegelin observed what the pharmacy district managers called a "flu bowl." The different district managers in the region would compete to see which district could give the most flu shots, with playoffs between the best performing stores. In Relator Wegelin's experience, such a focus on flu shots was also problematic because, like doing the proper due diligence on prescriptions, administering a flu shot took a good deal of time. The focus on flu shots, which were more profitable for the pharmacies than filling prescriptions, meant that pharmacists had even less time to do what was required to make sure other prescriptions, like those for opioids, were legitimate. In fact, Regional Vice President for Pharmacy Operations John Boyle

said that he hoped for a bad flu season to boost immunization numbers. He also said that "we want to get out of the prescription filling business; we just want to do immunizations."

582.    District managers were supposed to visit each Rite Aid location about once a month, but often this was not done. When the district manager did come into the store, one of the things he would do is to check the counts of dispensed controlled substances. But Relator Wegelin never saw these checks involve a substantive review of whether they were properly dispensed or whether they were issued for a legitimate medical purpose.  Instead, the focus was on increasing the volume of opioids dispensed.

583.    In addition to rampant drug seeking behaviors, Relator Wegelin also experienced diversion in her pharmacy firsthand. In approximately 2006-2007, Relator Wegelin noticed that another pharmacist (Jay Bai) who worked at the St. Lawrence Ave. store in Reading was adding onto prescriptions. Bai was writing additional drugs onto legitimate prescriptions, then keeping the additional drugs. In Relator Wegelin's experience, Bai would mostly add Phenergan-Codeine to the scripts for his own personal use. Relator Wegelin reported the issue to her manager, who reported it to DEA. Eventually, Bai was arrested.  Despite what it knew to be widespread issue with diversion and abuse in its stores, Rite Aid nonetheless did little to address these issues even while the epidemic continued unabated.

## I. Specific Examples of Unlawful Dispensing Conduct: Tennessee

### 1. *Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in Tennessee*

584. Tennessee is among the hardest-hit states when it comes to the opioid crisis. The story of its impact is often told in numbers:  1,268 opioid overdose deaths in Tennessee in 2017; more than six million painkiller prescriptions in Tennessee in 2018.[311]

585. In 2017, Tennessee had the third highest prescribing rate in the country[312] and one of the highest amounts of opioids prescribed per person in the country as measured in MMEs, according to the CDC.[313]

586. In 2015, Tennessee had 13,034 nonfatal overdose outpatient visits and 7,092 overdose inpatient stays.[314] In 2016, 7,636,112 opioids were prescribed in Tennessee. In 2016, there were 1,186 opioid-related overdose deaths in Tennessee – a rate of 18.1 deaths per 100,000 persons – higher than the national rate of 13.3 deaths per 100,000.[315]

587. Tennessee is ranked number six (6) in the nation for rates of opioid-related hospital admissions among senior citizens. In 2005, 467 out of every 100,000 Tennesseans aged

---

[311] Tennessee Department of Health, *Tennessee Faces of Opioids*, https://www.tn.gov/tnfacesofopioids.

[312] NIH National Institute on Drug Abuse, *Tennessee Opioid Summary, Opioid-Involved Overdose Deaths*, https://www.drugabuse.gov/opioid-summaries-by-state/tennessee-opioid-summary.

[313] Centers for Disease Control and Prevention, *Despite recent declines, opioid prescribing is still high and inconsistent across the US*, https://www.cdc.gov/vitalsigns/opioids/infographic.html.

[314] Tennessee Department of Health, *Tennessee Drug Overdose Dashboard*, https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard/.

[315] National Institute on Drug Abuse, *Tennessee Opioid Summary*, https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/tennessee-opioid-summary.

65 and older spent time hospitalized from opioid related use. By 2015, that rate shot up to 1,055 out of every 100,000 Tennesseans aged 65 and older.[316]

588.     Opioid use and misuse have increased the numbers of infants suffering from neonatal abstinence syndrome ("NAS"). The number of NAS cases attributable to prescription opioids has been disproportionately high in Tennessee.  A 2015 NAS update prepared by the Tennessee Department of Health shows that "[w]hen categorized into mutually exclusive categories of exposure, 48.5% of cases were exposed to prescription drugs only, 26.8% were exposed only to illicit or diverted drugs, and 23.2% were exposed to a mix of prescription and illicit or diverted drugs."[317]

589.     In Tennessee, the rate of NAS was three times above the national average between 2009 and 2012 and has been more than 10 times the national average in some areas of East Tennessee.[318] In 2013 and 2014, Tennessee had NAS rates of 25.5 and 28.5 per 1,000 live births respectively.[319]

590.     Despite having some 13 stores located all over the State of Tennessee, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in Tennessee.

---

[316] 1190 Anita Wadhwani, *Opioid-related Hospitalizations More than Triple for Tennessee Seniors*, THE TENNESSEAN, (August 12, 2017), https://www.tennessean.com/story/news/2017/08/13/opioid-related-hospitalizations-more-than-triple-tennessee-seniors/545556001/ (citing the U.S. Agency for Healthcare Research and Quality).

[317] A.M. Miller, *Neonatal Abstinence Syndrome Surveillance Annual Report* 2015, Tennessee Department of Health 5 (2015), https://www.tn.gov/content/dam/tn/health/documents/nas/NAS_Annual_report_2015_FINAL.pdf.

[318] Paul Campbell, M.D., PhD, *Neonatal Abstinence Syndrome in East Tennessee: Characteristics and Risk Factors among Mothers and Infants in One Area of Appalachia*, 28 J. Health Care Poor Underserved 1293-1408 (2017).

[319] *Id*.

591.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | City | Sentence |
| --- | --- | --- | --- |
| 19-Sep-05 | Christopher W. Fletcher, MD | Nashville, TN | 3 yrs probation |
| 13-Apr-07 | Joe P. Moss, MD | Franklin, TN | 18 mos. |
| 15-Aug-07 | Robert Delaplane | Columbia, TN | License revoked August 2007, but he currently practices medicine. |
| 29-Sep-08 | Kelvin Lynn Douglas, MD | Jackson, TN | Time served |
| 24-Nov-08 | Sanford K. Myers, MD | Knoxville, TN | 156 months |
| 14-Aug-10 | Larry Karr | Hixson, TN | 108 months |
| 21-Oct-10 | Sylvia Hofstetter (Pain Clinic Owner) | Knoxville, TN | 33 years |
| 9-Mar-11 | Elisabeth Reimers, MD | Winchester, TN | 70 months |
| 28-Mar-11 | Samuel Ashby, MD | Fayetteville, TN | 108 months |
| 14-Apr-12 | Allen R. Walker, MD | Portland, TN | |
| 30-May-12 | Ihsaan Al-Amin, MD | Chattanooga, TN | 100 months |
| 8-Feb-13 | Larry E. Boatwright, PharmD | Germantown, TN | 15 2/3 years |
| 1-Apr-13 | Thomas Patrick Brown, PharmD | Johnson City, TN | 5 years |
| 18-Apr-13 | Tamral Guzman, owner | Maryville, TN | 21 years |
| 4-Jun-13 | Robert D. McNeese, PharmD | Greenville, TN | 63 months |
| 7-May-14 | Randy Kincaid, owner | Maryville, TN | 69 years |
| 23-May-14 | Dustin Morgan, Owner's Son | Maryville, TN | 17 years |
| 24-Jul-14 | Michael Alan Patterson, MD | Bartlett, TN | 16 years |
| 19-Aug-14 | Sandra Kincaid, owner | Manchester, TN | 39 years |
| 5-Sep-14 | Wendi Henry, owner's daughter | Maryville, TN | 18 years |
| 16-Oct-14 | David Eric Brickhouse, PA | Maryville, TN | Deceased |
| 5-Nov-14 | Rosaire Michel Dubrule, MD | Tiptonville, TN | 12.5 years |
| 1-May-15 | Charles Larmore, NP | Chattanooga, TN | 13 years |
| 28-Aug-15 | Barbara Lang, owner | Chattanooga, TN | 280 years |

| | | | |
|---|---|---|---|
| **1-Oct-15** | Faith Blake, owner | Chattanooga, TN | 44 years |
| **1-Oct-15** | Jerome Sherard, MD | Chattanooga, TN | 5 years |
| **1-Feb-16** | Sherry Barnett, NP | Jonesborough, TN | 2 years |
| **24-Mar-16** | Matthew Anderson, DCM | Lenoir City, TN | |
| **24-Mar-16** | David Florence, DO | Manchester, TN | |
| **1-Oct-16** | Cynthia Clemons, NP | Knoxville, TN | |
| **4-Oct-16** | Sylvia Hofstetter, owner | Knoxville, TN | |
| **17-Nov-16** | James Brian Joyner | Maryville, TN | 70 months |
| **17-Nov-16** | Deborah G. Thomas, MD | Maryville, TN | 10 years |
| **13-Jan-17** | Jamie Chiles Cordes, MD | Maryville, TN | 54 months |
| **21-Jan-17** | Sherry Ann Fetzer, NP | Maryville, TN | 3 yrs probation |
| **21-Jan-17** | Buffy Rene Kirkland, NP | Maryville, TN | 2 years |
| **24-Feb-17** | Donna Jeanne Smith, NP | Maryville, TN | 2 years |
| **4-Mar-17** | Walter D. Blankenship, PA | Maryville, TN | 3 yrs probation |
| **24-Mar-17** | Don Robert Lewis, PA | Maryville, TN | 3 years |
| **14-Mar-18** | Abdeirahman Mohamed, MD | Morristown, TN | 36 months |
| **7-Nov-18** | Lawrence Joseph Valdez | Hendersonville, TN | pled guilty, sentencing 4/3/2020 |
| **13-Dec-18** | Samuel Orusa, MD | Clarksville, TN | Trial Summer 2020 |
| **10-Apr-19** | Bowdoin G. Smith, DO | Carthage, TN | |
| **17-Apr-19** | Timothy Abbott, DPM | Nashville, TN | Trial 3/3/2020 |
| **17-Apr-19** | Brian Richey, NP | Cookeville, TN | |
| **17-Apr-19** | Daniel Seeley, NP | Batesville, MS | |
| **17-Apr-19** | Jonathan White, NP | Tullahoma, TN | |
| **17-Apr-19** | John Polston, PharmD | Tompkinsville, TN | |
| **17-Apr-19** | Charles Brooks, Jr., MD | Maryville, TN | |
| **17-Apr-19** | Henry Babenco, MD | Paducah, KY | |
| **17-Apr-19** | Sharon Naylor, NP | Jacksboro, TN | |
| **17-Apr-19** | Alicia Taylor, NP | Oneida TN | |
| **17-Apr-19** | Gregory Madron, | Jacksboro, TN | |
| **17-Apr-19** | Harrison Yang, MD | Manchester, TN | |
| **17-Apr-19** | Glenn Bonifield, PharmD | Bells, TN | |
| **17-Apr-19** | Michelle Bonifield, PharmD | Bells, TN | |
| **18-Apr-19** | Alexander Alperovich, MD | Jackson, TN | |
| **18-Apr-19** | Jeffrey Young, NP | Jackson, TN | |
| **18-Apr-19** | Andrew Rudin, MD | Jackson, TN | |
| **18-Apr-19** | Thomas Kelly Ballard, MD | Jackson, TN | |
| **18-Apr-19** | Loran Karlosky, MD | Bells, TN | |
| **18-Apr-19** | Jay Shires, MD | Bells, TN | |
| **18-Apr-19** | Charles Alston, MD | Jackson, TN | |
| **18-Apr-19** | Britney Petway, NP | Jackson, TN | |

| | | | |
|---|---|---|---|
| **18-Apr-19** | Mary Bond, NP | Bells, TN | |
| **18-Apr-19** | James Litton, NP | Memphis, TN | |
| **22-Apr-19** | Steven Mynatt, MD | Knoxville, TN | Pled guilty |
| **22-Apr-19** | David G. Newman, MD | Knoxville, TN | Preparing for trial |
| **9-Aug-19** | Timothy Dennis Gowder, MD | Hixson, TN | 21 years |
| **9-Aug-19** | Anwar Mithavayani, Owner | Boca Raton, FL | 25 years |
| **30-Aug-19** | Pete Anthony Tyndale, Owner | Hixson, TN | 29 years |
| **18-Oct-19** | Samuel Mcgaha, MD | Sevierville, TN | pled guilty |
| **18-Oct-19** | Frank McNiel, MD | Knoxville, TN | pled guilty |
| **23-Oct-19** | Heather Marks, NP | Murfreesboro, TN | Indicted |
| **29-Oct-19** | Hemal V. Mehta, MD | Brentwood, TN | indicted |
| **2-Dec-19** | Darrell R. Rinehart | Columbia, TN | Pled Guilty, sentencing 7/30/2020 |
| **14-Jan-20** | David Bruce Coffey, MD | Oneida, TN | Under investigation |
| **26-Feb-20** | Timothy Abbott, D.P.M. | Nashville, TN | Pled Guilty |
| **30-Oct-20** | Richard Farmer, MD | Memphis, TN | 48 months |
| | Joyce Brown, MD | Columbia, TN | |

### 2.   *Chattanooga, Tennessee (Pharmacist No. 3).*

592.     Pharmacist No. 3 was a pharmacist at Rite Aid in Chattanooga, Tennessee, from about 2006 to 2016. She started at the Rite Aid on Highway 58 in Chattanooga (store #11908), where she stayed for about 18 months. She then moved to the Rite Aid on East Brainerd Road in Chattanooga (store #11909).

593.     During her tenure at Rite Aid in Chattanooga, she saw customers come in to her pharmacy with prescriptions from doctors who she determined were "pill mill" doctors. "We did have an issue with pill mills occurring in our area for a while," she said. "They were a pretty big issue. We had people traveling from Kentucky, from Florida, whole carloads of people who had prescriptions from a pill mill, sometimes out of state doctors."

594.   She said the patients of pill mill doctors communicated with each other and word would get around about which pharmacies would fill their prescriptions and which pharmacies would not.

595.   The East Brainerd Rite Aid was robbed on Wednesday, February 20, 2013. According to Chattanooga Police Sergeant Daniel Jones, the robber handed the clerk at the pharmacy counter a note in which he demanded narcotics. The clerk "ended up complying with him because, the clerk, you know, basically looks at the guy and says, you know, 'Is this for serious? Is this for real?' The gentleman shows him a pistol that he's got in his waistband," said Jones. [320]

596.   During her time at Rite Aid, she recalled facing pressure from her store managers and her district managers to fill opioid prescriptions for customers who complained that it was rejected. She said when customers complained to the store manager, some of her managers – who she noted typically did not have pharmacy experience – tried to get her to fill the prescription to satisfy the customer. "Some (store managers) will come back (to the pharmacy) and say, 'You have to do this or that,'" she said.

597.   Rite Aid store managers are not supposed to have anything to do with the pharmacy or its management because the store manager has no authority over the pharmacy manager. When customer complaints were submitted through the corporate system, or a customer escalated the complaint from the store level, she would sometimes hear from her district manager about it. "They (district managers) get pressure from the patient," She said. "And the district manager will call and say, 'You should go ahead and fill it.'"

---

[320] *Crime Stoppers: East Brainerd Rite Aid Robbery*, WRCBtv (March 13, 2013), https://www.wrcbtv.com/story/21636701/crime-stoppers-east-brainerd-rite-aid-robbery.

598.     Rite Aid expected her to perform tasks that "constantly" pulled her away from what a pharmacist is supposed to concentrate on. A pharmacist's job responsibilities are checking the accuracy of labels of prescriptions and ensuring the correct medication and amount is being dispensed. They are also monitor patients' prescriptions to detect incompatible drug or inappropriate prescriptions. Other key responsibilities include counseling patients about new prescriptions or answering any questions about medications.

599.     At Rite Aid, she was expected to perform many more tasks that "constantly" pulled her away from her more important responsibilities. She worked 12-hour shifts at a pharmacy that typically filled between 125 and 160 prescriptions a day. For about two hours at the beginning and two hours at the end of her shifts, she was often alone in the pharmacy. She had a pharmacy technician assisting her only for a portion of the day because the Company did not want to pay for a tech to be on the job the entire 12 hours, she said. That meant she often had to open and close the pharmacy alone, and for four hours each day, she had to do everything alone. This included typing in prescriptions to the computer system, confirming the insurance, printing the label, filling the prescription, checking the label and medication for accuracy, bagging it, counseling the patient if necessary and ringing the customer up at the cash register. During that time, she was also processing and filling prescriptions that came in via fax or email as well as regular refills. All the while, she was also answering calls from and making calls to physicians' offices, customers and insurance companies. Plus, she was expected to give immunizations and flu shots among other additional tasks.

600.     She noted that at the Rite Aid on East Brainerd, the customer counter was right near the pharmacist's work station so she was constantly bombarded by customers. Even when juggling all of these tasks, she was still expected to fill prescriptions for waiting customers within

15 minutes. "It is humanly impossible to do that," she said. "There was no break, no lunch, no pee time," she said. "I might get to pee at 5 o'clock in the afternoon."

601.     Rite Aid understaffed its pharmacies, which "set you up for failure" in noticing inappropriate prescriptions.  When a pharmacist is overloaded with work – much of it a distraction from the pharmacists most important responsibilities – the pharmacist is less likely to notice red flags or detect inappropriate prescriptions for controlled substances, she said. "It can set you up for failure," she said. "The way you have to work and the constant pressure you work under, definitely you can let things slip through that if there was time to stop and really look at it like you should, you wouldn't make that mistake."

602.     Rite Aid provided "absolutely nothing" in terms of training for how to spot inappropriate controlled substance prescriptions and how to deal with the customer when rejecting inappropriate prescriptions. There was no training on how to spot inappropriate prescriptions. There was no training on how to deal with a customer when rejecting an inappropriate prescription. And there was no training on how to share information about problem doctors writing inappropriate prescriptions. Rite Aid also did not have any specific policies about when pharmacists were required to reject a controlled substance prescription. "There were no policies in place."

603.     Rite Aid did not keep a list of pill mill doctors or doctors who prescribed inappropriately that could be shared among pharmacists in different stores. There was no system or policy at Rite Aid for her to share information about problem doctors with pharmacists at other stores. Pharmacists would sometimes call and talk to each other about problematic doctors, telling each other to watch for prescriptions with that doctor's name. But Rite Aid did not keep an internal

list of those doctors so information about the doctors was systematically shared with other pharmacists.

604.    She said her job evaluations were based on a multitude of metrics, such as fill-rate and prescription volume. "They study every number … anything you can put a number to, they look at it and use it to evaluate you," she said. "It had nothing to do with your real abilities to be a medical professional and know your medications and counsel patients. They want the numbers, and that's the bottom line, and that's it. They don't care how good a pharmacist you are."

605.    Her evaluations were based on metrics measuring how quick she filled prescriptions, how many she filled, how many complaints she got and whether they were resolved. "There was no fairness involved in the way they are evaluating you," she said. "It's, 'You filed this many prescriptions.' That's pretty much it."

### 3.    *Franklin, Tennessee (Pharmacist No. 11)*

606.    Franklin, Tennessee is the county seat of Williamson County, Tennessee, about 21 miles south of Nashville.  Williamson County has not been immune to the devastation of the ongoing opioid crisis.  Twenty-seven people in Williamson County died in 2017 from overdoses, including from drugs such as fentanyl and heroin.[321]

607.    Pharmacist No. 11 was a pharmacy manager at a Rite Aid store at 1122 Murfreesboro Road, Franklin, Tenn. from 2005 to 2018. The store was located in a relatively affluent area. It was not a high-volume store, filling about 200 prescriptions a day.  His employment ended when the store was sold to Walgreens and closed.

---

[321] Elaina Sauber, *The opioid crisis has hit Williamson County. Why aren't more people talking about it?*, Tennessean (Aug. 16, 2018), https://www.tennessean.com/story/news/local/williamson/2018/08/16/opioid-crisis-williamson-county-tn/769368002/.

608.    Around 2008, he first started seeing prescriptions from Florida, something he said neither he nor his team understood. But if the pharmacists filled one from out of state, "you'd suddenly get 10 more," he said. Word apparently spread quickly about pharmacies that would fill out of state prescriptions. People began camping out at his store.  "They started getting hotels and sleeping in our parking lot," he said.

609.    Neither he nor his staff was prepared for these developments. "We didn't know how to act," he said. "That disturbed us. We started seeing behaviors we didn't understand. It probably took us a year or two to figure it out," he said.

610.    He did not feel there was much support from the Company on handling this influx of drug-seeking patients.  "There wasn't a whole lot of support," he said. "I don't think anybody was addressing it yet." The Company never addressed the patients camping out issue, he said.

611.    The patients were not always seeking large amounts of opioids. Sometimes, they would have prescriptions for small amounts, including the "Holy Trinity" of opioids, benzodiazepines and muscle relaxers.

612.    Eventually, he began refusing to fill prescriptions "all the time." It would happen, on average, more than once a day. "Somedays you'd get 10, other days you'd get one or none. "On average, you'd have several a day," he said. The red flags he looked for included high opiate counts, prescriptions from pain clinics, and prescriptions from doctors with whom he was unfamiliar.

613.    Finally, at one point Rite Aid began a program under which pharmacists could submit doctors to be banned from having scripts filled in the Rite Aid system. The pharmacist would submit the doctor's name and information through an internal electronic portal. Then

someone at the corporate level was supposed to investigate. He was not sure who or what department conducted the investigation, but it would be done at the district level.

614.    He submitted several practitioners under this system, but did not recall their names. He does not know the outcome of his recommendations, but he did not think they were shut out or knocked out of the Rite Aid system.

615.    In approximately 2009, his attitude about what was going on around his store changed. A man – "he looked like a pimp," he said – came in with a gun in his waistband looking for customers he knew. "The people were junkies," he said. "We knew it, we had seen them several times."

616.    The man with the gun had apparently been floating the customers' money to buy prescriptions, and then, he believed, he would take a portion of the prescription and resell it on the street. The man wondered why the customers were taking so long in the store and ran in looking for them. A pharmacy technician screamed and the man ran out.

617.    He and his staff unilaterally changed how they handled opioid prescriptions after that. "We said, 'We're never doing that again. If we don't know you, we're not filling. No new patients, no one from those clinics" would be accepted, he said.

618.    His store was later robbed on March 23, 2017 "by a white man [who] walked up to the counter with a note demanding drugs, according to Franklin Police. The pharmacist complied with the demand and the man left the store."[322]

---

[322] Zach Harmuth, *Man Holds Up Franklin Pharmacy, Escapes with Drugs*, Williamson Source (March 30, 2017), https://williamsonsource.com/man-holds-up-franklin-pharmacy-escapes-with-drugs-remains-at-large/.

### 4. *White House, Tennessee (Pharmacist No. 12)*

619.    Pharmacist No. 12 was a staff pharmacist at the Rite Aid store in White House, Tennessee, at 485 Highway 76 from August 2009 to October 2015. The store is located on the outskirts of the Nashville area. She reported to District Manager Shan Parker. She also reported to Pharmacy Managers Brian Collins and Miyoung Cheong (after Collins left).

620.    The Pharmacy Managers at the store where she worked in White House set a policy not to fill any prescriptions from Dr. James Marracone, a doctor they had determined was operating as a pill mill. Dr. Marracone was located in Clarksville, Tennessee, more than an hour's drive away from White House. He only took cash to provide patients with a number of different controlled substances, including opioids at powerful strengths.

621.    Despite the distance from Dr. Marracone's location, her store would regularly see people come in trying to fill a stack of prescriptions from him. Some customers said that other pharmacies would not fill the prescriptions. Dr. Marracone's prescriptions were easy to spot because they were written on blue paper and the customers did not look like a patient who legitimately needed severe pain medications, she said. "Even coming down the aisle, you could see it was a Marracone script," she said. "As soon as they came around the corner, you thought, 'I bet it's a Marracone.'"

622.    The prescriptions from Dr. Marracone were almost always the same for every patient. "They all had the same medications," she said. "That's a red flag right there. Everybody you meet should not need the exact same thing. And he was located out of Clarksville, another red flag."

623.    She recalled that the combination prescriptions Dr. Marracone prescribed were usually a strong opioid such as oxymorphone, a benzodiazepine such as Xanax or Klonopin, a

muscle relaxer and one or two "BS" (bullshit) prescriptions such as ibuprofen and a laxative. From her conversations with Dr. Marracone's patients, she gleaned that the doctor was not even seeing the patients for an office visit.

624.     His "patients" would call his office, tell him what drugs they wanted, pay his fee, and he would write or call in the prescriptions to the pharmacy. She recalled customers coming in and saying, "'I called ([him] and paid my money, they should have sent my script in.'"

625.     When a Dr. Marracone prescription came in, she said the pharmacists would tell the customer the store did not have the pills in stock and could not fill the prescription. "We'd tell them we don't have it," she said. "Our Pharmacy Manager did not want to do (dispense) that or mess with that at all." She said Dr. Marracone was well known as a pill mill doctor among area pharmacists and pharmacy technicians. "Everybody around knew about Dr. Marracone," she said. Most of the pharmacies in the area would not fill for Dr. Marracone.

626.     She said her Pharmacy Managers, especially Miyoung Cheong, were very strict about their store not dispensing opioids unless the pharmacists knew the patient was in legitimate need and was a regular customer.

627.     But the Rite Aid in downtown Nashville on West End Avenue was doing the opposite, she said. "They would fill anything," she said. "Even they knew the prescriptions were sketchy." She said the people with prescriptions from Dr. Marracone stopped coming as often to the Rite Aid in White House after word got out that the West End store was filling the doctor's prescriptions.

628.     She worked at the West End store a few times, during which time the Pharmacy Manager of that store told her: "'We fill for those [prescriptions] at this store.' I can remember all these people bringing in these [Dr. Marracone] scripts," She said. "I didn't feel comfortable."

629.     But the Pharmacy Manager, Kelly Parker, told her, "If they come in, go ahead and fill them." She said she saw a number of customers with Dr. Marracone prescriptions at the West End store. "He was churning them out," she said. She said many of these customers appeared to be drug addicts. "They'd be missing teeth," she said. "Their skin would have little meth holes." She said she saw customers who are "Clearly selling his medications on the street, and probably using some."

630.     Dr. Marracone's patients often came to the store together, but they would attempt to hide that fact, she recalled. She said one person would come in, and if the prescription was filled, another person would come in. Then a few more. "A lot of these people kind of ran together," she said. "It'd be five to six people in a car. They'd test you to see if your store would fill it."

631.     The West End store had no problem dispensing prescriptions for large amounts of opioids and at high strength levels. She recalled the West End store dispensed a lot of oxymorphone, which she said is approaching the strength of fentanyl in pill form. She thinks the store also dispensed fentanyl, but she was not certain.

632.     Despite appearing as if they don't have jobs or any money, Dr. Marracone's customers paid large sums of cash for the drugs. Many of them were on disability and/or TennCare, but TennCare does not pay for opioid prescriptions except for the most severe diagnosis. She said the prescriptions could cost between $300 to $1,500, but that amount was easy for customers to pay if they were selling some of the pills on the street.

633.     She said the cost of the pills generally coincided with the strength of the pill. For example, a single 30mg oxycodone would cost $30, she said. For example, if the customer gets a prescription for 150 pills, used 30 themselves, and sells the remaining 120, the customer could

make $3,600 – plenty enough to pay Dr. Marracone for another prescription and the pharmacy for the additional pills.

634.    She recalled that, when a customer paid large amounts of cash, the pharmacy had to move the cash to the store safe. She did not know how Rite Aid would track how much of a store's revenue came in as cash, or how that compared to other stores, but she believed it was likely tracked because the company tracked everything. She also said the District Manager would have known how much cash was flowing through the store.

635.    The West End Rite Aid was robbed on October 9, 2017, during which the security guard was killed.[323]

636.    Her District Manager, Shan Parker, was married to Kelly Parker, who he promoted to Pharmacy Manager of the Rite Aid on West End Ave. At the time, the West End store was struggling because of low prescription volume and was "on the verge of closing," she said. The store is in downtown Nashville across the street from Vanderbilt University. Prior to Kelly Parker's tenure, customers were mostly buying its retail products and not filling a lot of prescriptions there.

637.    Kelly Parker had been working as a floating pharmacist for Rite Aid when Shan Parker put her in the West End store as its Pharmacy Manager, she said. "Shan ended up putting her in that store to try to turn it around," she said. "One of the things they did was [start to] take these scripts. Their whole thing was, "'They are valid prescriptions. You should fill it.' That was one way that Kelly's store really improved script volume. They were taking all these scripts. Her husband told her she needed to start filling those scripts," she said. "He said it was good for our company and good for the store, and a good way to earn bonuses."

---

[323] Chuck Morris, *Two face federal charges for armed robbery at West End pharmacy*, NEWS4 (Aug. 22, 2018), https://www.wsmv.com/news/two-face-federal-charges-for-armed-robbery-at-west-end/article_e7d1957c-a63f-11e8-82af-8fc9de17f261.html.

638.    She recalled that Shan and Kelly Parker reasoned that taking Dr. Maccarone's prescriptions was okay because they were valid prescriptions and that they would be "good for the company, good profitability for our store."

639.    She noted that each of Dr. Marracone's patients came in with a stack of prescriptions – usually five. So when the West End pharmacy began filling the customer's prescriptions, the prescription count increased by at least five for every person served. That had a significant impact on the store's overall prescription volume and saved the store from being closed.

640.    She also noted that the cash-paying customers receiving high-cost opioids also represented a higher profitability than customers who have insurance companies or government insurance programs paying for more typical (and less expensive) maintenance medications like blood pressure pills.

641.    The Kelly's were driven to fill Dr. Marracone's prescriptions by Rite Aid's bonus incentives. "They started filling for this doctor even though he was known to be shady," she said. "It would be good money for the store and a good possibility for her to get a bonus as well as him." The Kelly's used the rationale that they were merely filling "valid prescriptions," and if they did not do it, someone else would.

642.    She said Rite Aid offered District Managers and Pharmacy Managers a bonus if they reached specific prescription volume and store profitability levels. "The more you do, the more scripts you take in, the more money you make," she said. "It looks great for the District Manager, and he gets his big bonus, and the Pharmacy Manager may also get a bonus."

643.    She said the goals set by Rite Aid were so high and unlikely, that it was almost impossible to reach. But the possibility motivated employees to trying anyway. During conference

calls, the District Manager told pharmacists in the district that they could fill any prescriptions that are valid, including Dr. Maccarone's prescriptions.

644.    She learned about the Kelly's' activities and motivations from conversations with the Kelly's themselves as well as from other pharmacists working in the district. Shan Kelly had conference calls with the pharmacists in the district, during which time he discussed dispensing controlled substances. She remembered at least one conference call when they were discussing controlled substance prescriptions and the concerns about prescriptions from Dr. Marracone and others like him. Shan Parker told the pharmacists: "They are valid scripts. We should fill them," she recalled. "Anything to get the store [prescription] volume up… He wanted us to take these scripts to increase volume."

645.    Controlled substance prescriptions were counted toward prescription volume at Rite Aid when she was there.

646.    The Rite Aid stores in Old Hickory and Springfield, Tennessee were also known to fill any and all prescriptions, including Dr. Maccarone's. She said the Old Hickory store kept a lot of opioids in stock, which made it a target for robbers. She understood the store had been robbed a few times.[324]

J.    **Specific Examples of Unlawful Dispensing Conduct: West Virginia**

1.    ***Rite Aid failed to investigate, report, or halt dispensing of inappropriate or medically unnecessary prescriptions of controlled substances in West Virginia***

647.    Opioid abuse and trafficking in West Virginia is widespread. The state has one of the highest prescription rates for opioids in the United States. Statistics show that illicit

---

[324] *See Police find 14,000 pills, catch suspects*, 3 WRCBtv (Aug. 19, 2013), https://www.wrcbtv.com/story/23171373/police-find-14000-pills-catch-suspects.

pharmaceutical drug use contributed to approximately 61 percent of state overdose deaths in 2015.[325] The extraordinarily high abuse rate of opioids is attributed in part to the large number of jobs in heavy manual labor such as mining, timbering, and manufacturing. These professions often cause injuries to workers that are treated with opioid pain relievers, which in turn can lead to addiction.[326]

648.    Opioid abusers and traffickers in West Virginia obtain the drugs from either licensed providers or out-of-state drug traffickers who have expanded into West Virginia. In some instances, doctors and other health care providers, acting outside medical guidelines, write prescriptions for prescription opioids without a legitimate need on the part of the "patient." In other cases, the prescriptions are written by doctors in good faith, for unsuspected "doctor shoppers" who are providing for their own addictions, supplying pills to dealers, or both.

649.    Despite having some 71 stores located all over the State of West Virginia, Rite Aid's gross inadequacies in the performance of its due diligence obligations are underscored by the following examples of illegal prescribing and diversion and abuse activities in West Virginia.

650.    Upon information and belief, none of the following health care professionals (many of whose prescriptions were filled at Rite Aid stores), who were apprehended (and many later convicted) as a result of a DEA or local law enforcement investigation, were identified, investigated, or blocked by Rite Aid despite their prescribing habits rising to a criminal level:

| Date | Name | Location | Sentence |
|---|---|---|---|
| 24-Mar-06 | Louis Ortenzio, MD | Blacksville, WV | 6 months home detention |
| 1-Mar-07 | Breton Lee Morgan, MD | Point Pleasant, WV | 30 days |
| 1-Mar-08 | Robert J Crake, DO | Wheeling, WV | 36 months probation |

---

[325] West Virginia Health Statistics Center, March 2016.

[326] David Gutman, How did West Virginia come to lead the nation in overdoses?, Charleston Gazette-Mail; (October 17, 2015), https://www.wvgazettemail.com/news/health/how-did-wv-come-to-lead-the-nation-in-overdoses/article_60c46a00-eec5-5c42-b6b0-2050439074f5.html.

| 7-Jul-08 | Robert Allara, MD | Charleston, WV | 5 months |
|---|---|---|---|
| 1-Aug-09 | Danny Ray Wills, MD | Princeton, WV | 6 months |
| 1-Mar-12 | William F Ryckman, MD and owner | Williamson, WV | 6 months |
| 7-Jan-13 | Anita Dawson, DO | Milton, WV | 2 years |
| 1-Mar-13 | Myra Sue Miller, Office Manager | Williamson, WV | 6 mo months |
| 3-Sep-13 | Fernando Gonzales-Ramos, MD | Logan City, WV | 5 years 11 months |
| 12-Sep-14 | Mario Blount, PharmD | Bridgeport, WV | 3 year |
| 1-Oct-14 | Hogan, Robert Timothy II Doctor and owner | Wood City, WV | 48 months |
| 12-May-15 | Edita Milan, MD | Harrison City, WV | 5 years 11 months |
| 1-Jan-16 | Jose Jorge Abbud Gordinho, MD | Glen Daniel, WV | 8 years |
| 28-Jun-16 | Tressie Duffy, MD | Martinsburg, WV | 1 year + 1day |
| 8-Jul-16 | Iraj Derakhshan, MD | Charleston, WV | probation, home confine |
| 3-Apr-17 | Donald Chaney, MD | Barboursville, WV | 6 months |
| 23-Aug-17 | Michael Kostenko, DO | Daniels, WV | 20 years |
| 21-May-18 | Manuel Barit, MD | Mullens, WV | Restitution |
| 1-Nov-18 | Roland Chalifoux, DO | McMechen, WV | Restitution and supervision |
| 29-Nov-18 | Teresa Emerson | Beckley, WV | 3 years probation |
| 10-Jan-19 | John Pellegrini, DO | Beckley, WV | 87 months |
| 1-Apr-19 | David M Wasanyi, Pharmacist | Martinsburg, WV | 3 years 11mo |
| 30-Apr-19 | George P. Naum, MD | Wheeling, WV | 6 months |
| 29-May-19 | Chad Poage | Morgantown, WV | 5 years probation |
| 8-Aug-19 | James H Blume, DO | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Michael T. Moran, MD | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Sanjay Mehta, DO | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Brian Gullett, DO | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Vernon Stanley, MD | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Mark Clarkson, DO | Beckley, WV | indicted; trial July 2021 |
| 28-Aug-19 | Paul W. Burke, MD | Beckley, WV | trial pending |
| 28-Aug-19 | Roswell Tempest Lowry, MD | Beckley, WV | trial pending |
| 18-Sep-19 | Sriramloo Kesari, MD | Charleston, WV | indicted, trial in Dec 2020 |
| 24-Sep-19 | Ricky Huddled, MD | Ona, WV | guilty verdict, sentencing Nov 2020 |
| 24-Sep-19 | Seraglio Kari, MD | Charleston, WV | |
| 17-Dec-19 | Jeffery Addison, MD | Charleston, WV | 18 months |
| 19-Jan-20 | Mark Spelar, MD | Huntington, WV | 3 months |

| 20-Feb-20 | William Earley, DO | Beckley, WV | pled guilty; sentencing pending |
| 29-Jun-20 | Muhammed Samer Nasher-Alneam, MD | Charleston, WV | 63 months |
| 16-Jul-20 | Michael Shramowiat, MD | Vienna, WV | pled guilty; sentencing Dec 2020 |
| 10-Aug-20 | Ricky Houdersheldt, DO | Hurricane, WV | convicted by jury |

### 2. *Beckley, West Virginia (Relator Rosenberg)*

651.    Relator Rosenberg worked as a pharmacy tech at the Rite Aid at 719 Johnstown Road, Beckley, West Virginia (store #2667) from approximately late 2010 until the store closed in June 2019 after being bought by Walgreens.  He worked with multiple pharmacists while there. Virginia Brosser was the pharmacy manager.

652.    The Beckley Rite Aid was an especially high-volume pharmacy, particularly for a town with only 16,404 residents.  According to DEA ARCOS data for 2006 through 2012, the Beckley Rite Aid filled 1,224,535 doses of opioids, or 12,169,175 MME.  Here is a chart showing the prescribing at the Johnstown Rite Aid by opioid class by year:



653.    Even though the volume of scripts was not extremely high, Relator Rosenberg saw lots of inappropriate dispensing that went on in the store. Many pharmacists did not care. This was due in no small part to the fact that pharmacists had "script counts" they had to meet every week or else the store's pharmacy hours would get cut. Pharmacists thus had a vested interested in keeping the script count high.

654.    Particularly before hydrocodone was reclassified as a C-II in 2014, the Rite Aid store where he worked would dispense hydrocodone "like candy" with no concern at all.

655.    During his time working at the Beckley Rite Aid, patients were constantly coming in to fill prescriptions early.  Prescriptions for outrageous amounts were commonplace. He would often see opioid prescriptions filled for a 90-day supply at 3 times-a-day. He questioned whether a patient on opioid pain medication 3x a day for 5-7 years, but Rite Aid did not question it.

656.    At the Beckley Rite Aid, an estimated 75% of the customers were on Government Programs.

657.    He remembered many bad doctors in the area. In particular, Relator Rosenberg recalls Dr. James Blume, Dr. Sanjay Mehta, Dr. Michael Kostenko, and Dr. Jose Jorge Abbud Gordinho. In fact, Gordinho's clinic was right across the street from the Rite Aid pharmacy.

658.    On April 27, 2016, Dr. Gordinho was sentenced to 8 years in prison after pleading guilty to illegally prescribing opioids and defrauding Medicaid and Medicare. Dr. Gordinho prescribed hydrocodone, an opioid pain reliever, for illegitimate purposes and billed Medicaid and Medicare for medically unnecessary services.[327]

_____

[327] Press Release, U.S. Attorney, S.D.W.V., *Beckley Doctor Sentenced to Eight Years in Prison for Federal Drug Crime and Health Care Fraud* (Apr. 27, 2016), https://www.justice.gov/usao-sdwv/pr/beckley-doctor-sentenced-eight-years-prison-federal-drug-crime-and-health-care-fraud.

659.    On August 23, 2017, Michael Kostenko, DO, of Daniels, West Virginia, pled guilty to one count of Distributing Oxycodone Not for Legitimate Medical Purposes in the Usual Course of Professional Medical Practice and Beyond the Bounds of Medical Practice. Kostenko was the owner, operator, and sole physician at Coal Country Clinic, located in Daniels, West Virginia. On a single day, December 9, 2013, Kostenko wrote 375 prescriptions for Oxycodone to 271 "patients" who had arrived at his house that day seeking Oxycodone. Kostenko wrote those prescriptions, totaling 22,255 Oxycodone pills, without seeing any of the "patients" and while collecting over $20,000 in cash payments. None of the 371 prescriptions Kostenko wrote that day were for a legitimate medical purpose. Kostenko was sentenced to 20 years' incarceration.[328]

660.    According to the Superseding Indictment, "[b]etween 2012-2014, defendant and his staff confronted pharmacies and filed complaints with the West Virginia Board of Pharmacy against pharmacies that refused to fill prescriptions written by defendant."[329]

661.    On February 13, 2018, 69-count indictment was unsealed charging a total of 12 individuals with operating the HOPE Clinic, a "pill mill" which operated as a purported pain management clinic in Beckley (Raleigh County), Beaver (Raleigh County) and Charleston, West Virginia (Kanawha County), as well as Wytheville, Virginia (Wythe County), from November 2010 to June 2015.  They also owned HOPE locations in Whitehall, West Virginia; Fisherville and Mechanicsville, Virginia; and Murfreesboro, Tennessee.  Included in the indictment are:

- James H. Blume, Jr., D.O,

- Mark T. Radcliffe, Shady Springs, West Virginia;

---

[328] *Id.*

[329] Superseding Indictment, *United States v. Kostenko*, Crim. No. 5:16-cr-00221, at 5 (S.D.W.V. March 22, 2017), Dkt. No. 54.

- Joshua Radcliffe, Shady Springs, West Virginia;

- Michael T. Moran, M.D., Beckley and Beaver, West Virginia (2012-13);

- Sanjay Mehta, D.O., Beckley and Beaver, West Virginia (2012-15);

- Brian Gullett, D.O., Charleston, West Virginia (2012-14);

- Vernon Stanley, M.D., Charleston, West Virginia (2012-14);

- Mark Clarkson, D.O., Wytheville, Virginia (2013-15);

- William Earley, D.O., Charleston, West Virginia (2013-14);

- Paul W. Burke, M.D., Charleston, West Virginia (2014);

- Roswell Tempest Lowry, M.D., Charleston, West Virginia (2014); and

- Teresa Emerson, LNP, Blytheville, Virginia (2014-15).[330]

662.    According to the Superseding Indictment, area pharmacies "began to refuse to fill prescriptions from practitioners of the HOPE clinic."[331]  According to Relator Rosenberg, Rite Aid was not one of those pharmacies.

663.    Relator Rosenberg's Beckley Rite Aid location routinely filled prescriptions from those bad doctors. The bad prescriptions included numerous "Holy Trinity" prescriptions.

664.    In fact, the pharmacy staff used to joke about the "Wednesday Club" which was the club of regular patients of Dr. Kostenko who would show up every Wednesday to fill their pain prescriptions. When Dr. Kostenko was finally shut down, Relator Rosenberg marked it as "Goodbye Kostenko Day" on the pharmacy's calendar.

---

[330] Indictment, *United States v. Blume, et al.*, Crim. No. 5:18-cr-00026 (S.D.W.V. Feb. 15, 2018), Dkt. No. 4.

[331] Superseding Indictment, *United States v. Blume, et al.*, Crim. No. 5:18-cr-00026, at 12 (S.D.W.V. March 13, 2018), Dkt. No. 139.

665.    He called the West Virginia Board of Pharmacy and Medical Board about the bad doctors, but never got anywhere with his complaints.

666.    All the while, Rite Aid continued to fill the doctors' prescriptions. He was often told as a pharmacy technician not to question the doctor or the pharmacist decisions, even if it was clear to him that the prescriptions were inappropriate. He was told questioning prescriptions "was not his job."

667.    He recalls many examples of highly-questionable dispensing. In one incident, he reported to the pharmacist that one of their customers was snorting pills in the parking lot. But the pharmacist ignored this information saying to him "[w]ell, I did not see it" as justification to keeping the individual as a customer at the pharmacy.

668.    The pharmacy also had a customer fall asleep on the blood pressure device because he was so out of it. Yet, Rite Aid still filled the same customer's prescriptions.

669.    After many of the pill mill doctors in the area got shut down, the Rite Aid location started to see prescriptions coming in from doctors many miles away. In particular, they started to see many patients from Jonathan Shelton, PA from a Wytheville, Virginia pain clinic. Shelton has extremely high prescription counts for opioids, ranking #1 amongst his peers according to ProPublica's Physician Checkup database.[332]

670.    PAs can prescribe controlled substances in Virginia, but not in West Virginia. That is why Relator Rosenberg believes the customers were going so far away. Wytheville is over an hour away from Beckley (~75 miles). Despite the large distance, Rite Aid never questioned prescriptions from these patients and always filled them.

---

[332]    Jonathan        Shelton,        ProPublica        Prescriber        Checkup, https://projects.propublica.org/checkup/providers/1063859544.

202

671. Likewise, Relator Rosenberg recalls that a woman who routinely filled prescriptions written by a doctor in Michigan at the Rite Aid in Beckley, West Virginia. The pharmacist also allowed the woman to pay for the pain pills using ½ Medicaid and ½ cash, which he believed was explicitly forbidden. Eventually, Rite Aid did stop filling prescriptions for the woman who then moved to Michigan to be able to fill her pain prescriptions more easily.

672. Recognizing that customers of the Rite Aid were abusing narcotics, a pharmacist insisted on selling sterile syringes to a customer "no questions asked." The pharmacist did this because she could tell that the customer was an addict and thought it better to give him clean syringes if he was going to use anyway.

## VIII. INJURY TO GOVERNMENT PROGRAMS RESULTING FROM RITE AID'S ACTIONS

673. Rite Aid is a registered pharmacy which owned, operated, and was in charge of DEA-registered pharmacies throughout the U.S., and (a) knowingly or recklessly dispensed controlled substances without a valid prescription in violation of 21 U.S.C. § 842(a)(1); and (b) knowingly and intentionally dispensed controlled substances outside the usual course of the professional practice of pharmacy, in violation of 21 U.S.C.§ 841(a) and corresponding State statutes.

674. Rite Aid repeatedly failed to exercise its corresponding responsibility as a DEA registrant to ensure that controlled substances were dispensed only pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice. Rite Aid knowingly or recklessly ignored readily identifiable red flags that the controlled substances prescribed were being diverted, abused, or otherwise were not for legitimate medical purposes and dispensed despite unresolved red flags.

675.     Rite Aid's pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where its pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer.

676.     Moreover, even in instances in which a prescriber told a Rite Aid pharmacist that a suspicious prescription had been issued for a legitimate medical purpose, Rite Aid willfully ignored its independent, legally-mandated duty to examine the other, often glaring, evidence that the prescription had, in fact, not been issued for a legitimate medical purpose or that the prescriber had acted outside of the usual course of his or her professional practice and dispense the prescription.

677.     Despite the fact that Rite Aid knew, or had reason to know, from its own robust data collection databases and from red flags, including the sheer volume of opioid drugs being dispensed at numerous many of its pharmacies, that hundreds of thousands of prescriptions were not valid, it nonetheless failed to use its own readily-available and extensive information and resources from its own databases to fulfil its obligations under the CSA and ensure that there was reason to believe these prescriptions it dispensed were issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice.

678.     Rite Aid knew, or had reason to know, the prescriptions were not valid and not only dispensed those prescriptions, but also failed to notify any authority of these issues. Instead, Rite Aid committed affirmative acts to conceal the conspiracy, such as continued filling inappropriate and medically unnecessary prescriptions for opioids in particular. By filling these prescriptions while the conspiracy was ongoing, Rite Aid dispensed hundreds of millions of opioid pills based on illegitimate prescriptions.

679.     Government Programs have been damaged by Rite Aid's unfair, false, misleading, or deceptive acts or practices in the conduct of the pharmaceutical business by failing to investigate, report, and cease dispensing inappropriate or medically unnecessary prescriptions of controlled substances in its pharmacies.

680.     Government Programs have been damaged by Rite Aid's negligent and/or intentional and reckless actions by failing to investigate, report, and halt inappropriate or medically unnecessary prescriptions of controlled substances dispensed at its pharmacies.

## IX.     CAUSES OF ACTION

### COUNT I

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(1)(A))

681.     The United States incorporates herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

682.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the United States of America false or fraudulent claims for payment or approval of Opioids, in violation of 31 U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A).

683.     Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

### COUNT II

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B))

684.     Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

685.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2)and 31 U.S.C. § 3729(a)(1)(B).

686.    The United States of America, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid and may continue to be paying or reimbursing for Opioids prescribed to patients enrolled in Federal Programs.

687.    Because of Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT III

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3); 31 U.S.C. § 3729(a)(1)(C))

688.    Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

689.    Defendant knowingly conspired, and may still be conspiring, with the various health care professionals identified and alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B).  Defendant and these health care professionals committed overt acts in furtherance of the conspiracy as alleged above.

690.    Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV

## (Violation of False Claims Act, 31 U.S.C. § 3729(a)(7); 31 U.S.C. § 3729(a)(1)(G))

691.    Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

692.    Rite Aid knowingly avoided or decreased its obligation to pay or transmit money to the Government.  Specifically, Rite Aid:  (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) Rite Aid knew that the records or statements were false.

693.    Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

## COUNT V

## (Violation of California False Claims Act)

694.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

695.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

696.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

697.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of California or its political subdivisions in violation of Cal. Gov't Code § 12651(a)(7).

698.    The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

699.    Because of Defendant's actions, the State of California, including its political subdivisions, has been, and may continue to be, severely damaged.

## COUNT VI

### (Violation of Colorado Medicaid False Claims Act)

700.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

701.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Colorado, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

702.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

703.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado, or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

704.     The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

705.     Because of Defendant's actions, the State of Colorado and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VII

### (Violation of Connecticut False Claims Act for Medical Assistance Programs)

706.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

707.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and may still be presenting or causing to be presented to, an officer or

employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 4-275(a)(1).

708. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid in violation of Conn. Gen. Stat. § 4-275(a)(2).

709. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions in violation of Conn. Gen. Stat. § 4-275(a)(7).

710. The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state and state subdivision funded health insurance programs.

711. Because of Defendant's actions, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII

### (Violation of Delaware False Claims and Reporting Act)

712. Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

713.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, §1201(a)(1).

714.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, §1201(a)(2).

715.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

716.    The State of the State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health care programs funded by the State of Delaware.

717.    Because of Defendant's actions, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX

### (Violation of District of Columbia False Claims Act)

718.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

719.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

720.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(2).

721.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-381.02(a)(6).

722.     The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the District.

723.    Because of Defendant's actions, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT X

### (Violation of Florida False Claims Act)

724.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

725.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

726.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

727.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

728.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements,

paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance plans funded by the State of Florida or its agencies.

729.    Because of Defendant's actions, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT XI**

**(Violation of Georgia False Medicaid Claims Act)**

730.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

731.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

732.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

733.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

734.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

735.    Because of Defendant's actions, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII

### (Violation of Illinois False Claims Act)

736.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

737.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

738.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

739.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

740.     The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

741.     Because of Defendant's actions, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XIII

### (Violation of Indiana False Claims and Whistleblower Protection Act)

742.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

743.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

744.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

745.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

746.     The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

747.     Because of Defendant's actions, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV

## (Violation of Louisiana Medical Assistance Programs Integrity Law)

748.     Relator incorporates herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

749.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

750.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt

to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

751.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

752.    The State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department, unaware of the falsity of the claims and/or statements made by Defendant, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of Defendant's claims and/or statements in paying for Opioids prescriptions for medical assistance program recipients.

753.    Because of Defendant's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department have been, and may continue to be, severely damaged.

## COUNT XV

### (Violation of Maryland False Health Claims Act)

754.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

755.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false

or fraudulent claims for payment or approval, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(1).

756.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(2).

757.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland, or its political subdivisions, in violation of Md. Code Ann., Health-Gen. § 2-602(a)(8).

758.     The State of Maryland, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

759.     Because of Defendant's actions, the State of Maryland and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVI

### (Violation of Massachusetts False Claims Act)

760.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

761.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

762.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

763.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

764.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

765.    Because of Defendant's actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVII

### (Violation of Michigan Medicaid False Claims Act)

766.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

767.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

768.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

769.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which Defendant were not entitled or in an amount greater than that to which Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

770.    Defendant, in possession of facts under which they are aware or should be aware of the nature of its conduct and that its conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented, or caused to be made or presented, and may still be

making, presenting, or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

771.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

772.    Because of Defendant's actions, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVIII

### (Violation of Nevada False Claims Act)

773.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

774.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

775.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

776.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

777.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

778.     Because of Defendant's actions, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX

### (Violation of New Hampshire False Claims Act)

779.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

780.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer, or agent of the State of New Hampshire, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of the New Hampshire False Claims Act, N.H. RSA 167:61-bI(a), *et seq*.

781.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and may still be making, using, or causing to be made or

used, false records or statements to get false or fraudulent claims paid or approved by the State of New Hampshire, or its political subdivisions, in violation of N.H. RSA 167:61-bI(b).

782. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Hampshire, or its political subdivisions, in violation of N.H. RSA 167:61-bI(e).

783. The State of New Hampshire, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

784. Rite Aid of New Hampshire is incorporated in New Hampshire (Co. Number 20047) and has its principal place of business within New Hampshire (registered office address is 2 ½ Beacon St., Concord NH, 03301) in accordance with N.H. RSA 167:61-c, II(a).

785. Because of Defendant's actions, as set forth above, the State of New Hampshire and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XX

### (Violation of New Jersey False Claims Act)

786. Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

787. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or

intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

788.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

789.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

790.     The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

791.     Because of Defendant's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI

### (Violation of New York False Claims Act)

792.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

793.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

794.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

795.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

796.    The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

797.     Because of Defendant's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII

### (Violation of North Carolina False Claims Act)

798.     Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

799.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

800.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

801.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

802.     The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims

and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of health insurance programs funded by the state or its political subdivisions.

803. Because of Defendant's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIII

### (Violation of Oklahoma Medicaid False Claims Act)

804. Relator incorporates herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

805. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

806. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

807. Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit

money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

808.    The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

809.    Because of Defendant's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIV

## (Violation of Rhode Island False Claims Act)

810.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

811.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

812.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

813.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

814.　The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of Medicaid.

815.　Because of Defendant's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV

### (Violation of Tennessee Medicaid False Claims Act)

816.　Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

817.　Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

818.　Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the

Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

819.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

820.     The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of the Medicaid program.

821.     Because of Defendant's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI

### (Violation of Texas Medical Assistance Program, Damages, and Penalties Act)

822.     Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

823.     Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under

the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

824.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

825.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

826.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

827.   The State of Texas, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

828.    Because of Defendant's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVII

### (Violation of Vermont False Claims Act)

829.    Relators incorporate herein by reference the preceding paragraphs of the Second Amended Complaint as though fully set forth herein.

830.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(1)-(2).

831.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and may still be concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

832.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced, or sought to induce, and may still be making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact

concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Vt. Stat. Ann. tit. 32, § 631(a)(2).

833.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for products that were inappropriate, in violation of Vt. Stat. Ann. tit. 32, § 631(a).

834.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs for recipients of Medicaid.

835.    Because of Defendant's actions, as set forth above, the State of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVIII

### (Violation of Virginia Fraud Against Taxpayers Act)

836.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

837.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

838.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

839.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

840.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

841.    Because of Defendant's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIX

### (Violation of Washington Medicaid False Claims Act)

842.    Relators incorporate herein by reference the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

843.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of Wash. Rev. Code § 74.66.020(1)(a).

844.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

845.    Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Washington, or its political subdivisions, in violation of Wash. Rev. Code § 74.66.020(1)(g).

846.    The State of Washington, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for Opioids prescriptions for recipients of state funded health insurance programs.

847.    Because of Defendant's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** Relators pray for judgment against Defendant as follows:

A.    That Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et*

*seq.*; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; Conn. Gen. Stat. §§ 4-274 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Md. Code Ann., Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.H. RSA 167:61-bI(a), *et seq.;* N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.;* R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; Wash Rev. Code §§ 74.66.005 *et seq.*

B.    That judgment be entered against Defendant in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3),[333] to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

C.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more

---

[333] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a),[334] to the extent such penalties shall fairly compensate the State of California or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

D.      That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

E.      That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Conn. Gen. Stat. § 4-275(b)(1),[335] to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes

---

[334] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

[335] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

F.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

G.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

H.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate the State of Georgia or its political subdivisions for losses resulting from the various schemes

239

undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

I.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

J.    That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no less than five thousand five hundred dollars ($5,500) and no more than eleven thousand dollars ($11,000) per false claim, plus payment of interest as provided for in La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

K.    That judgment be entered in Relators' favor and against Defendant for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) per false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the

State of Maryland or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

L.    That judgment be entered in Relators' favor and against Defendant for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of Defendant's actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B,[336] to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

M.    That judgment be entered in Relators' favor and against Defendant for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of Defendant's unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relators, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various

---

[336] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

N.      That judgment be entered in Relators' favor and against Defendant for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927)  per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c),[337] to the extent such multiplied penalties shall fairly compensate the State of Nevada for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

O.      That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of New Hampshire or its political subdivisions multiplied as provided for in N.H. RSA 167:61-bI(a), *et seq.*, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Hampshire or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

P.      That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not

---

[337] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Q.     That judgment be entered in Relators' favor and against Defendant for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

R.     That judgment be entered in Relators' favor and against Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

S.      That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

T.      That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

U.      That judgment be entered in Relators' favor and against Defendant for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code

Ann. § 71-5-182(a)(l),[338] to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

V.     That judgment be entered in Relators' favor and against Defendant for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of Defendant's unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a) and Tex. Hum. Res. Code Ann. § 32.039, multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus an administrative penalty not to exceed twice the amount paid, as provided by Tex. Hum. Res. Code. Ann. § 32.039(c)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Tex. Hum. Res. Code Ann. § 36.052(a)(3)(A) & (B), plus an administrative penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act, pursuant to Tex. Hum. Res. Code. Ann. § 32.039(c)(2)(A) & (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

---

[338] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

W.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631(b)(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(1), as well as the costs incurred by the State of Vermont, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

X.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Y.    That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020 (1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Wash. Rev. Code § 74.66.020(1) and Wash. Admin. Code

§ 44-02-010,[339] to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Z.      That Defendant be ordered to disgorge all sums by which they have been enriched unjustly by its wrongful conduct;

AA.     That judgment be granted for Relators against Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators in the prosecution of this suit;

BB.     That the Court issue an order enjoining the Defendant from continuing to engage in the fraudulent conduct alleged herein; and

CC.     That this Court award such further relief as it deems just and proper.

---

[339] These figures are subject to change pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. 101-410, 104 Stat. 890 (Oct. 5, 1990), as amended.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated:  November 16, 2020

**BARON & BUDD, P.C.**

By: _____
     W. Scott Simmer

W. Scott Simmer (admitted *pro hac vice*)
ssimmer@baronbudd.com
William G. Powers (PA Bar No. 316876)
wpowers@baronbudd.com
**BARON & BUDD, P.C.**
The Watergate, 10th Floor
600 New Hampshire Ave., NW
Washington, DC  20037
Telephone:  (202) 333-4562
Facsimile:  (202) 337-1039

*Attorneys for Plaintiffs/Relators*